## IN THE DISTRICT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ALABAMA, NORTHEASTERN DIVISION

| | |
|---|---|
| ALABAMA EDUCATION ASSOCIATION, an Alabama non-profit corporation; A-VOTE, an Alabama political committee; PAM HILL; CATHEY MCNEAL; JEFF BREECE; CHASSITY SMITH; DOROTHY J. STRICKLAND; and RONALD SLAUGHTER, | CIVIL ACTION NO. |
| Plaintiffs, | |
| v. | |
| ROBERT BENTLEY, in his official capacity as Governor of the State of Alabama and President of the State Board of Education; JOSEPH B. MORTON, in his official capacity as Superintendent of Education; THOMAS L. WHITE, JR., in his official capacity as Comptroller of the State of Alabama; DAVID PERRY, in his official capacity as Director of Finance of the State of Alabama; FREIDA HILL, in her official capacity as Chancellor of Postsecondary Education; CITY OF MADISON BOARD OF EDUCATION; MADISON COUNTY BOARD OF EDUCATION; HUNTSVILLE CITY BOARD OF EDUCATION; ROBERT L. BROUSSARD, in his official capacity as the District Attorney for Madison County; NICK ABBETT, in his official capacity as the District Attorney for Lee County. | |
| Defendants. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### I. NATURE OF THE ACTION

1. In this lawsuit, Plaintiffs are challenging legislation rushed through an extraordinary special session of a newly elected legislature, at the behest of a governor with weeks left in his final term of office, for the purpose of harming and retaliating against an employee organization because of its constitutionally protected advocacy regarding issues and candidates. The challenged

legislation was enacted in the guise of "ethics reform" but is designed to silence political

opposition.  As detailed below, the legislation infringes Plaintiffs' rights to free speech, equal

protection of the laws, and due process of law, in violation of the First and Fourteenth

Amendments to the United States Constitution.

2.  Plaintiffs challenge the constitutionality of Act 2010-761 ("the Act"), which was

passed by the Alabama Legislature on December 15, 2010, and signed by then-outgoing Governor

Robert Riley on December 20, 2010.  Plaintiffs challenge the Act, pursuant to 42 U.S.C. § 1983, as

a violation of the First and Fourteenth Amendments to the United States Constitution.  Plaintiffs

seek a declaratory judgment that the Act is unconstitutional in multiple respects, an injunction

against implementation and enforcement of the Act, and attorneys' fees, pursuant to 28 U.S.C.

§§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, the Court's inherent

equitable powers, and 42 U.S.C. § 1988.

## II.  JURISDICTION AND VENUE

3.  This Court has federal-question jurisdiction under 28 U.S.C. § 1331, as this case

arises under 42 U.S.C. § 1983 and the Constitution of the United States.

4.  Venue is proper in this Court under 28 U.S.C. § 1391(b).

## III.  PARTIES

5.  Plaintiff AEA is a voluntary membership organization with some 75,000 active

members.  AEA is a non-profit corporation organized under the laws of the State of Alabama.

6.  Plaintiff Alabama Voice of Teachers for Education (A-VOTE) is registered with the

Alabama Secretary of State as a political action committee, associated with AEA.

7.  AEA's active members are professional educators and education support

professionals employed by the State of Alabama, the Department of Postsecondary Education

("DPE"), Alabama four year universities, postsecondary institutions under the DPE, and local

boards of education. The vast majority of AEA members have executed voluntary requests to have their membership dues for AEA, as well as voluntary contributions to A-VOTE, deducted from their paychecks, and this has been the case for decades.

8. Plaintiff Pam Hill is an education support professional employed by the Huntsville City Board of Education and a member of AEA. For several years, Plaintiff Hill has paid her AEA membership dues and made voluntary contributions to A-VOTE by means of payroll deductions administered by the Huntsville City Board of Education because it is the most convenient and efficient way to make these voluntary payments. Plaintiff Hill wishes to continue to pay AEA dues and make voluntary contributions to A-VOTE, but fears prosecution if, after the Act becomes effective, she continues to pay for her membership dues and voluntary contributions to A-VOTE by means of payroll deduction.

9. Plaintiff Cathy McNeal is professional educator employed by the Huntsville City Board of Education and a member of AEA. For several years, Plaintiff McNeal has paid her AEA membership dues and made voluntary contributions to A-VOTE by means of payroll deductions administered by the Huntsville City Board of Education because it is the most convenient and efficient way to make these voluntary payments. Plaintiff McNeal wishes to continue to pay AEA dues and make voluntary contributions to A-VOTE, but fears prosecution if, after the Act becomes effective, she continues to pay for her membership dues and voluntary contributions to A-VOTE by means of payroll deduction.

10. Plaintiff Chassity Smith is professional educator employed by the City of Madison Board of Education and a member of AEA. For several years, Plaintiff Smith has paid her AEA membership dues and made voluntary contributions to A-VOTE by means of payroll deductions administered by the City of Madison Board of Education because it is the most convenient and efficient way to make these voluntary payments. Plaintiff Smith wishes to continue to pay AEA

3

dues and make voluntary contributions to A-VOTE, but fears prosecution if, after the Act becomes effective, she continues to pay for her membership dues and voluntary contributions to A-VOTE by means of payroll deduction.

11. Plaintiff Jeff Breece is a professional educator employed by the Madison County Board of Education and a member of AEA. For several years, Plaintiff Breece has paid his AEA membership dues and made voluntary contributions to A-VOTE by means of payroll deductions administered by the Madison County Board of Education because it is the most convenient and efficient way to make these voluntary payments. Plaintiff Breece wishes to continue to pay AEA dues and make voluntary contributions to A-VOTE, but fears prosecution if, after the Act becomes effective, he continues to pay for his membership dues and voluntary contributions to A-VOTE by means of payroll deduction.

12. Plaintiff Dorothy J. Strickland is professional educator employed by the Lee County School District and a member of AEA. For several years, Plaintiff Strickland has paid her AEA membership dues and made voluntary contributions to A-VOTE in cash. Plaintiff Strickland wishes to continue to pay AEA dues and make voluntary contributions to A-VOTE, but fears prosecution if, after the Act becomes effective, she continues to pay for her membership dues and voluntary contributions to A-VOTE in cash, because the Act can be read to prohibit public employees from arranging for the payment, by any means, of PAC contributions or membership dues to an organization that uses such dues for political activity.

13. Plaintiff Ronald Slaughter is professional educator employed by Alabama Agricultural and Mechanical University and a member of AEA. For several years, Plaintiff Slaughter has paid his AEA membership dues and made voluntary contributions to A-VOTE in cash. Plaintiff Slaughter wishes to continue to pay AEA dues and make voluntary contributions to A-VOTE, but fears prosecution if, after the Act becomes effective, he continues to pay for his

membership dues and voluntary contributions to A-VOTE in cash, because the Act can be read to prohibit public employees from arranging for the payment, by any means, of PAC contributions or membership dues to an organization that uses such dues for political activity.

14.    Defendant Robert Bentley is the Governor of State of Alabama. In that capacity, Defendant Bentley exercises "supreme executive authority" and is obligated to "take care that the laws be faithfully executed." Ala. Const. Art. 5, §§ 113, 120. By virtue of his elected office, Defendant Bentley also serves as President of the State Board of Education. In his capacity as Governor of Alabama, Defendant Bentley has the ultimate power and duty to implement and enforce the Act. In his capacity as President of the State Board of Education, Defendant Bentley is responsible for the control and supervision of the public schools in Alabama, *see* Ala. Const. Art. XIV, § 262; Ala. Code § 16-3-11, and thus for the implementation and enforcement of the Act's prohibitions and restrictions on payroll deductions. Defendant Bentley is sued in his official capacity.

15.    Defendant Joseph B. Morton is the State Superintendent of Education. In that capacity, Defendant Morton is the Chief School Officer in the State of Alabama, responsible for explaining the meaning and intent of laws relating to public schools, deciding all controversies and disputes involving the proper administration of the public school system, and reviewing actions and orders of county and city boards of education and of county superintendents of education and city superintendents of schools in matters relating to finance. *See* Ala. Code §§ 16-4-4, 16-4-8. Pursuant to these responsibilities, Defendant Morton sought guidance from the Alabama Attorney General on the implementation and enforcement of the Act, and, pursuant to that guidance, directed that City and County Superintendents "take the necessary steps to end the deduction of membership dues after issuing the February [2011] paychecks." Accordingly, Defendant Morton has a key role in implementing and enforcing the Act's prohibitions and

5

restrictions on payroll deductions with respect to Alabama public schools.  Defendant Morton is sued in his official capacity.

16.  Defendant Thomas L. White, Jr., is the Comptroller of the State of Alabama.  In that capacity, Defendant White directs, supervises, and controls the Finance Department's Division of Control and Accounts, which in turn is responsible for keeping all books, records, and accounts relating to the finances of State government as well as controlling and making records of all payments into and out of the State treasury and each special fund and account therein.  *See* Ala. Code §§ 41-4-50, 41-4-51.  Accordingly, Defendant White is ultimately responsible for the administration of deductions from state employees' pay and therefore has a key role in implementing and enforcing the payroll deduction prohibitions and restrictions of the Act.  Defendant White is sued in his official capacity.

17.  Defendant David Perry is the Director of Finance of the State of Alabama.  In that capacity, Defendant Perry is the chief financial officer of the state and is responsible for the administration of the Department of Finance.  Defendant Perry is responsible for statewide policies governing payroll deductions by state employers and therefore has a key role in implementing and enforcing the payroll deduction prohibitions and restrictions of the Act. Defendant Perry is sued in his official capacity.

18.  Defendant Freida Hill is Chancellor of Postsecondary Education.  In that capacity, Defendant Hill directs and supervises the administration of the Alabama Community College System, including the administration of deductions from the pay of Alabama Community College employees.  Accordingly, Defendant Hill has a key role in implementing and enforcing the Act's prohibitions and restrictions on payroll deduction in the Alabama Community College System.  Defendant Hill is sued in her official capacity.

19.  Defendant Huntsville City Board of Education administers and manages the public schools within the City of Huntsville.  Ala. Code § 16-11-9.  Defendant Huntsville City Board of Education administers and manages deductions from the City of Huntsville school employees' pay and therefore is responsible for implementing and enforcing the payroll deduction prohibitions and restrictions of the Act.

20.  Defendant City of Madison Board of Education administers and manages the public schools within the City of Madison.  Ala. Code § 16-11-9.  Defendant City of Madison Board of Education administers and manages deductions from the pay of City of Madison school employees and therefore is responsible for implementing and enforcing the payroll deduction prohibitions and restrictions of the Act.

21.  Defendant Madison County Board of Education administers and supervises county public schools within Madison County.  Ala. Code 1975 § 16-8-8.  Defendant Madison County Board of Education administers and supervises deductions from the pay of Madison County school employees and therefore is responsible for implementing and enforcing the payroll deduction prohibitions and restrictions of the Act.

22.  Defendant Robert L. Broussard is the District Attorney for Madison County.  In that capacity, Defendant Broussard is charged with the duty of enforcing the criminal provisions of the Act within Madison County.  Defendant Broussard is sued in his official capacity.

23.  Defendant Nick Abbett is the District Attorney for Lee County.  In that capacity, Defendant Abbett is charged with the duty of enforcing the criminal provisions of the Act within Lee County.  Defendant Abbett is sued in his official capacity.

## IV.  PAYROLL DEDUCTION OF MEMBERSHIP DUES AND PAC CONTRIBUTIONS PRIOR TO THE ACT

24.  AEA's mission is to promote educational excellence, advocate for its members, and lead in the advancement of equitable and quality public education for a diverse population. In support of this mission, AEA engages in numerous activities, many of which can be considered to be "political activity" as that term is used in the Act.

25.  For example, AEA advocates on an array of issues that are of concern to its members, including questions relating to tax policy, pension and insurance issues, education funding, tenure protections for education employees, school curriculum, and charter schools.

26.  To advance its mission, and ensure that AEA's members have a voice in the legislature, AEA has sponsored A-VOTE as a vehicle for members who wish to support candidates whose positions are consistent with AEA's missions and goals.  Voluntary contributions to A-VOTE provide contributing members of AEA an opportunity to participate in the electoral process and to support and elect candidates of their choice.

27.  For decades, Alabama law has permitted local boards of education and certain higher education institutions to administer payroll deductions "for, but not limited to, savings plans, tax sheltered annuities, the Public Employees' Individual Retirement Account Fund, membership dues, voluntary contributions, and group insurance premiums."  Ala. Code § 16-22-6. For decades Alabama law also has permitted the State of Alabama to administer payroll deductions "for membership dues, and voluntary contributions, and insurance premiums."  Ala. Code § 36-1-4.3.

28.  State and local officials have long implemented the statutes cited in ¶ 27 above by honoring employee requests for the payment of membership dues to employee organizations such as AEA and for the payment of voluntary contributions to political action committees associated with employee organizations such as Plaintiff A-VOTE.

8

29.  Hence, for decades, membership organizations such as Plaintiff AEA and political action committees such as A-VOTE have collected membership dues and voluntary PAC contributions, respectively, by means of payroll deduction.

30.  That practice neither resulted, nor was perceived to result, in governmental involvement in political activities, and the practice neither constituted nor was perceived as constituting governmental support for any political point of view.

31.  Payroll deduction is the easiest and most convenient way for members of AEA to pay their membership dues and to make voluntary contributions to A-VOTE.  Likewise, payroll deduction is the easiest and most convenient way for AEA to collect both membership dues and voluntary contributions to A-VOTE.

## V.  EVENTS LEADING UP TO THE PASSAGE OF THE ACT

32.  The political viewpoints and candidates that have been supported by AEA and A-VOTE have frequently been ones that the Riley administration and other leading Republican political figures have opposed.

33.  For example, although AEA and A-VOTE have supported Democratic and Republican candidates over the years, both have supported Democratic candidates more frequently than Republican ones.  The same has been true of most public employee organizations in Alabama and their associated PACs.

34.  The positions espoused by AEA on political issues likewise were often opposed by members of the Riley Administration and by other Republican leaders.

35.  For example, in 2007, AEA vocally opposed Riley's recommended appointment of Bradley Byrne to the post of Chancellor of DPE.  In late 2009 and early 2010, Governor Riley criticized AEA for its opposition to legislation authorizing charter schools.  And, in 2010, AEA and Riley clashed over a State Board of Education policy prohibiting two-year college system

employees from serving in the state legislature. Riley (then serving as both Governor of Alabama and *ex officio* President of the State Board of Education) and Bradley Byrne (whom Riley had appointed to be Chancellor of DPE) both supported the policy. AEA vocally opposed that policy, and brought a lawsuit to invalidate it.

36.  AEA's positions on political issues also have been strongly criticized by Bradley Byrne, who, with Riley's endorsement, ran unsuccessfully for the Republican gubernatorial nomination in 2010.

37.  AEA and Byrne had taken opposing positions on numerous issues while Byrne was a state senator and, later, Chancellor of DPE. For instance, in 2004, then-State Senator Byrne launched a filibuster against a teacher tenure bill supported by AEA, and AEA vocally and successfully lobbied for cloture votes to end Byrne's filibuster. As noted in ¶ 35 above, in 2010, then-Chancellor of DPE Byrne supported a State Board of Education policy prohibiting two-year college employees from serving in the legislature, a policy that AEA vociferously opposed.

38.  During his gubernatorial campaign, Byrne attacked AEA as "the single greatest impediment to quality education in this state," and as "stand[ing] for the worst" in the teaching profession.

39.  During the Republican primary campaign, AEA opposed Byrne and supported his opponent, who won the nomination. Riley, on the other hand, endorsed Byrne. Both Riley and Byrne publicly expressed their opposition to AEA's playing any role in the Republican primary by way of, for example, Byrne's statement on October 6, 2009 that "AEA money isn't welcome in the Republican primary," and Riley's statement on June 26, 2010 that "we do not support the AEA and we don't want 'em in our primary and we don't want anyone that wants 'em in our primary."

40.  On June 28, 2010—two days after Governor Riley stated his desire that AEA stay out of the Republican primary—Alabama Comptroller Thomas White announced to all state departments, agencies and personnel officers that, "Payroll deductions for Political Action Committees (PACs) will no longer be withheld from employees' pay effective July 1, 2010." Comptroller White subsequently amended the Fiscal Policy and Procedures Manual—which had expressly authorized payroll deductions for PAC contributions—to omit any mention of PACs as recipients of voluntary contributions.  The Comptroller purported to have come to the view that, even though such requests had been honored and effectuated for decades, longstanding statutory authority—in particular, the provision of Ala. Code § 17-17-5 prohibiting public employees from "us[ing] any state, county, or city funds, property, or time, for any political activities"—made it unlawful for the State to comply with such payroll deduction requests.

41.  In a subsequent press release, then-Governor Riley explained that the Comptroller's actions regarding payroll deduction were due to his administration, stating that "the Riley administration stopped payroll deductions …."

42.  Commenting on the Comptroller's actions, the editorial board of the *Birmingham News* reported that "Riley is ... on the warpath against state employees' groups."  Birmingham News Editorial Board, "Our View:  Riley's Administration Ends State Employees' Payroll Deductions for Political Purposes," *Birmingham News* (Sept. 6, 2010), available at http://blog.al.com/birmingham-news-commentary/2010/09/our_view_rileys_administration.html.

43.  On November 2, the voters of Alabama elected a state legislature that is, for the first time in more than a century, controlled by members of the Republican Party.  The new Republican majority consists almost exclusively of legislators that AEA and A-VOTE failed to support or actively opposed during the 2010 election campaign.

11

44. The members of the legislature elected on November 2 took office the following day, but were not scheduled to meet in a regular legislative session until March 2011, after the end of then-Governor Riley's second and final term of office on January 17, 2011.

45. On December 1, 2010, then-Governor Riley took the extraordinary step of calling a special session of the newly elected legislature in order to address a package of "ethics reforms."

46. One such "ethics reform" proposed by then-Governor Riley was an amendment to Ala. Code § 17-17-5 to prohibit payroll deductions for contributions to PACs.

47. On December 10, 2010, Senator Marsh introduced in the Alabama Senate a bill to prohibit public employees from "arrang[ing] by salary deduction or otherwise" for the payment of "dues for any membership organization which engages, directly or indirectly, in political activity" as well as to prohibit public employees from "arrang[ing] by salary deduction or otherwise" for the payment of PAC contributions.

48. On information and belief, defeated gubernatorial candidate Byrne participated in the drafting of the legislation and heavily lobbied Republican lawmakers to support it. Indeed, Byrne lobbied legislators on the floor of the legislature while the legislation was being debated.

49. On information and belief, a majority of the members of the new legislature share then-Governor Riley's antipathy toward the political activities of AEA and A-VOTE, and/or were recruited by then-Governor Riley and/or his supporters to support the Riley administration's campaign against those activities through legislation.

50. During the debate over the proposed legislation, both the Senate and the House defeated amendments that would have permitted payroll deductions if the organization collecting the contributions paid the full administrative costs of administering such deductions.

51. State and/or local governmental entities in Alabama belong to membership organizations such as the Alabama League of Municipalities ("ALM") and the Alabama

12

Association of School Boards ("AASB"), which engage in activities that are "political" within the meaning of the Act. State and/or local governmental entities use public funds to pay their membership dues to such organizations. At the behest of ALM and AASB, the legislature preserved the ability of government entities to use public funds to pay dues to organizations like ALM and AASB to be used for political activity, even as it was prohibiting the use by employees of payroll deduction to pay membership dues to public employee organizations like AEA. This was accomplished by amending the proposed legislation so that payroll deduction of membership dues would only be prohibited as to "dues of any person … employed" by a government entity.

52. On December 15, 2010, the legislation as amended passed the House by a margin of three votes and passed the Senate by a margin of ten votes. Then-Governor Riley signed the bill on December 20, 2010. Alabama Laws 1st Sp. Sess. Act 2010-761 (S.B. 2).

## V. THE ACT

53. Prior to the Act's amendments, Alabama Code § 17-17-5 prohibited state and local government employees from using public "funds, property, or time for any political activities"; provided that any political activities by public employees must be conducted while on personal time or approved leave; and prohibited public employees from soliciting political contributions from subordinates or coercing subordinates to "work in any capacity in any political campaign or cause." It also provided that "[a]ny person who violates this section shall be guilty of the crime of trading in public office."

54. The Act drastically amended and reoriented § 17-17-5. The Act carries forward the original prohibition against the use of public resources for "political activities" stated in the first sentence of § 17-17-5, with some minor amendments, into a new subsection (a), and adds a new, far-reaching subsection (b) to the statute. The remaining sentences of the old § 17-17-5 are included in a new subsection (c).

55. The first sentence of the new subsection (b) provides that:

> No person in the employment of the State of Alabama, a county, a
> city, a local school board, or any other governmental agency may
> arrange by salary deduction or otherwise for any payments to a
> political action committee or arrange by salary deduction or
> otherwise for any payments for the dues of any person so
> employed to a membership organization which uses any portion of
> the dues for political activity. [Act 2010-761 § 1 (to be codified at
> Ala. Code § 17-17-5(b)).]

56. The Act's new subsection (b) goes on to define "political activity," for the purpose
of this subsection only, as:

> (1) Making contributions to or contracting with any entity which
> engages in any form of political communication, including
> communications which mention the name of a political candidate.
> (2) Engaging in or paying for public opinion polling.
> (3) Engaging in or paying for any form of political communication,
> including communications which mention the name of a political
> candidate.
> (4) Engaging in or paying for any type of political advertising in
> any medium.
> (5) Phone calling for any political purpose.
> (6) Distributing political literature of any type.
> (7) Providing any type of in-kind help or support to or for a
> political candidate. [Act 2010-761 § 1 (to be codified at Ala. Code
> § 17-17-5(b)).]

57. No provision in the Act—and no provision elsewhere in the Alabama Code—
defines the term "political" or the key concepts in the definition: "political communication,"
"public opinion polling," "political advertising," "political purpose," or "political literature."

58. The Act's new subsection (b) goes on to prescribe the process that a membership
organization must undergo in order to qualify for payroll deduction of membership dues:

> Any organization that requests the State of Alabama, a county, a
> city, a local school board, or any other governmental agency to
> arrange by salary deduction or otherwise for the collection of
> membership dues of persons employed by the State of Alabama, a
> county, a city, a local school board, or any other governmental

14

agency shall certify to the appropriate governmental entity that none of the membership dues will be used for political activity. Thereafter, at the conclusion of each calendar year, each organization that has arranged for the collection of its membership dues of persons employed by the State of Alabama, a county, a city, a local school board, or any other governmental agency shall provide the appropriate governmental entity a detailed breakdown of the expenditure of the membership dues of persons employed by the State of Alabama, a county, a city, a local school board, or any other governmental agency collected by the governmental entity. [Act 2010-761 § 1 (to be codified at Ala. Code § 17-17-5(b)).]

59. The Act's new subsection (b) further provides:

Any organization that fails to provide the required certifications, that reports any expenditures for political activity or that files false information about political activity in any of its reports shall be permanently barred from arranging for the collection of its membership dues by any governmental entity. The Examiners of Public Accounts shall annually review a sample of at least ten percent of the certifications filed with each governmental entity and report its findings to the appropriate governmental entity. [Act 2010-761 § 1 (to be codified at Ala. Code § 17-17-5(b)).]

60. The Act's new subsection (c), *inter alia*, carries forward the criminal penalties set forth in the original law: "Any person who violates this section shall be guilty of the crime of trading in public office and upon conviction thereof, shall be fined or sentenced, or both, as provided by Section 13A-10-63." Act 2010-761 § 1 (to be codified at Ala. Code § 17-17-5(b)). Section 13A-10-63, in turn, provides that "trading in public office" is a Class A misdemeanor, which means a violation is punishable by imprisonment for up to one year and a fine of up to $6,000.00. *See* Ala. Code §§ 13A-5-7, 13A-5-12.

61. Pursuant to the statutory authority cited in ¶ 27 above, Alabama public employers set up payroll deduction systems for a variety of purposes—*e.g.*, withholding income and payroll taxes, allowing employees to pay their insurance premiums and make retirement contributions, and allowing employees to contribute to charities. The marginal cost of administering additional payroll deductions for membership dues and voluntary PAC contributions is *de minimis*.

15

62.  In enacting the Act, neither the legislature nor then-Governor Riley was concerned about whether administering payroll deductions actually would entail any costs for public employers, as evidenced by the facts that the legislature rejected amendments that would have allowed such deductions if paid for by the organization receiving the payroll deductions for dues or PAC contributions, and that neither the Comptroller, the Department of Finance, nor the legislature made any findings as to the costs, if any, incurred by public employers in processing such deductions.

63.  The Act permits state and/or local governmental entities in Alabama to continue allowing their employees to make contributions through payroll deduction to charitable organizations, mutual insurance companies, and credit unions, which are membership organizations and which engage in activities that are "political" as that term is used in the Act.

## VI. EFFECTS OF THE ACT IN THE ABSENCE OF INJUNCTIVE RELIEF

64.  Unless enjoined by this Court, the Act will prohibit any state or local government employee—on pain of criminal sanctions—from "arrang[ing]," by payroll deduction or otherwise, for the payment of any contribution to a PAC, or for the payment of membership dues to any public employee organization, such as AEA, if the organization uses "any portion of the dues," however small, for any "political activity" as broadly and vaguely defined in the Act.  Act 2010-761 § 1 (to be codified at Ala. Code § 17-17-5(b) and (c)).

65.  The Act, furthermore, conditions the collection of payroll-deducted membership dues for a public employee organization such as Plaintiff AEA upon the organization's acceptance of far-reaching restrictions on its speech regarding elections, candidates, and issues. Such an organization cannot use "any portion" of the dues so collected for any "political activity" as broadly and vaguely defined in the Act.  The Act then aggravates that condition by requiring that, in order to qualify for dues deductions, a public employee organization such as

16

AEA must submit a certification to the public employer that it will use no dues collected through payroll deduction for any "political activity" and must, at the end of the year, submit a "detailed breakdown of its dues expenditures"—thus opening its books to the employer to demonstrate that it complied with the certification and the Act's prohibitions.  Under this scheme, a public employee organization that endeavors to meet these conditions does so at the risk of being "permanently barred" from receiving payroll deductions in the event that so much as one penny of the dues collected through payroll deduction is found to have been used for "political activity."  And the Act apparently delegates to officials from the various public employers throughout the state—as well as the Examiners of Public Accounts—the role of determining what does and does not constitute "political activity."

      66.  The Act's broad definition of "political activity" is vague.  The definition lists seven types of activity that qualify as "political"—but the types of activity listed are themselves vaguely worded and in almost all cases rely, in a circular fashion, on the adjective "political."  Neither the legislation, nor any other provision of the Alabama Code, defines the word "political" or any of the key concepts within the statue:  "political communication," "public opinion polling," "political advertising," "political purpose," and "political literature."  It is therefore unclear, for example, whether the definition extends to pure issue advocacy as well as to communications relating to the election or defeat of candidates for office.  It also is unclear whether a public employee organization is disqualified from receiving dues deductions if it conducts a poll purely on issues rather than candidates in an election and, as well, whether such disqualification would follow from a purely internal poll of members rather than a poll of the general public.  The vague and open-ended nature of the term "political activity" and its definition leaves public employee organizations with no clear guidance as to how they might

conduct their affairs so as to make the required certifications and "detailed breakdown[s]" of expenditures in order to retain payroll deduction.

67. The Act's prohibition prevents payroll deduction for membership dues for any public employee organization unless the organization has certified that *no* portion of those dues—however small that portion may be—will be used for "political activity," and even if the organization would pay for any costs associated with the use of payroll deduction. No legitimate government interest is served by that broad prohibition: Public employee organizations collect dues to engage in a variety of activities, not just activities that are "political," and a governmental agency could not reasonably be regarded as involving itself in political activity, or as providing support for any political point of view, merely by allowing payroll deduction of dues without insisting on a certificate that the organization will not use any portion of its dues for "political activity." And even if a legitimate interest could be hypothesized, the prohibition has no rational, let alone substantial, relationship to any such interest.

68. Nor is any legitimate government interest served by the Act's further intrusive requirement that an organization that receives payroll deduction for membership dues must not only certify that it will comply with the Act in advance, but also affirmatively prove its compliance at the end of each year by providing a "detailed breakdown" of its expenditures. And even if a legitimate interest in imposing these conditions could be hypothesized, the conditions have no rational, let alone substantial, relationship to such an interest.

69. The Act states that "[n]o person in the employment of the State of Alabama, a county, a city, a local school board, or any other government agency may arrange by salary deduction *or otherwise* for any payments to a political action committee or arrange by salary deduction *or otherwise* for any payments for the dues of any person so employed to a

18

membership organization which uses any portion of the dues for political activity" (emphasis supplied).   Nothing in the Act explicitly explains or limits the meaning of "or otherwise."

70.  In a February 16, 2011, letter to Defendant Morton, the Attorney General of Alabama, Luther Strange, wrote that "[a]fter the effective date of [the Act], no employee of a local school board may arrange, by salary deduction or otherwise, for any payments for the membership dues of any person employed by the local school board to be made to a membership organization that uses any portion of the dues for political activity."

71.  Plaintiffs Hill, McNeal, Breece, and Smith are public employee members of AEA who have historically paid their membership dues to AEA and made voluntary contributions to A-VOTE through payroll deduction and wish to continue to do so, but they fear that if they do so after the effective date of the Act, they will be subject to prosecution under the criminal penalties spelled out in the act.

72.  Plaintiff Strickland is a public employee member of AEA who has historically paid membership dues to AEA and voluntary contributions to A-VOTE in cash and wishes to continue to do so, but fears that if she does so, she may be subject to prosecution under the criminal penalties spelled out in the act because the "or otherwise" language of the Act might be understood by a prosecutor to prohibit public employees from paying membership dues to AEA and making contributions to A-VOTE by any means.

73.  Plaintiff Slaughter is a public employee member of AEA who has historically paid membership dues to AEA and voluntary contributions to A-VOTE in cash and wishes to continue to do so, but fears that if he does so, he may be subject to prosecution under the criminal penalties spelled out in the act because the "or otherwise" language of the Act might be understood by a prosecutor to prohibit public employees from paying membership dues to AEA and making contributions to A-VOTE by any means.

74.   AEA and A-VOTE have historically collected membership dues and voluntary PAC contributions from AEA members through payroll deduction.  Indeed, the overwhelming majority of membership dues and PAC contributions collected from AEA members were paid by the members through payroll deduction.

75.   If AEA is unable to collect membership dues through payroll deduction, it will suffer significant reductions in dues revenue.  Likewise, if A-VOTE is unable to collect voluntary contributions from AEA members through payroll deduction, it will suffer significant reductions in voluntary member contributions.  And, to the extent that the language of the Act making it unlawful to arrange "by payroll deduction *or otherwise*" for payment of membership dues or PAC contributions may be understood to prohibit public employees from paying membership dues to AEA and making contributions to A-VOTE by any means, whether it involves the use of public resources or not, not only will the impact on dues revenue and voluntary contributions be all the greater, but AEA will suffer losses of membership as well, as individuals will fear that payment of the required membership dues by any means whatsoever may place them in legal jeopardy.

76.   Nothing in the Act prevents government bodies from using public funds to pay dues to membership organizations that are composed of government bodies rather than individual employees, such as the ALM and the AASB, even though such organizations engage in activity that is "political" within the meaning of the Act.  Indeed, the Act was tailored specifically to exclude such organizations from its coverage.

77.   Nothing in the Act prevents public employers from processing payroll deductions for employee payments to other membership organizations—such as charities, mutual insurance companies, and credit unions—that are not "dues," even though such organizations engage in activity that is "political" within the meaning of the Act.

20

**Count One: Violation of the Free-Speech and Free-Association Clauses of the First Amendment to the United States Constitution**

78.  All paragraphs above are realleged as if set out fully herein.

79.  The Act prohibits payroll deduction for public employee PAC contributions and public employee dues payments to membership organizations that use dues for "political activity," while permitting payments to other types of organizations or for other purposes.  This distinction is based on viewpoint discrimination, namely, antipathy to the political activities of public employee organizations in general, and AEA in particular.

80.  There is no rational basis for any view that, by permitting public employee PAC contributions and public employee dues payments to membership organizations that use dues for "political activities," government employers in Alabama will be perceived as being involved in politics or as supporting the political positions of public employee organizations.

81.  No legitimate government purpose is served by the Act's prohibition on payroll deduction of PAC contributions.

82.  The viewpoint discrimination on which the Act is based is further evidenced in the provisions limiting payroll deduction solely of individual employee membership dues payments to the exclusion of organizational dues payments.  Those provisions would violate the First Amendment even if the prohibition on payroll deduction of PAC contributions were permissible.

83.  Payroll deduction of membership dues is a useful and cost-effective method for an organization such as AEA, and for its members, to accomplish their shared goal of ensuring the payment of membership dues.  It thus is a benefit to the organization and its members.

84.  The Act places unconstitutional conditions on the availability of this benefit to public employee organizations.  A public employee organization that wishes to avail itself of this benefit must not only refrain from engaging in constitutionally protected "political activity"  but must submit a certification to the "appropriate government entity" promising that it will not use

21

any dues collected through payroll deduction for any "political activity." And, at the end of each calendar year, the organization must submit to a disclosure regime not applicable to any other comparable organization, by providing a detailed accounting of all of its expenditures from payroll-deducted dues. These conditions are policed through the threat of the organizations' being "permanently barred" from receiving payroll deductions.

85. The provisions at issue are targeted exclusively at public employee organizations like AEA. At the behest of the ALM and the AASB or their supporters, the Act was tailored to reach only dues paid by public employees, and not dues paid to membership organizations comprising government entities, which use dues for political activity but for whom the Act allows the dues to be paid out of public funds. Nor does the Act prohibit the use of payroll deductions to other membership organizations such as charities, credit unions, or mutual insurance companies.

86. The restrictions and conditions placed by the Act on the use of payroll deduction for paying dues to public employee organizations like AEA go far beyond any restrictions placed by the Act on organizations that engage in comparable uses of public resources.

87. Under subsection (a) of § 17-17-5, as it will be amended by the Act, an organization that engages in "political activity" may use public resources, such as state or local meeting rooms, for a non-"political" purpose, regardless of its other "political activities." In such a case, the organization receives a benefit from the government, but it need not provide any certification or year-end accounting to the government demonstrating that its use of that benefit has not in any way aided its "political activities." And, if the organization were to use the meeting rooms for "political activities" in violation of subsection (a), the organization would *not* be permanently barred from any further such use of public resources—indeed, it would face no sanction at all.

22

## Count Two: Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution

88.  All paragraphs above are realleged as if set out fully herein.

89.  The Act's differential treatment of public employee organizations, as detailed in ¶¶ 85-87, violates the equal protection clause of the Fourteenth Amendment to the United States Constitution as the differential treatment is not justified by a legitimate state interest, let alone by an important or compelling interest.

## Count Three: Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution

90.  All paragraphs above are realleged as if set out fully herein.

91.  The Act makes it a crime for a public employee to "arrange for" the payment of dues to a public employee organization if the organization uses "any portion of the dues" so collected on "political activity."  And, the sanction of permanent debarment of a public employee organization from receiving dues deductions likewise turns on whether the organization is found to have used the dues for "political activity."

92.  The Act's definition of "political activity"—particularly, its circular use of the terms "political communication," "political advertising," "political purpose," and "political literature" to define the term—is vague.  Neither the legislation, nor any other provision of the Alabama Code, defines "political" or any of the key phrases on which the Act's criminal and civil sanctions turn—"political communication," "political advertising," "political purpose," and "political literature."

93.  The adjective "political" is itself highly unclear, and might be read to apply not only to matters relating to the election or defeat of candidates for office but to any number of other matters.  As but one example, the Merriam-Webster Dictionary defines the adjective "political" to mean, *inter alia*: "of or relating to government, a government, or the conduct of

government"; "of, relating to, or concerned with the making as distinguished from the administration of governmental policy"; "of, relating to, involving, or involved in politics and especially party politics"; and "organized in governmental terms."

94. The phrases "political communication," "political advertising," "phone calling for any political purpose," and "political literature" are likewise unclear. In each case, the definition might be understood to apply to any communication concerning an issue of public policy—such as school funding—in any communication by the organization, whether to the public or to its own members and employees.

95. The vagueness of the Act is compounded by the definition's inclusion of "making contributions to or contracting with any entity that engages in any form of political communication, including communications which mention the name of a political candidate." This category might be understood to encompass such activities as paying for a subscription to a publication, such as a newspaper, that makes candidate endorsements.

96. The definition's inclusion of the phrase "including communications which mention the name of a political candidate" to modify the term "political communication" suggests that any communication that mentions the name of an elected official who is a candidate for re-election will constitute political activity, regardless of whether the communication is concerned solely with issues rather than with the election or defeat of the candidate in an election. This phrase creates the possibility that any comments by an organization such as AEA, in its communications to its membership or otherwise, regarding elected officials or of the policies that they propose, pursue, or adopt that affect the interests of the organization and its members will be determined to be a "political activity" that is subject to the strictures and sanctions of the Act. That would include, for instance, the organization's criticism of actions by a school superintendent or school board regardless of context. The Act might thus be read as prohibiting

24

payroll deductions for the organization by reason of its advocacy in connection with employee discipline and discharge proceedings, if such activity mentions the name of an elected school board member or superintendent who also happens to be a candidate for re-election.

97.  As the scenarios set forth in ¶¶ 94-96 demonstrate, the vagueness of the term "political" has particularly adverse effects in the context of public education.  In a public education setting, the officials responsible for personnel issues are often elected officials—*e.g.*, school board members and superintendents.  Hence, many of a public employee organization's day-to-day activities in support of its members will involve interacting with such officials, questioning and criticizing the actions or policies of such officials, and challenging those officials' actions or policies in administrative or judicial forums.  The vague definition of "political activity" could be understood to apply to these organization activities, such that the category of public employee organization activities that can be funded through dues deductions without fear of permanent debarment may be vanishingly small.  And, because the Act appears to give the very elected school officials who may be the target of such activities the authority to decide what is and is not a "political activity" that can be funded through dues deductions, the Act invites discriminatory enforcement.

98.  Given the severity of the Act's sanctions, the vagaries of the definition of "political activities" present particularly grave dangers for the organizations and individuals that are subject to them— public employee organizations such as AEA and their public employee members.  Public employees who "arrange for" any such deductions—either by administering them on behalf of a public employer or by authorizing the deduction from his or her paycheck— are subject to criminal prosecution.  Public employee organizations such as AEA are subject to a permanent ban against collecting any dues through payroll deduction if a public employer—or any other government entity or official with the authority to apply the Act—finds that the

organization used dues collected through payroll deduction for political activity. And the definition of "political activity" likewise provides insufficient guidance to an organization undertaking the task of adjusting its operations and providing the certifications and "detailed breakdown[s]" of expenditures that are required in order to collect dues through payroll deduction.

99. The fact that the Act permits various prosecutors and public employers throughout the state—as well as the Examiners of Public Accounts—to apply this vague language subjects the Plaintiffs to arbitrary, inconsistent, and discriminatory enforcement.

100. The key prohibitory sentence of the Act states that "[n]o person in the employment of the State of Alabama, a county, a city, a local school board, or any other government agency may arrange by salary deduction or otherwise for any payments to a political action committee or arrange by salary deduction or otherwise for any payments for the dues of any person so employed to a membership organization which uses any portion of the dues for political activity." Because the words "or otherwise" contain no limitation, this sentence, read literally, can be understood to prohibit public employees, on pain of criminal penalties, from paying dues to public employee organizations such as AEA and from making voluntary contributions to PACs.

101. The Act is therefore void for vagueness.

**PRAYER FOR RELIEF**

102. WHEREFORE, Plaintiffs respectfully pray that this Court:

     a. Enter a declaratory judgment that the Act violates the rights of Plaintiffs under the First and Fourteenth Amendments;

b. Enter an order enjoining defendants, their successors, and all those acting in concert with them or at their direction from implementing or enforcing the Act;

c. Award Plaintiffs attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

d. Grant such other and further relief as may be necessary to restore the *status quo ante*.

Respectfully submitted,

J. Cecil Gardner
THE GARDNER FIRM, P.C.
210 S. Washington Avenue
Mobile, Alabama 36602
(251) 433-8100
Fax (251) 433-8181
jcg@thegardnerfirm.com

Robert D. Segall
Copeland, Franco, Screws & Gill, P.A.
P.O. Box 347
Montgomery, Alabama 36101-0347
segall@copelandfranco.com

Herman Watson, Jr.
Watson, McKinney & Artrip, LLP
203 Greene Street, SE
Huntsville, Alabama 35801
watson@watsonmckinney.com

Gregory B. Stein
Stein and Pilcher, L.L.C.
104 St. Francis Street, Ste 601
Post Office Box 1051
Mobile, AL 36633
gstein@mobilebaylaw.com

Sam Heldman
THE GARDNER FIRM, P.C.
2805 31st Street, NW
Washington, DC 20008
sam@heldman.net

Alice O'Brien
Philip A. Hostak
National Education Association
Office of General Counsel
1201 16th Street NW, Suite 820
Washington, DC 20036
aobrien@nea.org
phostak@nea.org

27