

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| ALABAMA EDUCATION ASSOCIATION, an Alabama non-profit corporation; *et al.*, | ) ) ) ) |  |
| **Plaintiffs,** | ) ) |  |
| vs. | ) ) | **Civil Action No. CV-11-S-761-NE** |
| ROBERT BENTLEY, in his official capacity as Governor of the State of Alabama and President of the State School Board; *et al.*, | ) ) ) ) ) ) |  |
| **Defendants.** | ) |  |

## MEMORANDUM OPINION

This case is before the court on plaintiffs' "Motion for Preliminary Injunction or Restraining Order."[1]  Upon consideration of the motion, pleadings, testimony,

---

[1] Doc. no. 7.  Motions to dismiss were filed by four of the defendants on March 14, 2011. *See* doc. no. 28 ("Motion to Dismiss, for Judgment on the Pleadings, or for Summary Judgment by Defendants Joseph B. Morton, Superintendent, Freida Hill, Chancellor, and Robert T. Treese, III, Lee County District Attorney") and doc. no. 33 ("Motion to Dismiss for Lack of Jurisdiction" filed by defendant Governor Robert Bentley).  By separate order entered contemporaneously herewith, the court is ordering plaintiffs to file responses to those motions by April 8, 2011.  Because the Alabama Act that is the subject of this litigation will go into effect at 12:01 o'clock a.m. on Sunday, March 20, 2011, however, it is necessary for the court to rule on plaintiffs' request for injunctive relief before the motions to dismiss are fully briefed and ripe for argument and decision.

Even so, Governor Bentley raises some potentially valid arguments that this court does not have subject matter jurisdiction over the claims that plaintiffs assert against him.  It would be inappropriate to enter an injunction requiring Governor Bentley to act, or to refrain from acting, when subject matter jurisdiction over plaintiffs' claims against the Governor is uncertain.  Accordingly, the preliminary injunction that will be entered contemporaneously herewith will restrain the conduct of all defendants *except* Governor Bentley.  If the court later determines that it does have subject matter jurisdiction over the claims against Governor Bentley, the injunction will

exhibits, briefs, oral arguments of counsel, and independent research, the court

concludes that the motion is due to be granted, and a preliminary injunction entered.

The reasons for that conclusion are set forth below.

## I. RELEVANT ALABAMA LAWS

The Alabama Code directs city and county boards of education and some post-

secondary institutions to adopt procedures that allow their employees to deduct

voluntary contributions for, among other things, "membership dues." The pertinent

portion of the applicable statute states:

> Each local board of education and certain postsecondary
> institutions shall adopt policies or regulations which will provide for
> deductions from salaries of its employees or groups of employees
> whenever a request is presented to the board or postsecondary institution
> by the employees or groups. The deductions shall be made from salaries
> earned in at least nine different pay periods and shall be remitted to the
> appropriate company, association, or organization as specified by the
> employees within 10 days following each deduction. The deductions
> may be made for, *but* [are] *not limited to*, savings plans, tax sheltered
> annuities, the Public Employees' Individual Retirement Account Fund,
> *membership dues*, *voluntary contributions*, and *group insurance
> premiums*. Deductions for membership dues and voluntary
> contributions shall be made based upon membership lists and forms
> provided by the employees' organization. Such lists are to be corrected,
> updated, and returned to the employees' designated organization(s) not
> later than November 10 of each school year. . . . .

Ala. Code § 16-22-6(a) (1975) (2001 Replacement Vol.) (emphasis supplied). That

_____

be extended to apply to him.

statutory language, with amendments not pertinent to this discussion, has been a part

of the *corpus* of Alabama law since at least 1973.  Relatedly, Section 36-1-4.3 states:

> (a)  The state Comptroller shall adopt statewide policies which
> provide for deductions from the salaries of state employees or groups of
> state employees whenever a request is presented to the state Comptroller
> by a group of participating state employees equal in number to at least
> 200 provided, however, that deductions being made as of April 23,
> 1985, shall continue to be made.  The deductions shall be made at least
> monthly and shall be remitted to the appropriate company, association,
> or organization as specified by the employees.  The deductions may be
> made for *membership dues*, and *voluntary contributions*, and *insurance
> premiums*.  Any deduction provided under the provisions of this section
> may be terminated upon two months' notice in writing by a state
> employee to the appropriate company, association, or organization and
> to the appropriate payroll clerk or other appropriate officials as specified
> by the state Comptroller.

> (b)  The state Comptroller may, at his discretion, collect from the
> deductions withheld a cost of administration fee not to exceed one
> percent of the total deduction collected.

Ala. Code § 36-1-4.3 (1975) (2001 Replacement Vol.) (emphasis supplied).  Again,

that statutory language, with amendments not pertinent to this case, has been a part

of the *corpus* of Alabama law since at least 1985.

Both of the foregoing statutes are tempered by Alabama Code § 17-17-5, which

is located in a Chapter of the Code addressing "Election Offenses," and which

*currently* reads as follows:

> No person in the employment of the State of Alabama, a county,
> or a city whether classified or unclassified, shall use any state, county,

or city funds, property or time, for any political activities.  Any person who is in the employment of the State of Alabama, a county, or a city shall be on approved leave to engage in political action or the person shall be on personal time before or after work and on holidays.  It shall be unlawful for any officer or employee to solicit any type of political campaign contributions from other employees who work for the officer or employee in a subordinate capacity.  It shall also be unlawful for any officer or employee to coerce or attempt to coerce any subordinate employee to work in any capacity in any political campaign or cause.  Any person who violates this section shall be guilty of the crime of trading in public office and upon conviction thereof, shall be fined or sentenced, or both, as provided by Section 13A-10-63.

Ala. Code § 17-17-5 (1975) (2007 Replacement Vol.).[2]

---

[2] The statute referenced in the last line of the presently-codified provision — "Section 13A-10-63" — states the elements of the crime of "trading in public office":

> (a)  A person is guilty of trading in public office if:
>
> (1) He offers, confers or agrees to confer any pecuniary benefit upon a public servant or party officer upon an agreement or understanding that he himself will or may be appointed to a public office or public employment or designated or nominated as a candidate for public office; or
>
> (2) While a public servant or party officer, he solicits, accepts or agrees to accept any pecuniary benefit from another upon an agreement or understanding that that person will or may be appointed to a public office or public employment or designated or nominated as a candidate for public office.
>
> (b)  This section does not apply to contributions to political campaign funds or other political contributions.
>
> (c)  Trading in public office is a Class A misdemeanor.

Ala. Code § 13A-10-63 (1975) (2005 Replacement Vol.).  Class A misdemeanors are punishable under Alabama law by imprisonment in the county jail or to hard labor for the county for a term of not more than one year, or by a fine of not more than $2,000, or both.  *See id*. §§ 13A-5-2(c), 13A-5-7(a)(1), 13A-5-12(a)(1).

The subject of this litigation is Alabama Act No. 2010-761 (sometimes referred to as either "Act No. 761" or, simply, "the Act") "which was passed by the Alabama Legislature on December 15, 2010, and signed by then-outgoing Governor Robert Riley on December 20, 2010."[3] The Act is scheduled to take effect on Sunday, March 20, 2011, and it will amend the language of § 17-17-5 in the following manner:

ENROLLED, **An Act,**

**To amend Section 17-17-5, Code of Alabama 1975, relating to prohibited political activities by state, county, and city employees; to further specifically prohibit employees of the state, a county, a city, a local school board, or other governmental agency from using any agency funds, property, or time arranging for payments by salary deduction, or otherwise, to a political action committee or dues for membership organizations that use funds for political activities.**

BE IT ENACTED BY THE LEGISLATURE OF ALABAMA:

Section 1.   Section 17-17-5, Code of Alabama 1975, is amended to read as follows:

"§17-17-5.

"(a) No person in the employment of the State of Alabama, a county, a city, *a local school board, or any other governmental agency*, whether classified or unclassified, shall use any state, county, city, *local school board, or other governmental agency* funds, property,

---

[3] Doc. no. 1 (Complaint) ¶ 2. *See also* doc. no. 19 ("Plaintiffs' Notice of Filing Supplemental Materials Regarding Motion for Preliminary Injunction or Restraining Order"), Exhibit B (Declaration of Paul Hubbert), at 1-2 (verifying by sworn statement the allegations of the complaint).

or time, for any political activities.[4]

"(b) No person in the employment of the State of Alabama, a county, a city, a local school board, or any other governmental agency may arrange by salary deduction or otherwise for any payments to a political action committee or arrange by salary deduction or otherwise for any payments for the dues of any person so employed to a membership organization which uses any portion of the dues for political activity.  For purposes of this subsection (b) only, political activity shall be limited to all of the following:

"(1) Making contributions to or contracting with any entity which engages in any form of political communication, including communications which mention the name of a political candidate.

"(2) Engaging in or paying for public opinion polling.

"(3) Engaging in or paying for any form of political communication, including communications which mention the name of a political candidate.

"(4) Engaging in or paying for any type of political advertising in any medium.

"(5) Phone calling for any political purpose.

"(6) Distributing political literature of any type.

"(7) Providing any type of in-kind help or support to or for a political candidate.

"Any organization that requests the State of Alabama, a county, a city, a local school board, or any other governmental agency to arrange by salary deduction or otherwise for the collection of

---

[4] The italicized words in the text of this sub-section "(a)" were added to the preexisting language of section 17-17-5.  All of the language in the following, sub-section "(b)" is new.

membership dues of persons employed by the State of Alabama, a county, a city, a local school board, or any other governmental agency shall certify to the appropriate governmental entity that none of the membership dues will be used for political activity. Thereafter, at the conclusion of each calendar year, each organization that has arranged for the collection of its membership dues of persons employed by the State of Alabama, a county, a city, a local school board, or any other governmental agency shall provide the appropriate governmental entity a detailed breakdown of the expenditure of the membership dues of persons employed by the State of Alabama, a county, a city, a local school board, or any other governmental agency collected by the governmental entity. Any organization that fails to provide the required certifications, that reports any expenditures for political activity or that files false information about political activity in any of its reports shall be permanently barred from arranging for the collection of its membership dues by any governmental entity. The Examiners of Public Accounts shall annually review a sample of at least ten percent of the certifications filed with each governmental entity and report its findings to the appropriate governmental entity.

"(c) Any person who is in the employment of the State of Alabama, a county, a city, *a local school board*, *the State Board of Education or any other governmental agency*, shall be on approved leave to engage in political action or the person shall be on personal time before or after work and on holidays. *It shall be unlawful for any officer or employee to solicit any type of political campaign contributions from other employees who work for the officer or employee in a subordinate capacity*. It shall also be unlawful for any officer or employee to coerce or attempt to coerce any subordinate employee to work in any capacity in any political campaign or cause. Any person who violates this section shall be guilty of the crime of trading in public office and upon conviction thereof, shall be fined or sentence, or both, as provided by Section 13A-10-63."[5]

---

[5] The italicized words in the text of sub-section "(c)" were added to the preexisting language of section 17-17-5.

Section 2.  The provisions of this act are severable.  If any part of this action is declared invalid or unconstitutional, that declaration shall not affect the part which remains.

Section 3.  All law or parts of laws which conflict with this act are repealed.

Section 4.   This act shall become effective 90 days following its passage and approval by the Governor or its otherwise becoming law.

Alabama Act No. 2010-761 (emphasis supplied).

## II.  THE ALLEGATIONS OF PLAINTIFFS' COMPLAINT

Plaintiffs challenge Act No. 2010-761 as violating the Free Speech and Free Association Clauses of the First Amendment to the United States Constitution, as well as the Equal Protection and Due Process Clauses of the Fourteenth Amendment.

### A.    The Eight Plaintiffs

### 1.    The Alabama Education Association

Plaintiff Alabama Education Association ("AEA") is a "voluntary membership organization" and Alabama non-profit corporation with approximately 105,000 members, of whom about 75,000 are active members, and the remainder are retired public school teachers and support personnel.[6]  AEA's active membership consists of professional educators and education support personnel employed by the State of

---

[6] Complaint ¶ 5.

8

Alabama, the Department of Postsecondary Education ("DPE"), Alabama four-year colleges and universities, postsecondary institutions (two-year colleges and trade and vocational training schools) that function under the supervision of the DPE, and local boards of education.[7]  "AEA's mission is to promote educational excellence, advocate for its members, and lead in the advancement of equitable and quality public education for a diverse population."[8]  To advance this mission, "AEA advocates on an array of issues that are of concern to its members, including questions relating to tax policy, pension and insurance issues, education funding, tenure protections for education employees, school curriculum, and charter schools."[9]

Dr. Paul R. Hubbert, Executive Secretary and Treasurer of the Alabama Education Association testified at the hearing conducted on March 15, 2011, and described some of the non-political services that the association provides its members.

### a.   *Teacher Credit Conferences*

Three to four times each year, AEA conducts instructional conferences for teachers to attend and gain "continuing education credits" towards the renewal or updating of their teaching certificates, something teachers must do under Alabama

---

[7] *See id.* ¶ 7.

[8] *Id.* ¶ 24.

[9] *Id.* ¶ 25.

law.[10]  AEA pays for many of the conference instructors, and generally incurs fifty to sixty thousand dollars in expenses for each conference.[11]

###### b.  *The Alabama Reading Initiative*

AEA's membership provided the initial funding for the Alabama Reading Initiative,[12] a statewide K-12 initiative managed by the State Department of Education.  The goal of the program "is to significantly improve reading instruction and ultimately achieve 100% literacy among public school students.  The Alabama Reading Initiative training for teachers helps them teach reading in proven and effective ways."[13]

###### c.  *The English as a Second Language Program*

In response to the growing issue of non-English-speaking immigrants who are

---

[10] *See* doc. no. 34 (Transcript of March 15, 2011 Hearing), at 10.

[11] *Id.* at 11-12.

[12] *Id.* at 13.

[13] http://www.alsde.edu/html/sections/section_detail.asp?section=50&footer=sections (last visited March 18, 2011).  Dr. Hubbert described the program as follows:

> The Alabama Reading Initiative has actually been recognized throughout the country. It's primarily at the elementary grades, and it's a very intensive program for instruction for students and it's being very successful in helping us to gain achievement levels in Alabama that really have not been excelled anywhere else in the country in recent times.  That program started as a volunteer program.  It was funded in part by AEA, funded by several other groups.  Some corporations gave to it.  A-Plus, which is an education foundation out of Birmingham, contributed.  We contributed and several other groups.  . . .  Ultimately, the state picked it up and started funding it, and now it's across the state in every elementary school.

Doc. no. 34 (Transcript of March 15, 2011 Hearing), at 12-13.

enrolled in Alabama public schools, AEA assembled several teachers who spoke Spanish sufficiently well to train educators to speak "common words that teachers would need to know when they're dealing with Hispanic students who don't speak a word of English."[14]  AEA took the initiative in delivering such instruction to educators because, at the time, it was a "need that nobody else was fulfilling"; now, however, "the legislature is beginning . . . to appropriate some money to help teachers with that problem."[15]

###### d.  *Legal Services for AEA Members*

Legal services in such circumstances as described below are provided to the members of AEA under the association's professional liability insurance program:

> A teacher that may have a lawsuit filed against them, for an example, would use our professional liability insurance.  Or a teacher who feels that they've been unjustly accused of failing to perform adequately in the classroom, the state law provides for a due process hearing, and we provide the attorney for the teacher to be represented in those hearings.  If there's a certificate of revocation involved, we provide an attorney for the teacher to have in case of someone wishing to withdraw their certificate.  The state superintendent, for example, may withhold a certificate under certain conditions:  and we provide legal counsel for that teacher.[16]

The AEA also hosts conferences for AEA attorneys, "to discuss cases that have

---

[14] *Id.* at 14-15.

[15] *Id.* at 15.

[16] *Id.*

occurred and to bring each other up to date."[17]

### e.    *Alabama Education Retirees Association*

The AEA maintains this division, which actively represents "the interests of retired personnel, particularly as it relates to health insurance . . . ."[18]

### e.    *Educator Benefits Corporation*

The Educator Benefits Corporation is a wholly-owned subsidiary of AEA that exists for the purpose of allowing AEA members to have access to insurance and financial savings programs.[19]  The corporation deals with "very close to two dozen" independent insurance companies, and provides a number of benefit options to active and retired AEA members, including cancer, life, long-term care, critical care, and automobile insurance policies.[20]

### f.    *Public opinion polling*

AEA also engages in public-opinion polling, and not just for political purposes, but also for such objectives as the following:

> [W]e survey for school boards running tax referenda, trying to raise revenues for the local school district.  We survey parents oftentimes to see if they're satisfied with the way the school district is being operated. We survey our own members to see if there are programs that they feel

---

[17] Doc. no. 34 (Transcript of March 15, 2011 Hearing), at 16-17.

[18] *Id.* at 23.

[19] *Id.* at 25-26.

[20] *Id.* at 26.

12

the need for that we're not providing.  We survey retired members for the same purposes.[21]

## 2.    A-VOTE

Plaintiff "A-VOTE" — an acronym standing for "Alabama Voice of Teachers for Education" — is a political action committee affiliated with AEA.[22]   AEA sponsors A-VOTE as "a vehicle for members who wish to support candidates whose positions are consistent with AEA's missions and goals."[23]   AEA members who contribute to A-VOTE have the "opportunity to participate in the electoral process and to support and elect candidates of their choice."[24]   According to the complaint, for the past few decades the "vast majority" of AEA members have executed voluntary requests to have their AEA membership dues, as well as their voluntary contributions to A-VOTE, automatically deducted from their paychecks.[25]

## 3.    The six individual plaintiffs

Plaintiff Pam Hill is an education support professional employed by the Huntsville City Board of Education.  Plaintiff Dr. Cathey McNeal, Ph.D., is a professional educator employed by the Huntsville City Board of Education.  Plaintiff

---

[21] *Id.* at 49-50 [bracketed alteration supplied].

[22] Complaint ¶ 6.

[23] *Id.* ¶ 26.

[24] *Id.*

[25] *Id.* ¶ 7.

Chassity Smith is a professional educator employed by the City of Madison Board of Education.  Plaintiff Jeff Breece is a professional educator employed by the Madison County Board of Education.  Plaintiff Dorothy J. Strickland is a professional educator employed by the Lee County School District.  Plaintiff Ronald Slaughter is a professional educator employed by Alabama Agricultural & Mechanical University. All of the individual plaintiffs are AEA members.

For several years, plaintiffs Hill, McNeal, Smith, and Breece have each paid their AEA membership dues and made voluntary contributions to A-VOTE by means of payroll deductions administered by their respective employers, because doing so "is the most convenient and efficient way to make these voluntary payments."[26] Hill, McNeal, Smith, and Breece desire to continue paying AEA dues and making A-VOTE contributions, but they fear prosecution if they continue to do so by means of payroll deduction after the effective date of Act No. 761.[27]

For several years, plaintiffs Strickland and Slaughter have paid their AEA membership dues and made A-VOTE contributions in cash.  They both fear prosecution if they continue to pay AEA membership dues and make A-VOTE contributions in cash, because they believe "the Act can be read to prohibit public

---

[26] *Id.* ¶¶ 8-11.

[27] *Id.*

employees from arranging for the payment, by any means, of PAC contributions or membership dues to an organization that uses such dues for political activity."[28]

## B.    The Ten Defendants

### 1.    The Governor

Defendant Dr. Robert Bentley, M.D., is sued in his official capacity as the Governor of Alabama and President of the State Board of Education.  In those roles, he is responsible for ensuring that all state laws be faithfully executed, and for controlling and supervising Alabama's public schools.[29]

### 2.    The State Superintendent of Education

Defendant Joseph B. Morton is sued in his official capacity as the State Superintendent of Education.

> In that capacity, Defendant Morton is the Chief School Officer in the State of Alabama, responsible for explaining the meaning and intent of laws relating to public schools, deciding all controversies and disputes involving the proper administration of the public school system, and reviewing actions and orders of county and city boards of education and of county superintendents of education and city superintendents of schools in matters relating to finance.  *See* Ala. Code §§ 16-4-4, 16-4-8. Pursuant to these responsibilities, Defendant Morton sought guidance from the Alabama Attorney General on the implementation and enforcement of the Act, and, pursuant to that guidance, directed that City and County Superintendents "take the necessary steps to end the

---

[28] Complaint ¶¶ 8-13.

[29] *Id*. ¶ 14.  *See also* Ala. Const. Art. V, §§ 113, 120 (1901); Ala. Const. Art. XIV, § 262 (1901); Ala. Code § 16-3-11 (1975) (2001 Replacement Vol.).

deduction of membership dues after issuing the February [2011] paychecks."[30]

Accordingly, plaintiffs assert, "Morton has a key role in implementing and enforcing the Act's prohibitions and restrictions on payroll deductions with respect to Alabama public schools."[31]

### 3.   The State Comptroller

Defendant Thomas L. White, Jr., is sued in his official capacity as Comptroller of the State of Alabama.

> In that capacity, Defendant White directs, supervises, and controls the Finance Department's Division of Control and Accounts, which in turn is responsible for keeping all books, records, and accounts relating to the finances of State government as well as controlling and making records of all payments into and out of the State treasury and each special fund and account therein.  *See* Ala. Code §§ 41-4-50, 41-4-51.[32]

According to plaintiffs, White is "responsible for the administration of deductions from state employees' pay and therefore has a key role in implementing and enforcing the payroll deduction prohibitions and restrictions of the Act."[33]

### 4.   The Finance Director

Defendant David Perry is sued in his official capacity as Director of Finance

---

[30] *Id.* ¶ 15.

[31] *Id.*

[32] *Id.* ¶ 16.

[33] *Id.*

for the State of Alabama.  In that capacity, "Perry is the chief financial officer of the state and is responsible for the administration of the Department of Finance."[34] According to plaintiffs, Perry "is responsible for statewide policies governing payroll deductions by state employers and therefore has a key role in implementing and enforcing the payroll deduction prohibitions and restrictions of the Act."[35]

### 5. The Chancellor of Postsecondary Education

Defendant Freida Hill is sued in her official capacity as Chancellor of Postsecondary Education.  In that capacity, "Hill directs and supervises the administration of the Alabama Community College System, including the administration of deductions from the pay of Alabama Community College employees."[36] Thus, according to plaintiffs, "Hill has a key role in implementing and enforcing the Act's prohibitions and restrictions on payroll deduction in the Alabama Community College System."[37]

### 6. The City and County Boards of Education

Defendants Huntsville City Board of Education, City of Madison Board of Education, and Madison County Board of Education "administer[] and manage[] the

---

[34] Complaint ¶ 17.

[35] *Id.* ¶ 17.

[36] *Id.* ¶ 18.

[37] *Id.*

public schools" within their respective jurisdictions, including administering and managing deductions from the pay of their employees. According to plaintiffs, these Boards of Education are "responsible for implementing and enforcing the payroll deduction prohibitions and restrictions of the Act."[38]

### 7.  The District Attorneys

Defendants Robert L. Broussard and Robert T. Treese III[39] are sued in their official capacities as the District Attorneys for Madison County and Lee County, respectively. In those capacities, Broussard and Treese are "charged with the duty of enforcing the criminal provisions of the Act" within their respective jurisdictions.[40]

### C.  Alleged Political Motivations Behind Act No. 2010-761

Plaintiffs allege that AEA often clashed with the Republican administration of

---

[38] *Id.* ¶¶ 19-21.

[39] Robert T. Treese III succeeded former Lee County District Attorney Nick Abbett after the commencement of this action. *See* Doc. no. 22, at 1 n.1. Therefore, Mr. Treese is substituted as a party, replacing Mr. Abbett, who was sued in his official capacity only, in accordance with the following provisions of Federal Rule of Civil Procedure 25:

> An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. *The officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name*, but any misnomer not affecting the parties' substantial rights must be disregarded. The court may order substitution at any time, but the absence of such an order does not affect the substitution.

Fed. R. Civ. P. 25(d) (emphasis supplied).

[40] Complaint ¶¶ 22-23.

former Alabama Governor Bob Riley, who served from 2003 to 2011. "For example,

although AEA and A-VOTE have supported Democratic and Republican candidates

over the years, both have supported Democratic candidates more frequently than

Republican ones."[41]

35. [Additionally,] in 2007, AEA vocally opposed Riley's recommended appointment of Bradley Byrne to the post of Chancellor of DPE [the Department of Postsecondary Education]. In late 2009 and early 2010, Governor Riley criticized AEA for its opposition to legislation authorizing charter schools. And, in 2010, AEA and Riley clashed over a State Board of Education policy prohibiting two-year college system employees from serving in the state legislature. Riley (then serving as both Governor of Alabama and *ex officio* President of the State Board of Education) and Bradley Byrne (whom Riley had appointed to be Chancellor of DPE) both supported the policy. AEA vocally opposed that policy, and brought a lawsuit to invalidate it.

36. AEA's positions on political issues also have been strongly criticized by Bradley Byrne, who, with Riley's endorsement, ran unsuccessfully for the Republican gubernatorial nomination in 2010.

37. AEA and Byrne had taken opposing positions on numerous issues while Byrne was a state senator and, later, Chancellor of DPE. For instance, in 2004, then-State Senator Byrne launched a filibuster against a teacher tenure bill supported by AEA, and AEA vocally and successfully lobbied for cloture votes to end Byrne's filibuster. As noted in ¶ 35 above, in 2010, then-Chancellor of DPE Byrne supported a State Board of Education policy prohibiting two-year college employees from serving in the legislature, a policy that AEA vociferously opposed.

38. During his gubernatorial campaign, Byrne attacked AEA as

---

[41] Complaint ¶ 33.

"the single greatest impediment to quality education in this state," and as "stand[ing] for the worst" in the teaching profession.

39.   During the Republican primary campaign, AEA opposed Byrne and supported his opponent, who won the nomination.  Riley, on the other hand, endorsed Byrne.   Both Riley and Byrne publicly expressed their opposition to AEA's playing any role in the Republican primary by way of, for example, Byrne's statement on October 6, 2009 that "AEA money isn't welcome in the Republican primary," and Riley's statement on June 26, 2010 that "we do not support the AEA and we don't want 'em in our primary and we don't want anyone that wants 'em in our primary."

40.   On June 28, 2010 — two days after Governor Riley stated his desire that AEA stay out of the Republication primary — Alabama Comptroller Thomas White announced to all state departments, agencies and personnel officers that, "Payroll deductions for Political Action Committees (PACs) will no longer be withheld from employees' pay effective July 1, 2010."  Comptroller White subsequently amended the Fiscal Policy and Procedures Manual — which had expressly authorized payroll deductions for PAC contributions — to omit any mention of PACs as recipients of voluntary contributions.   The Comptroller purported to have come to the view that, even though such requests had been honored and effectuated for decades, longstanding statutory authority — in particular, the provision of Ala. Code § 17-17-5 prohibiting public employees from "using any state, county, or city funds, property, or time, for any political activities" — made it unlawful for the State to comply with such payroll deduction requests.

41.   In a subsequent press release, then-Governor Riley explained that the Comptroller's actions regarding payroll deduction were due to his administration, stating that "the Riley administration stopped payroll deductions . . . ."

42.   Commenting on the Comptroller's actions, the editorial board of the Birmingham News reported that "Riley is . . . on the warpath against state employees' groups."  Birmingham News Editorial Board,

"Our View:  Riley's administration Ends State Employees' Payroll Deductions for Political Purposes," Birmingham News (Sept. 6, 2010), available at . . . .[42]

On November 2, 2010, a majority-Republican state legislature was elected. The members of the Republican majority included many individuals AEA and A-VOTE had either failed to support, or actively opposed during the election.[43]  The newly-elected legislature was not scheduled to meet in regular session until March of 2011, but, on December 1, 2010, outgoing-Governor Riley called a special session of the legislature to address an "ethics reform" package of proposed legislation.[44] One part of the package was the bill enacted as Act No. 761.[45]  Plaintiffs allege, "on information and belief," that Bradley Byrne participated in drafting the legislation and lobbied heavily for its adoption.[46]  They also allege, "on information and belief," that "a majority of the members of the new legislature shared then-Governor Riley's antipathy toward the political activities of AEA and A-VOTE, and/or were recruited by then-Governor Riley and/or his supporters to support the Riley administration's

---

[42] Complaint ¶¶ 35-42 (bracketed alteration and ellipses in original, internet website address omitted).  The omitted address is set-out below:
http://blog.al.com/birmingham-news-commentary/2010/09/our_view_rileys_administration.html.

[43] Complaint ¶ 43.

[44] Id. ¶¶ 44-45.

[45] Id. ¶¶ 46-47, 52.

[46] Id. ¶ 48.

21

campaign against those activities through legislation."[47]

**D**.    **Alleged Effects of the Act**

Plaintiffs allege that public employers in Alabama establish payroll deduction systems for purposes other than political activity, including, but not limited to, federal and state income tax withholdings, health and life insurance premium payments, retirement contributions, and charitable contributions, and that the additional cost of administering payroll deductions for employee membership dues and voluntary political action committee contributions is *de minimus*.[48]   In contrast, if AEA and A-VOTE become unable to collect membership dues and voluntary contributions through payroll deductions, they will suffer significant reductions in revenue.   AEA also believes that it will suffer loss of membership if its members fear that paying the required membership dues by any means whatsoever — *i.e.,* "by payroll deduction *or otherwise*" — could lead to their arrest and prosecution.[49]   Significantly, even under the constrictions of the Act, public funds may be used to pay dues to membership organizations that are comprised of *government bodies* rather than *individual employees*.[50]   Furthermore, and regardless of the constrictions of the Act,

---

[47] *Id.* ¶ 49.

[48] Complaint ¶ 61.

[49] *Id.* ¶ 75.

[50] *Id.* ¶ 76.   For example, plaintiffs state:

public employers may process payroll deductions for employee payments to other membership organizations, such as charities, mutual insurance companies, credit unions, and fraternal organizations (such as the Fraternal Order of Police), but only so long as those payments are not in the nature of "dues," and despite the fact that "such organizations engage in activity that is 'political' within the meaning of the Act."[51]

### E.   Plaintiffs' Claims

### 1.   First Amendment

Plaintiffs first claim that the Act violates the Free Speech and Free Association Clauses of the First Amendment. Their First Amendment argument is two-fold. First, plaintiffs assert that, by prohibiting payroll deductions for public-employee political action committee contributions and dues payments to membership organizations that

---

State and/or local governmental *entities* in Alabama belong to membership organizations such as the Alabama League of Municipalities ("ALM") and the Alabama Association of School Boards ("AASB"), which engage in activities that are "political" within the meaning of the Act. State and/or local governmental *entities* use public funds to pay their membership dues to such organizations. At the behest of ALM and AASB, the legislature preserved the ability of government *entities* to use public funds to pay dues to organizations like ALM and AASB to be used for political activity, even as it was prohibiting the use by *employees* of payroll deduction to pay membership dues to public employee organizations like AEA. This was accomplished by amending the proposed legislation so that payroll deduction of membership dues would only be prohibited as to "dues of any person . . . employed" by a government entity.

Complaint ¶ 51 (emphasis supplied).

[51] *Id.* ¶ 77.

use the dues for "political activity," but not prohibiting payroll deductions for payments to other types of organizations or for other purposes, the Act constitutes unlawful viewpoint discrimination.[52]  Secondly, plaintiffs assert that the Act places "unconstitutional conditions" on the ability of public employee organizations to enjoy the benefit of collecting dues through payroll deduction.[53]

### 2.   Equal Protection

Plaintiffs also assert, briefly, that "[t]he Act's differential treatment of public employee organizations, as detailed in ¶¶ 85-87, violates the equal protection clause of the Fourteenth Amendment to the United States Constitution as the differential treatment is not justified by a legitimate state interest, let alone by an important or compelling interest."[54]  Paragraphs 85-87 of the Complaint describe: (1) how the Act only reaches dues paid by public employees, not dues paid to membership organizations comprising government entities, or payments to charities, credit unions, or mutual insurance companies;[55] (2) how the conditions imposed by the Act on payroll deductions for the payment of dues to employee organizations like AEA are far more restrictive than the conditions placed on other organizations that engage in

---

[52] *Id.* ¶ 79.

[53] *Id.* ¶¶ 84-87.

[54] *Id.* ¶ 89 (bracketed alteration supplied).

[55] Complaint ¶ 85.

24

comparable uses of public resources;[56] and (3) how even organizations that engage in "political activity" can use public resources for "non-political" purposes, without having to submit to any certification or year-end accounting requirements.[57]

### 3.   Due Process

Finally, plaintiffs claim that the Act is void for vagueness because its definition of the phrase "political activity" is vague, and because the Act prohibits public employees from arranging to pay dues or contribute to a political action committee by salary deduction "*or otherwise.*"[58]

### 4.   Relief requested

As relief for their claims, plaintiffs request this court to:

a.  Enter a declaratory judgment that the Act violates the rights of Plaintiffs under the First and Fourteenth Amendments;

b.  Enter an order enjoining defendants, their successors, and all those acting in concert with them or at their direction from implementing or enforcing the Act;

c.  Award Plaintiffs attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

d.  Grant such other and further relief as may be necessary to restore the *status quo ante.*[59]

---

[56] *Id.* ¶ 86.

[57] *Id.* ¶ 87.

[58] *Id.* ¶¶ 90-101.

[59] Complaint ¶ 102.

**5.**    **The constitutional context of plaintiffs' claims for relief**

The first ten amendments to the United States Constitution were ratified in 1791, and one through eight of those address the rights, liberties, and freedoms that we generally refer to as the "Bill of Rights."[60]  The five civil rights that most closely mirror the motivations of those English-speaking peoples who originally settled the eastern seaboard of North America, and which constituted the bedrock ideological foundations of the American Revolution, are enshrined in the First Amendment: *i.e.*, the freedoms of religion, speech, press, assembly, and petition.

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. amend. I (1791).

It is axiomatic as a matter of history and original intent that the Framers intended for the first ten amendments to act as restraints only upon the exercise of power by the new, National government, and not the various states.  *See*, *e.g.*, *Barron v. Baltimore*, 32 U.S. (7 Pet.) 243 (1833) (Marshall, C.J., unanimous opinion) (holding that the first eight amendments "demanded security against the apprehended

---

[60] The Ninth Amendment provides that the "enumeration in the Constitution of certain rights, shall not be construed to deny or disparage others retained by the people."  U.S. Const. amend. IX (1791).  The Tenth Amendment provides that the "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. amend. X (1791).

encroachments of the general government — not against those of the local governments").

Unlike the Bill of Rights, however, the Fourteenth Amendment, adopted in the wake of the Civil War as the principal component of Congressional "Reconstruction" of the Union, was restrictive of the exercise of power by state governments.  The Due Process Clause of that Amendment provides that "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."  U.S. Const. amend. XIV, § 1 (1868).[61]  In 1908, the Supreme Court recognized the possibility that some of the personal rights protected by the first eight amendments might also be "incorporated" into the Fourteenth Amendment and, thereby, made applicable to state and local governments, "because a denial of them would be a denial of due process of law . . . ."  *Twining v. New Jersey*, 211 U.S. 78, 99 (1908).[62]

---

[61] In full text, the first section of the amendment provides that:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, § 1 (1868).

[62] In *Twining*, the Court rejected the claim of criminal defendants that a state court had violated their constitutional rights by instructing a jury that the jurors could draw a negative inference from their failure to testify at trial, but then went on to say by way of *dicta* that it

> is possible that some of the personal rights safeguarded by the first eight

27

Beginning in 1925, the Supreme Court held in a variety of cases that some of the individual rights protected by the Bill of Rights are also protected against interference by the states through "incorporation" into the Fourteenth Amendment's Due Process Clause. *See Gitlow v. New York*, 268 U.S. 652 (1925). The freedoms of speech and press were the first two rights to be "incorporated" and, thereby, made applicable to state governments. *Id*. at 666 (stating in *dicta* that, for "present purposes we may and do assume that freedom of speech and of the press — which are protected by the First Amendment from abridgement by Congress — are among the fundamental personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States").

Even though the First Amendment is written in absolutist language — *i.e.*, "Congress [and, by extension, state legislatures] *shall* make *no law*"[63] — the Supreme Court has never accepted the view that the First Amendment prohibits *all* government

---

Amendments against National action may also be safeguarded against state action, because a denial of them would be a denial of due process of law . . . . If this is so, it is not because those rights are enumerated in the first eight Amendments, but because they are of such a nature that they are included in the conception of due process of law.

*Twining v. New Jersey*, 211 U.S. 78, 99 (1908).

[63] In law, the word "shall" means "must." *Hicks v. Miranda*, 422 U.S. 332, 352 (1975) (Burger, C.J., concurring) ("It is well settled that 'shall' means 'must.'"). *See also*, *e.g.*, *United States v. Quirante*, 486 F.3d 1273, 1275 (11th Cir. 2007) (Carnes, J.) ("That is, where Congress uses the word 'shall' to describe a party's obligation, Congress intends to command rather than suggest.") (citing *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947) ("The word 'shall' is ordinarily 'The language of command.'" (citation omitted)).

regulation of expression.  Thus, it is inevitable that courts must engage in line-drawing when determining just what kind of speech will be protected under the First Amendment.

Of all of the categories of "speech" that can be discerned, there is no disagreement over the proposition that "political speech" lies at the core of whatever forms of expression are protected by the First Amendment.  Indeed, in a case arising out of Alabama during the most contentious political environment of the Twentieth Century, the Supreme Court declared the ability to criticize government and governmental officers as "the central meaning of the First Amendment."  *New York Times v. Sullivan*, 376 U.S. 254, 273 (1964).

It is against this historical and constitutional backdrop that plaintiffs' claims must be evaluated.  That inquiry is, to say the very least, "complex."

### III.  THE STANDARDS FOR ENTRY OF TEMPORARY OR PRELIMINARY INJUNCTIVE RELIEF

Parties seeking either a temporary restraining order or preliminary injunctive relief generally are required to satisfy four prerequisites:  the moving parties must demonstrate

(1) a substantial likelihood of success on the merits of the underlying case, (2) the movant will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the

29

injunction issued, and (4) an injunction would not disserve the public interest.

*North American Medical Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1217 (11th Cir. 2008). *See also*, *e.g.*, *Grizzle v. Kemp*, No. 10-12176, 2011 WL 782033, at *4 (11th Cir. Mar. 8, 2011) (same); *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (same); *Northeastern Florida Chapter of the Association of General Contractors of America v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990) (same). *See generally* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure – Civil 2d* § 2948, at 131-33 (2d ed. 1995). "The purpose of the preliminary injunction is to preserve the positions of the parties as best we can until a trial on the merits may be held." *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011).

It is not necessary for parties seeking temporary or preliminary injunctive relief to show that they are *certain* to succeed on the merits. *See Johnson v. United States Department of Agriculture*, 734 F.2d 774, 782 (11th Cir. 1984); 11A Wright, Miller & Kane, *Federal Practice and Procedure – Civil 2d* § 2948.3, at 188 & n.5 (2d ed. 1995). Rather, in light of the underlying rationales of both temporary restraining orders and preliminary injunctions, the moving parties simply must show a "substantial likelihood" of succeeding after a trial on the merits.

30

> Given th[e] limited purpose [of a preliminary injunction, namely preserving the relative positions of the parties in advance of a trial], and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.  A party thus is not required to prove his case in full at a preliminary-injunction hearing, . . . and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.

*University of Texas v. Camenisch*, 451 U.S. 390, 394 (1981) (alterations supplied).

"If [the plaintiff] is unable to show a substantial likelihood of success on the merits, [the court] need not consider the other requirements." *Bloedorn*, 631 F.3d at 1229.

Likewise, in the context of certain asserted abridgements of rights granted under the United States Constitution, the mirror image of this analytical rule-of-thumb is equally true.  That is, where certain constitutional violations are claimed, including alleged violations of First Amendment rights, the irreparable injury, balance of the harms, and public interest inquiries collapse into the single question of whether the moving parties have established a substantial likelihood that they will ultimately prove the existence of the constitutional violation alleged.

Defendants are certainly correct to note that the mere assertion by plaintiffs of claims under the First Amendment does not inexorably satisfy the other elemental

prerequisites for issuance of temporary or preliminary injunctive relief.[64]  Even so, the

Eleventh Circuit has

> repeatedly held that harms to speech rights "'for even minimal periods
> of time, unquestionably constitute[] irreparable injury'" supporting
> preliminary relief. [*Florida Businessmen for Free Enterprise v. City of
> Hollywood*, 648 F.2d 956,] 958 [(5th Cir. 1981)] (quoting *Elrod v.
> Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976));
> *see also KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271-72
> (11th Cir. 2006); *Let's Help Fla. v. McCrary*, 621 F.2d 195, 199 (5th
> Cir.1980).  "The rationale behind these decisions [is] that chilled free
> speech . . . , because of [its] intangible nature, could not be compensated
> for by monetary damages; in other words, plaintiffs could not be made
> whole." [*Northeast Florida Chapter of the Association of General
> Contractors of America v. City of Jacksonville, Florida*], 896 F.2d 1283,
> 1285 (11th Cir.1990).

*Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) (textual alterations and

omissions in original).  Hence, if plaintiffs can demonstrate they are substantially

likely to show the statute they challenge to be substantially overbroad or vague in a

fashion that would inevitably chill speech, that would necessarily satisfy their burden

to demonstrate irreparable harm.

---

[64] *See, e.g.*, doc. no. 29, at 13-14 (citing *Hohe v. Casey*, 868 F.2d 69, 72-73 (3d Cir. 1989) ("[T]he assertion of First Amendment rights does not automatically require a finding of irreparable injury, thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits."), *quoted with approval in Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000)).  *But see id.* ("The only areas of constitutional jurisprudence where we have said that *an on-going violation may be presumed to cause irreparable injury* involve the right of privacy and certain *First Amendment claims establishing an imminent likelihood that pure speech will be chilled* or prevented altogether.") (emphasis supplied).  That language, especially in light of the Eleventh Circuit's much more recent pronouncement in *Scott*, which, like this case, involved money as political speech, convince this court that the "presumed" injury discussed in *Siegel* is present here.

Further, "even a temporary infringement of First Amendment rights constitutes a serious and substantial injury, and the [government] has no legitimate interest in enforcing an unconstitutional ordinance." *KH Outdoor, LLC*, 458 F.3d at 1272. Thus, where a plaintiff establishes a substantial likelihood that First Amendment rights will be significantly impacted, the question of "whether the harm that the applicant [for preliminary relief] will likely suffer outweighs the harm that its opponent will suffer as a result of an injunction" inevitably favors the grant of preliminary relief: the government's inability to enforce a statute substantially likely to be held unconstitutional during the pendency of the challenge could not possibly outweigh the "serious and substantial injury" to the plaintiff. *Scott*, 612 F.3d at 1295 (alterations supplied).

"For similar reasons, [an] injunction plainly is not adverse to the public interest. *The public has no interest in enforcing an unconstitutional ordinance*." *Id.* (alterations and emphasis supplied) (citing *Joelner v. Village of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004) ("[T]here can be no irreparable harm to a municipality when it is prevented from enforcing an unconstitutional statute because it is always in the public interest to protect First Amendment liberties." (internal quotation marks omitted)). *See also*, *e.g.*, *Florida Businessmen for Free Enterprise v. City of Hollywood*, 648 F.2d 956, 959 (5th Cir. 1981) (stating that "[t]he public

33

interest does not support the city's expenditure of time, money, and effort in attempting to enforce an ordinance that may well be held unconstitutional"); *Planned Parenthood Association of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987) (stating that the public's interest is in "prevention of enforcement of ordinances which may be unconstitutional").

In this action, plaintiffs have lodged a series of attacks on Act No. 761 premised upon its alleged infringement on the expressive and associational rights of public employees, public employee organizations, and public employee-focused political action committees by the imposition of unconstitutional conditions upon the grant of a valuable benefit.[65]   Additionally, plaintiffs assert a claim based upon the vague language of the statute that, in most respects is, as defendants correctly state, "really more of an overbreadth argument than a vagueness argument . . . ."[66]   These challenges to Act No. 761 are the sole bases upon which they seek temporary or preliminary injunctive relief.[67]   Both of these challenges raise questions about

_____

[65] *See generally* doc. no. 1 (Complaint) ¶¶ 78-97; *see also id.* ¶ 84 ("The Act places unconstitutional conditions on the availability of this benefit to public employee organizations."); doc. no. 30, at 5-7.

[66] Doc. no. 29, at 7.

[67] Doc. no. 7, at 4; *see also* doc. no. 30, at 4 ("Plaintiffs move for a temporary restraining order or preliminary injunction on two legal claims where the likelihood of success is apparent based on the text of the law itself.   Specifically, Plaintiffs move on that portion of Count One of the Complaint challenging the unconstitutional conditions the Act places on the use of payroll deductions. . . .   Plaintiffs also move on Count Three of the Complaint challenging the unconstitutional vagueness and overbreadth of the Act, which prohibits conduct on pain of severe

whether the Act will effectively silence some speech altogether, or cause other speakers to self-censor. Accordingly, the question of whether a temporary or preliminary injunction is due to be granted rests solely upon a determination of the issue of whether plaintiffs have carried their burden of demonstrating that they are substantially likely to succeed on the merits of these two claims.

## IV. PLAINTIFFS' CONSTITUTIONAL CHALLENGES

Upon first reading of the Alabama Act at issue here — a statute that plainly addresses and proscribes certain forms of "political speech" — it appeared that this court's analytical task would be an easy one. As a result of the Supreme Court's decision in *Ysursa v. Pocatello Education Association*, — U.S. —, 129 S. Ct. 1093 (2009), however, nothing can be farther from the truth. In essence, *Ysursa* held that an Idaho statute prohibiting governmental employees from deducting money from their paychecks for union political activities did not violate the First Amendment. As the Court explained, "[t]he question is whether the State must affirmatively assist political speech by allowing public employers to administer payroll deductions for political activities. For the reasons set forth in this opinion, the answer is no." *Id.* at 1101 (Roberts, C.J., majority opinion).

---

sanction without delineating what types of activities fall on the permissible and, hence, lawful, or impermissible side of the line.").

More precisely, prior to 2003, Idaho law permitted private, state, and local governmental employees to direct their employers to withhold from the employee's salary or wages "*both* a payroll deduction for general union dues *and* a payroll deduction for union political activities conducted through a political action committee." *Ysursa*, 129 S. Ct. at 1096 (emphasis supplied). In 2003, however, the Idaho state legislature enacted a so-called "Voluntary Contributions Act" that, in part, prohibited payroll deductions earmarked for a union's "political activities." The statute defined the term "political activities" as meaning "electoral activities, independent expenditures, or expenditures made to any candidate, political party, political action committee or political issues committee or in support of or against any ballot measure." *Id.*[68]

---

[68] The majority opinion in *Ysursa* described the Idaho statutory scheme as follows:

Idaho's Right to Work Act declares that the "right to work shall not be infringed or restricted in any way based on membership in, affiliation with, or financial support of a labor organization or on refusal to join, affiliate with, or financially or otherwise support a labor organization." 1985 Idaho Sess. Laws ch. 2, § 1 (codified at Idaho Code § 44-2001 (Michie 2003)). As part of that policy, the Act prohibits any requirement for the payment of dues or fees to a labor organization as a condition of employment, § 44-2003, but authorizes employers to deduct union fees from an employee's wages with the employee's "signed written authorization," § 44-2004(1). The Act covers all employees, "including all employees of the state and its political subdivisions." § 44-2011.

Prior to 2003, employees could authorize both a payroll deduction for general union dues and a payroll deduction for union political activities conducted through a political action committee. App. 55-56, 83-84. In 2003, the Idaho Legislature passed the Voluntary Contributions Act (VCA). 2003 Sess. Laws chs. 97 and 340

Following the enactment of Idaho's Voluntary Contributions Act ("VCA"), but prior to its effective date, unions representing both private and public employees filed suit against state officials seeking to enjoin enforcement of the Act. The district court partially invalidated the statute, striking down its application to private and local-governmental employees. *See Pocatello Education Ass'n v. Heidelman*, No. CV-03-0256-E-BLW, 2005 WL 3241745 (D. Idaho Nov. 23, 2005).

Idaho's Secretary of State and Attorney General appealed the district court's decision, arguing only that the VCA was constitutional as applied to local government employees;  in other words, neither party appealed the district court's conclusion that the Act was constitutional as applied to payroll deductions by state employees that were earmarked for political activities. *See Ysursa*, 129 S. Ct. at 1097.

The Ninth Circuit affirmed the district court's ruling. *See Pocatello Education*

---

(codified at Idaho Code §§ 44-2601 through 44-2605, and § 44-2004). That legislation, among other things, amended the Right to Work Act by adding a prohibition on payroll deductions for political purposes. That amendment provides: "Deductions for political activities as defined in chapter 26, title 44, Idaho Code, shall not be deducted from the wages, earnings or compensation of an employee." § 44-2004(2). The term "political activities" is defined as "electoral activities, independent expenditures, or expenditures made to any candidate, political party, political action committee or political issues committee or in support of or against any ballot measure." § 44-2602(1)(e). Violations of § 44-2004(2) are punishable by a fine not exceeding $1,000 or up to 90 days of imprisonment, or both. § 44-2007.

*Ysursa v. Pocatello Education Ass'n*, – U.S. –, 129 S. Ct. 1093, 1096-97 (2009) (emphasis supplied).

37

*Ass'n v. Heideman*, 504 F.3d 1053 (9th Cir. 2007).

The Supreme Court reversed.  In writing for the majority,[69] Chief Justice Roberts said that Idaho's Voluntary Contributions Act was a relatively straightforward case of government refraining from subsidizing certain speech.  *See Ysursa*, 129 S. Ct. at 1096.  The majority admitted that government is forbidden to abridge the ability of groups to engage in political speech, but held that the State was "not required to assist others in funding the expression of particular ideas, including political ones."  *Id*. at 1098.  Further, "the State is not constitutionally obligated to provide payroll deductions at all."  *Id*.  As a consequence, the State's decision to cease payroll deductions for "political activities" was "*not an abridgment of the unions' speech*; they are free to engage in such speech as they see fit.  *They simply are barred from enlisting the State in support of that endeavor*."  *Id*. (emphasis supplied).

> Restrictions on speech based on its content are "presumptively invalid" and subject to strict scrutiny.  *Davenport v. Washington Ed. Assn*., 551 U.S. 177, 188, 127 S. Ct. 2372, 168 L. Ed. 2d 71 (2007); *R.A.V. v. St. Paul*, 505 U.S. 377, 382, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992).  The unions assert that the ban on checkoffs for political activities falls into this category because the law singles out political speech for disfavored treatment.

---

[69] Chief Justice Roberts was joined by Justices Scalia, Kennedy, Thomas, and Alito.  Justice Ginsburg joined the majority for Parts I and III and concurred in the Court's judgment.  Justice Breyer filed an opinion concurring in part and dissenting in part.  Justices Stevens and Souter dissented.

The First Amendment, however, protects the right to be free from government abridgment of speech. *While in some contexts the government must accommodate expression, it is not required to assist others in funding the expression of particular ideas, including political ones.* "[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny." *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 549, 103 S. Ct. 1997, 76 L. Ed. 2d 129 (1983); *cf. Smith v. Highway Employees*, 441 U.S. 463, 465, 99 S. Ct. 1826, 60 L. Ed. 2d 360 (1979) (*per curiam*) ("First Amendment does not impose any affirmative obligation on the government to listen, to respond or, in this context, to recognize [a labor] association and bargain with it").

The court below concluded, and Idaho does not dispute, that "unions face substantial difficulties in collecting funds for political speech without using payroll deductions." 504 F.3d, at 1058. *But the parties agree that the State is not constitutionally obligated to provide payroll deductions at all.* See Plaintiffs' Reply Memorandum 10; see also *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 319-320 (C.A.6 1998); cf. *Charlotte v. Firefighters*, 426 U.S. 283, 286, 96 S. Ct. 2036, 48 L. Ed. 2d 636 (1976) ("Court would reject . . . contention . . . that respondents' status as union members or their interest in obtaining a dues checkoff . . . entitle[s] them to special treatment under the Equal Protection Clause"). While publicly administered payroll deductions for political purposes can enhance the unions' exercise of First Amendment rights, *Idaho is under no obligation to aid the unions in their political activities. And the State's decision not to do so is not an abridgment of the unions' speech*; they are free to engage in such speech as they see fit. *They simply are barred from enlisting the State in support of that endeavor.* Idaho's decision to limit public employer payroll deductions as it has "is not subject to strict scrutiny" under the First Amendment. Regan, 461 U.S., at 549, 103 S. Ct. 1997.

*Ysursa*, 129 S. Ct. at 1098 (emphasis added).

Having thus classified the Idaho prohibition on payroll deductions earmarked

39

for a union's "political activities" as a refusal to "promote," or "affirmatively assist political speech," rather than as "suppression of" First-Amendment-protected political-speech, the majority opinion held that "the State need only demonstrate *a rational basis* to justify the ban on political payroll deductions." *Id*. (emphasis supplied) (citing *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 546-51 (1983)).  The Court found such a foundation in

> the State's interest in avoiding the reality or appearance of government favoritism or entanglement with partisan politics. . . . . Banning payroll deductions for political speech similarly furthers the government's interest in distinguishing between internal governmental operations and private speech.  Idaho's decision to allow payroll deductions for some purposes but not for political activities is plainly reasonable.

*Id*. at 1098-99 (citations omitted); *see also id*. at 1100 ("The ban on political payroll deductions furthers Idaho's interest in separating the operation of government from partisan politics.  That interest extends to all public employers at whatever level of government.").

A.    **Comparison of Act No. 761 to the Idaho Statute**

The Alabama Act at issue here is markedly different from the Idaho statute addressed in *Ysursa*.  In contrast to Idaho's statutory scheme — which "allow[s] payroll deductions for some purposes [*e.g*., "a payroll deduction for *general union*

*dues*"[70]] but not for political activities"[71] — the Alabama Act goes far beyond simply

banning payroll deductions for "payments to a political action committee,"[72] or (as

in Idaho's case) banning "deductions for political activities."[73]  Instead, the Alabama

Act prohibits payroll deductions "for the dues of any person" employed by any

governmental agency within the State of Alabama "to a membership organization

which uses any portion of the dues for political activity," a term that is very broadly

defined indeed,[74] especially when its expansiveness is compared to the Idaho statute's

---

[70] *Ysursa*, 129 S. Ct. at 1096 (emphasis supplied).

[71] *Id*. at 1099.

[72] Alabama Act No. 2010-761, sub-section "(b)."

[73] Idaho Code Annot. § 44-2004(2) (2011).

[74] As noted in text in Part I of this opinion, Act No. 761 states that "For purposes of this subsection (b) only, political activity shall be limited to all of the following:"

(1) Making contributions to or contracting with any entity which engages in any form of political communication, including communications which mention the name of a political candidate.

(2) Engaging in or paying for public opinion polling.

(3) Engaging in or paying for any form of political communication, including communications which mention the name of a political candidate.

(4) Engaging in or paying for any type of political advertising in any medium.

(5) Phone calling for any political purpose.

(6) Distributing political literature of any type.

(7) Providing any type of in-kind help or support to or for a political candidate.

41

definition of the same term.[75]

Furthermore, even though the prefatory sentence of sub-section (b) of Act No. 2010-761 appears to focus, as in the case of Idaho's Voluntary Contributions Act, upon state governmental *employees*, from whose wages, earnings, or compensation deductions are made for various purposes *at the request of the governmental employee*,[76] the Alabama Act actually is squarely aimed at a different, *non-governmental*, actor or speaker altogether, as is made clear by the concluding sentences of sub-section (b):

> **Any organization** that requests the State of Alabama, a county, a city, a local school board, or any other governmental agency to arrange by salary deduction or otherwise for the collection of membership dues of persons employed by the State of Alabama, a county, a city, a local school board, or any other governmental agency shall certify to the appropriate governmental entity that none of the membership dues will be used for political activity. *Thereafter, at the conclusion of each*

---

[75] As previously noted, the Idaho statute defines the term "political activities" as meaning "electoral activities, independent expenditures, or expenditures made to any candidate, political party, political action committee or political issues committee or in support of or against any ballot measure." *See Ysursa*, 129 S. Ct. at 1096.

[76] Sub-section (b) of Alabama Act No. 2010-761 begins with the following words:

> (b) No person in the employment of the State of Alabama, a county, a city, a local school board, or any other governmental agency may arrange by salary deduction or otherwise for any payments to a political action committee or arrange by salary deduction or otherwise for any payments for the dues of any person so employed to a membership organization which uses any portion of the dues for political activity. *For purposes of this subsection (b) only, political activity shall be limited to all of the following*: . . . .

Act No. 761 (emphasis supplied).

> *calendar year*, *each* **organization** *that has arranged for the collection
> of its membership dues of persons employed by the State of Alabama*, a
> county, a city, a local school board, or any other governmental agency
> *shall provide the appropriate governmental entity a detailed breakdown
> of the expenditure of the membership dues of persons employed by the
> State of Alabama*, *a county*, *a city*, *a local school board*, *or any other
> governmental agency collected by the governmental entity*. *Any*
> **organization** that fails to provide the required certifications, that reports
> any expenditures for political activity or that files false information
> about political activity in any of its reports shall be permanently barred
> from arranging for the collection of its membership dues by any
> governmental entity. The Examiners of Public Accounts shall annually
> review a sample of at least ten percent of the certifications filed with
> each governmental entity and report its findings to the appropriate
> governmental entity.

Alabama Act No. 2010-761, sub-section (b) (all emphasis supplied).

For that reason, it clearly appears to this court that Act No. 761 actually seeks

to regulate the political activities of the Alabama Education Association — a non-

governmental, associational entity whose political speech and political activities the

State has no constitutional power or authority to directly regulate. That perception

leads to the following discussion.

**B**.    **The Doctrine of Unconstitutional Conditions**

It has been argued, and this court has considered, whether Act No. 761 violates

the doctrine of "unconstitutional conditions." Under that doctrine, "'the government

may not deny a benefit to a person on a basis that infringes his constitutionally

protected . . . freedom of speech even if he has no entitlement to that benefit.'"

43

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 59 (2006) (quoting *United States v. American Library Association., Inc.*, 539 U.S. 194, 210 (2003) (in turn quoting *Board of Commissioners, Wabaunsee County. v. Umbehr*, 518 U.S. 668, 674 (1996))).  As the Eleventh Circuit recently stated in *Johnston v. Tampa Sports Authority*, 530 F.3d 1320 (11th Cir. 2008), "'[t]he doctrine of unconstitutional conditions prohibits *terminating benefits*, though not classified as entitlements, *if the termination is based on motivations that other constitutional provisions proscribe*.'"  *Id.* at 1329 (quoting *Adams v. James*, 784 F.2d 1077, 1080 (11th Cir. 1986)) (emphasis supplied).  Further, the Supreme Court observed in *Perry v. Sindermann*, 408 U.S. 593 (1972), that:

> For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely.  It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests — *especially, his interest in freedom of speech.  For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.  This would allow the government to "produce a result which* [it] *could not command directly." Speiser v. Randall*, 357 U.S. 513, 526, 78 S. Ct. 1332, 1342, 2 L. Ed. 2d 1460.  Such interference with constitutional rights is impermissible.

*Perry v. Sindermann*, 408 U.S. at 597 (emphasis supplied, alteration in original).

Here, Act No. 761 can be read as offering to confer a benefit upon AEA (*i.e.*,

*access to the payroll systems of governmental employers for the purpose of deducting dues from the paychecks of the association's members*), but only upon the basis of conditions (*e.g.*, *AEA must refrain from engaging in political activity*, *and annually jump through elaborate audit hoops to demonstrate compliance with that mandate*): conditions that, if directly imposed upon the beneficiary by legislation, would be unconstitutional.    Stated differently, the State of Alabama could not have constitutionally implemented a statute directly prohibiting the AEA from engaging in the seven categories of political activities enumerated in sub-section (b) of Act No. 761.  Even so, the State appears to be attempting to utilize Act No. 761 as a tool to indirectly produce that result. "Such interference with constitutional rights is impermissible."  *Perry*, 408 U.S. at 597 (quoting *Speiser*, 357 U.S. at 526).

As the Governor's attorney argued during the March 15, 2011 hearing before this court, however, the Supreme Court's decision in *Regan v. Taxation With Representation of Washington*, 461 U.S. 540 (1983), suggests a contrary result.[77]  In that case, a non-profit corporation engaged in lobbying for the "'public interest' in the area of federal taxation" challenged its denial of tax exempt status under § 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3).  *Id.* at 541-42.  That statute granted tax exemption to:

--------------------------------------------------

[77] *See* doc. no. 34 (Transcript of Hearing conducted on Mar. 15, 2011), at 82-86.

45

Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition . . . , or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, *no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation* (except as otherwise provided in subsection (h)), *and which does not participate in*, *or intervene in* (including the publishing or distributing of statements), *any political campaign on behalf of any candidate for public office.*

*Id.* at 542 n.1 (quoting 26 U.S.C. § 501(c)(3) as then in effect) (emphasis in original).

The Internal Revenue Service denied the non-profit's application for tax exempt status because the organization's primary purpose was to influence legislation. *Id.* The corporation challenged the statute arguing, among other things, that "Congress' decision not to subsidize its lobbying violate[d] the First Amendment [because] the prohibition against substantial lobbying by § 501(c)(3) organizations impose[d] an 'unconstitutional condition' on the receipt of tax-deductible contributions." *Id.* at 545 (citation omitted) (bracketed alterations supplied). The Supreme Court rejected that argument. Justice Rehnquist, writing for the Court and considering the organization's "attack [on] the prohibition against substantial lobbying in § 501(c)(3)," concluded that: "In short, Congress chose not to subsidize lobbying as extensively as it chose to subsidize other activities that non-profit organizations undertake to promote the public welfare." *Id.* at 544. The Court went on to note that the non-profit corporation

46

was "certainly correct . . . that [the Supreme Court has] held that the government may not deny a benefit to a person because he exercises a constitutional right." *Id.* at 545 (citing *Perry*, 408 U.S. at 597) (bracketed alteration supplied).  Even so, the Court found the organization "just as certainly *incorrect*" in arguing that the challenged provision violated the doctrine of unconstitutional conditions.  *Id.* (emphasis added).

The Court reasoned as follows:

> Congress has merely refused to pay for the lobbying out of public monies.  This Court has never held that the Court must grant a benefit such as TWR claims here to a person who wishes to exercise a constitutional right.
>
> This aspect of the case is controlled by *Cammarano v. United States*, 358 U.S. 498 (1959), in which we upheld a Treasury Regulation that denied business expense deductions for lobbying activities.  We held that Congress is not required by the First Amendment to subsidize lobbying.  *Id*. at 513.  In this case, like in *Cammarano*, Congress has not infringed any First Amendment rights or regulated any First Amendment activity.  Congress has simply chosen not to pay for TWR's lobbying.  We again reject the "notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State."  *Id*. at 515 (Douglas, J., concurring).

*Regan*, 461 U.S. at 545-46.

The *Regan* decision appears at odds with the argument that Alabama's decision to cease payroll deduction of dues for organizations engaged in political activities violates the unconstitutional conditions doctrine.  Like the non-profit corporation in *Regan*, the plaintiffs in the present case argue that they are denied a benefit absent

47

compliance with a purported unconstitutional condition imposed by the government.[78]

In *Regan*, the condition imposed by the government was a mandate that the organization seeking the tax-exempt benefit refrain from some varieties of political activity. Nevertheless, *Regan* held that Congress did not infringe any First Amendment rights, or regulate any First Amendment activity, when refusing to grant tax-exempt status to an organization, if a "substantial part of the activities of" that organization consisted of "carrying on propaganda, or otherwise attempting to influence legislation." 26 U.S.C. § 501(c)(3); *see also Regan*, 461 U.S. at 545-46.

Applying the rationale of *Regan* and other Supreme Court decisions,[79] it

---

[78] *E.g.*, doc. no. 30, at 5-11.

[79] Indeed, a number of cases reach the same conclusion without even a discussion of whether the doctrine of unconstitutional conditions applies. *See, e.g., Ysursa*, 129 S. Ct. at 1096, 1098, 1101 (citing *Regan*, but omitting all discussion of the doctrine of unconstitutional conditions, and ultimately concluding that a statute prohibiting payroll deductions for political activities did not violate the First Amendment). Thus, it may be that the doctrine is wholly rejected, albeit implicitly, in cases such as the one currently before this court. *See, e.g., National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) (holding, without discussion of unconstitutional conditions doctrine, that an art grant program requiring the National Endowment for the Arts to judge the content of the proposed art to be funded did not violate the First Amendment); *Rust v. Sullivan*, 500 U.S. 173 (1991) (upholding regulation that prohibited family planning clinics from using federal funds to counsel or refer pregnant women for abortion or to engage in any advocacy in favor of abortion with no discussion of doctrine of unconstitutional conditions); *Lyng v. International Union, United Automobile, Aerospace & Agricultural Implement Workers*, 485 U.S. 360 (1988) (holding that the government was permitted to decline to distribute food stamps to the households of striking workers with no discussion of doctrine of unconstitutional conditions); *Harris v. McRae*, 448 U.S. 297, 316 (1980) (upholding law, without discussing unconstitutional conditions, prohibiting federal Medicaid funds from use in abortions, finding that "it simply does not follow that a woman's freedom of choice carries with it a constitutional entitlement to the financial resources to avail herself of the full range of protected choices"); *Maher v. Roe*, 432 U.S. 464, 474 (1977) (concluding, without discussion of the doctrine of unconstitutional conditions, that state regulation providing Medicaid recipients with payments for medical services in conjunction with childbirth but not for

48

appears that this Court would be bound to reach the same conclusion in considering this matter at a later stage.  *See United States v. American Library Association, Inc*., 539 U.S. 194, 211 (2003) (rejecting the argument that a statute conditioning library funding on the libraries' use of internet content filters violated the doctrine of unconstitutional conditions, noting that "when the Government appropriates public funds to establish a program it is entitled to define the limits of that program").  Of course, that does not render Act No. 761 constitutionally sound, but it does lead this court to conclude that plaintiffs have failed to demonstrate a substantial likelihood of success on the merits with respect to their claim that the Act at issue violates the doctrine of unconstitutional conditions.

## C.   **The Doctrines of Vagueness and Overbreadth**

In general, facial challenges to the constitutionality of a statute may be maintained only if there is "'no set of circumstances'" under which the law could be valid.  *United States v. Stevens*, — U.S. — , 130 S. Ct. 1577, 1587 (2010) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).[80]

Even so, "when overly broad statutory language seems to sweep protected First

---

nontherapeutic abortions was merely "a value judgment [by the state] favoring childbirth over abortion," and nothing more than a refusal by the state to subsidize the exercise of a right).

[80] *See also City of Chicago v. Morales*, 527 U.S. 41, 78 n.1 (1999) (Scalia, J., dissenting) ("In other words, a facial attack . . . requires unconstitutionality in all circumstances . . . .").

Amendment expression directly into the scope of a regulation affecting speech, or indirectly places an undue burden on such protected activity, free expression can be chilled . . . ." *American Booksellers v. Webb*, 919 F.2d 1493, 1499-1500 (11th Cir. 1990).[81]  The Supreme Court has, therefore, recognized that the void-for-vagueness doctrine, rooted in the Due Process Clause of the Fourteenth Amendment,[82] applies with particular stringency where a law regulates speech, both out of concern that individuals will self-censor or that government will indirectly regulate speech or association in an impermissible fashion through the mechanism of arbitrarily discriminatory enforcement of an unclear standard.  *E.g.*, *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982) (stating that, because such laws "threaten[] to inhibit the exercise of constitutionally protected rights," where a "law interferes with the right of free speech or of association, a more stringent vagueness test should apply").   Relatedly, but distinctly, the Court has uniquely recognized the doctrine of "overbreadth" (also often called "substantial overbreadth"), under which laws that sweep in a substantial amount of constitutionally protected expression may be invalidated, even though those laws

---

[81] *See also Keyishian v. Board of Regents of University of State of N. Y.*, 385 U.S. 589, 603-604 (1967); *Entertainment Productions, Inc. v. Shelby County, Tenn.*, 588 F.3d 372, 379 (6th Cir. 2009) ("When a law implicates First Amendment freedoms, vagueness poses the same risk as overbreadth, as vague laws may chill citizens from exercising their protected rights.").

[82] Or, of course, the Fifth Amendment, in suits challenging federal statutes.

permissibly regulate other kinds of expression. *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (describing "a second type of facial challenge in the First Amendment context under which a law may be overturned as impermissibly overbroad because a substantial number of its applications are unconstitutional" even though the law has a "plainly legitimate sweep") (citations and quotation marks omitted).   This court believes that both of these doctrines are, for the reasons discussed below, implicated in the present case.

Courts have "traditionally viewed vagueness and overbreadth as logically related and similar doctrines."[83]  *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983); *see also, e.g., Jordan v. Pugh*, 425 F.3d 820, 827 (10th Cir. 2005) ("Although not identical, vagueness and overbreadth challenges in the First Amendment context are alternative and often overlapping grounds for the same relief, namely invalidation of the offending regulation.").   Indeed, one of the most widely-cited commentaries on

---

[83] The Third Circuit described the doctrinal landscape well:

> First Amendment vagueness overlaps with, but is distinct from, an overbreadth challenge. Like the overbreadth doctrine, a meritorious First Amendment vagueness challenge will annul an unclear law that 'chills' protected First Amendment activities. Hence, a vagueness challenge will succeed when a party does not have actual notice of what activity the statute prohibits. Yet the vagueness doctrine, unlike the overbreadth doctrine, additionally seeks to ensure fair and non-discriminatory application of the laws, thus reflecting its roots in the due process clause.

*Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1266 (3d Cir. 1992).

the overbreadth doctrine opines that "First Amendment vagueness doctrine . . . is best

conceptualized as a subpart of First Amendment overbreadth doctrine."  Richard H.

Fallon, Jr., *Making Sense of Overbreadth*, 100 Yale L.J. 853, 904-05 (1991).  Even

panels of seasoned appellate judges sometimes have enormous difficulty separating

the strands of reasoning that must be applied in any given case.  *See*, *e.g.*, *Holder v.*

*Humanitarian Law Project*, — U.S. —, 130 S. Ct. 2705, 2719 (2010) ("By deciding

how the statute applied in hypothetical circumstances, the Court of Appeals'

discussion of vagueness seemed to incorporate elements of First Amendment

overbreadth doctrine.").

Even though the concepts overlap, the two doctrines are analytically distinct.[84]

First, the overbreadth doctrine permits the facial invalidation of
laws that inhibit the exercise of First Amendment rights if the
impermissible applications of the law are substantial when judged in
relation to the statute's plainly legitimate sweep.  Second, even if an
enactment does not reach a substantial amount of constitutionally
protected conduct, it may be impermissibly vague because it fails to
establish standards for the police and public that are sufficient to guard

---

[84] *See also*, *e.g.*, *Humanitarian Law Project*, 130 S. Ct. at 2719 (stating that "a plaintiff
whose conduct is constitutionally proscribed may not challenge a law on the basis of vagueness,"
but that "[s]uch a plaintiff may have a valid overbreadth claim under the First Amendment, but our
precedents make clear that a Fifth Amendment vagueness challenge does not turn on whether a law
applies to a substantial amount of protected expression.  Otherwise the doctrines would be
substantially redundant") (citations omitted); *Hallandale Professional Fire Fighters Local 2238 v.*
*City of Hallandale*, 922 F.2d 756, 760 n.4 (11th Cir. 1991) ("[W]e do not accept the contention that
vagueness and overbreadth are synonymous:  vagueness is based on due process, and overbreadth
is part of first amendment doctrine."); *American Booksellers*, 919 F.2d at 1505 ("The overbreadth
and vagueness doctrines are related yet distinct.") (citations omitted).

against the arbitrary deprivation of liberty interests.

*City of Chicago v. Morales*, 527 U.S. 41, 52 (1999).  Further, "vagueness is based on due process, and overbreadth is part of first amendment doctrine."  *Hallandale Professional Fire Fighters Local 2238*, 922 F.2d at 760 n.4; *see also United States v. Williams*, 553 U.S. 285, 304 (2008) ("Vagueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment.").

Despite the (often murky) distinctions between the two doctrines, the Supreme Court has instructed that the analytical pathway for both is intertwined at its inception:

> In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct.  If it does not, then the overbreadth challenge must fail.  The court should then examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all of its applications.

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982); *see also Bama Tomato Co. v. United States Department of Agriculture*, 112 F.3d 1542, 1546 (11th Cir. 1997) (stating that, in a challenge based upon either doctrine, or both, "we first determine whether the . . . provision reaches First Amendment rights").

53

The Supreme Court has regularly reiterated that application of these doctrines is "manifestly, strong medicine" to be "employed . . . sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973); *see also Locke v. Shore*, No. 10-11052, 2011 WL 692238, at *3 (11th Cir. Mar. 1, 2011). Nevertheless, particularly where, as here, political speech on matters of public import is implicated, and the statute carries the threat of criminal penalties, courts must protect public debate (and the speakers whose voices inform it) from statutes that would distort its contours by directly or indirectly discouraging constitutionally protected activities.

> [S]peech on matters of public concern [is] at the heart of the First Amendment's protection. The First Amendment reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open. That is because speech concerning public affairs is more than self-expression; it is the essence of self-government. Accordingly, speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.

*Snyder v. Phelps*, — U.S. —, 130 S. Ct. 1206, 1215 (2011) (internal quotation marks and citations omitted);[85] *see also Humanitarian Law Project*, 130 S. Ct. at 2732

---

[85] To put this quotation into proper historical and jurisprudential context, it is repeated here, in full, with citations and internal quotation marks included:

"[S]peech on 'matters of public concern' . . . is 'at the heart of the First Amendment's protection.'" *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758-59, 105 S. Ct. 2939, 86 L. Ed. 2d 593 (1985) (opinion of Powell, J.) (quoting *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 776, 98 S. Ct. 1407, 55 L. Ed. 2d 707 (1978)). The First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited,

(Breyer, J., dissenting) (observing that "speech and association for political purposes is the kind of activity to which the First Amendment ordinarily offers its strongest protection"); *Coral Springs Street Systems, Inc. v. City of Sunrise*, 371 F.3d 1320, 1347 (11th Cir. 2004) ("[P]olitical speech . . . enjoys the highest level of First Amendment protection."). Following a discussion of the principles the Supreme Court and Eleventh Circuit have laid down for this court to follow in addressing vagueness and overbreadth challenges, the court will address each of the challenged provisions under the appropriate rubric.

### 1.     The void-for-vagueness doctrine

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "To satisfy due process, a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and

---

robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). That is because "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74-75, 85 S. Ct. 209, 13 L. Ed. 2d 125 (1964). Accordingly, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983) (internal quotation marks omitted).

*Snyder*, 130 S. Ct. at 1215.

discriminatory enforcement.   The void-for-vagueness doctrine embraces these requirements." *Skilling v. United States*, — U.S. —, 130 S. Ct. 2896, 2927-28 (2010) (citation and quotation marks omitted) (alterations in original); *see also National Endowment for the Arts v. Finley*, 524 U.S. 569, 588-89 (1998) ("Under the First and Fifth Amendments, speakers are protected from arbitrary and discriminatory enforcement of vague standards."); *Connally v. General Construction Co.*, 269 U.S. 385, 391 (1926) ("[A] Statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.").

To restate in a slightly different manner, a criminal statute may be invalidated for vagueness "if it either (1) fails 'to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits' or (2) authorizes or encourages 'arbitrary and discriminatory enforcement.'" *United States v. Eckhardt*, 466 F.3d 938, 944 (11th Cir. 2006), *cert. denied* 549 U.S. 1230 (2007) (quoting *City of Chicago v. Morales*, 527 U.S. 41 (1999)); *see also City of Chicago*, 527 U.S. at 56 ("Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage

arbitrary and discriminatory enforcement.") (plurality opinion).

In short, a "law is void for vagueness if it fails to give fair warning of what is prohibited, if it fails to provide explicit standards for the persons responsible for enforcement and thus creates a risk of discriminatory enforcement, and if its lack of clarity chills lawful behavior." *Anderson v. Milwaukee County*, 433 F.3d 975, 978 (7th Cir. 2006).

These constitutional strictures are applicable to all statutes carrying criminal penalties. *See*, *e.g.*, *Skilling*, 130 S. Ct. at 2933. However, "where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.'" *Grayned*, 408 U.S. at 109 (quoting, respectively, *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964), and *Cramp v. Board of Public Instruction of Orange County, Fla.*, 368 U.S. 278, 281 (1961)) (alteration in original); *see also Reno v. American Civil Liberties Union*, 521 U.S. 844, 872 (1997) ("The severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images. As a practical matter, this increased deterrent effect, coupled with the risk of discriminatory enforcement of vague regulations, poses greater First Amendment concerns . . . .") (internal citations and quotation marks omitted).

The Supreme Court "ha[s] said that when a statute 'interferes with the right of

free speech or of association, *a more stringent vagueness test should apply*.'"
*Humanitarian Law Project*, 130 S. Ct. at 2719 (alteration and emphasis supplied).
"Because First Amendment freedoms need breathing space to survive, government
may regulate in the area only with narrow specificity."  *N.A.A.C.P. v. Button*, 371
U.S. 415, 433 (1963).

For such reasons, the "standards of permissible statutory vagueness are strict
in the area of free expression."  *Id.* at 432 (citing *Smith v. California*, 361 U.S. 147,
151 (1959); *Winters v. New York*, 333 U.S. 507, 509-510, 517-18 (1948); *Herndon
v. Lowry*, 301 U.S. 242 (1937); *Stromberg v. California*, 283 U.S. 359 (1931); *United
States v. C.I.O.*, 335 U.S. 106, 142 (Rutledge, J., concurring) (1948)).  That is because
vague laws regulating the exercise of freedoms protected by the First Amendment risk
significant "chilling effects . . . since those persons covered by the statutes are bound
to limit their behavior to that which is unquestionably safe."  *Id.*

"But 'perfect clarity and precise guidance have never been required even of
regulations that restrict expressive activity.'"  *Holder*, 130 S. Ct. at 2719 (quoting
*United States v. Williams*, 553 U.S. 285, 304 (2008) (quoting, in turn, *Ward v. Rock
Against Racism*, 491 U.S. 781, 794 (1989))).  "What renders a statute vague is not the
possibility that it will sometimes be difficult to determine whether the incriminating
fact it establishes has been proved; but rather the indeterminacy of precisely what that

fact is." *Williams*, 553 U.S. at 306.

### 2.    The overbreadth doctrine

"[T]he overbreadth doctrine 'permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" *City of Chicago*, 527 U.S. at 52 (quoting *Broadrick*, 413 U.S. at 615).  Courts must "construe [a] statute to avoid constitutional problems, if the statute is subject to such a limiting construction." *Locke*, 2011 WL 692238, at *3 (alteration supplied).  The analysis of whether a statute "is unconstitutionally overbroad [entails examining whether] it sweeps within its ambit *protected speech of persons not before the Court* . . . ." *Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, Florida*, 337 F.3d 1251, 1274 n.24 (11th Cir. 2003) (alteration and emphasis supplied).

"A statute may be invalidated on its face, however, only if the overbreadth is 'substantial.'" *Board of Airport Commissioners of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987) (citations omitted).  "[T]here must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protection of parties not before the Court for it to be facially challenged on overbreadth grounds." *Id.* (quoting *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984)).

As is often also true with vagueness challenges, the doctrine requires "a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression" that can colorably be read as proscribed by the statutory text. *Broadrick*, 413 U.S. at 612.

"To determine whether the provision reaches a 'substantial amount of constitutionally protected activity, [courts] consider both the ambiguous and unambiguous scope of the provision.'" *Bama Tomato Co. v. United States Department of Agriculture*, 112 F.3d 1542, 1546 (11th Cir. 1997) (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.6 (1982)).

Courts also should look to both the "direct and indirect burdens on speech" in querying the existence of substantial overbreadth, which necessarily requires "evaluat[ing] the *potential* reach of a statute [under all rationally] conceivable sets of circumstances . . . ." *American Booksellers*, 919 F.2d at 1499 (emphasis and alterations supplied). "The type of 'legislative overkill' most commonly associated with 'overbreadth' results when lawmakers define the scope of a statute to reach both unprotected expression as well as, at least potentially, protected speech." *Id.* at 1502.

The final aspect of the "substantial overbreadth" determination that is of enormous importance in this action emerges from the doctrine of "constitutional

avoidance":

> It has long been a tenet of First Amendment law that in determining a facial challenge to a statute, if it be "readily susceptible" to a narrowing construction that would make it constitutional, it will be upheld. *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). The key to application of this principle is that the statute must be "*readily susceptible*" to limitation. [The court] will not rewrite a state law to conform it to constitutional requirements.

*Virginia v. American Booksellers Association*, 484 U.S. 383, 397 (1988) (emphasis supplied). That is, courts must consider a claim that a statute is substantially overbroad "in light of our twin obligations to (1) construe the statute narrowly, (2) without rewriting its terms." *American Booksellers*, 919 F.2d at 1500.

### 3.    Application of doctrinal principles to Act No. 761

Sub-section (c) of Act No. 761 provides that "[a]ny person who violates this section shall be guilty of the crime of trading in public office and upon conviction thereof, shall be fined or sentenced, or both, as provided by Section 13A-10-63."[86] As discussed above, the threat of criminal penalties amplifies this court's concern with vagueness and overbreadth. Yet, as discussed below, even the applicability of the criminal penalties is, itself, vague. Further, the Act indisputably deals with at

---

[86] *See supra* note 2 for a discussion of the applicable penalties. *See also* doc. no. 34 (Transcript of Preliminary Injunction/TRO Hearing held on March 15, 2011), at 110-13 (defense counsel discussing with the undersigned the criminal penalties under Act No. 761).

least two critical aspects of the First Amendment, as even defendants concede.[87]

Specifically, it deals with *both* the political speech of voluntary associations *and*

public employees' speech and association rights *via* payment of dues to those

associations and to political action committees that support the associational entity's

advocacy of the employees' interests.  Accordingly, this court understands Supreme

Court precedent to dictate incisive inquiries into three issues:  (1) the question of

whether the statute provides those subject to its penalties with fair notice of activities

that may violate the statute; (2) the question of whether the statute provides adequate

guidance to the numerous state officials who will be charged with enforcing it;[88] and

(3) the question of whether the statute draws within its ambit a substantial amount of

constitutionally protected activity.  Following a brief discussion of the challenged

statute's criminal penalty clause, the court will address the provisions plaintiffs

challenge as vague and overbroad.

### a.    The challenged Act's penal nature

---

[87] *See* doc. no. 29 ("Opposition to Motion for Preliminary Injunctive Relief by Defendants" Morton, Hill, and Treese), at 3 (arguing that the Act is supported by the state's interest "in distinguishing between internal governmental operations and private speech").

[88] *See* doc. no. 34 (Transcript of Proceedings Held Mar. 15, 2011), at 70 ("It's made much more difficult by the fact that there are scores — hundreds maybe, an enormous number — of enforcers of this law. Every school board, every two-year college, every four-year college, the Comptroller, every DA in every circuit, all of those various enforcers may take varying different perspectives.").  Counsel for plaintiffs made this point both at the hearing, and in plaintiffs' brief, and defendants have not contradicted it.

Initially, the court will note that it is not entirely clear whether the criminal penalty provision of Act No. 761, contained in sub-section (c), is actually applicable to individuals who engage in the activity proscribed in the newly-created sub-section (b) challenged in this action.  The final sentence of sub-section (c) states in full: "Any person who violates this section shall be guilty of the crime of trading in public office and upon conviction thereof, shall be fined or sentenced, or both, as provided by Section 13A–10–63."[89]  This language would appear categorically to subject any individual who violates any proscription in "the section" — *i.e.*, *the amended law that will be codified as* sections 17-17-5(a) – (c) of the Alabama Code, *if the Act is allowed to become effective* — to the penalties described in the cited portion of the criminal code.  Those penalties make "trading in public office" a Class A misdemeanor.[90]

---

[89] The full text of sub-section (c) of Act No. 761 reads as follows:

   (c) Any person who is in the employment of the State of Alabama, a county, a city, a local school board, the State Board of Education or any other governmental agency, shall be on approved leave to engage in political action or the person shall be on personal time before or after work and on holidays.  It shall be unlawful for any officer or employee to solicit any type of political campaign contributions from other employees who work for the officer or employee in a subordinate capacity.  It shall also be unlawful for any officer or employee to coerce or attempt to coerce any subordinate employee to work in any capacity in any political campaign or cause.  Any person who violates this section shall be guilty of the crime of trading in public office and upon conviction thereof, shall be fined or sentence, or both, as provided by Section 13A-10-63.

[90] *See supra* note 2 for a description of the penalties that apply to Class A misdemeanors.

Nevertheless, the language that precedes the final sentence of sub-section (c) appears targeted solely to the prohibitions set forth in the remainder of the section as it existed before the amendment challenged in this action.[91]  Sub-section (a) — one half of the law as it existed before the amendatory Act challenged here — makes it unlawful for a public employee "to use any state, county, city, local school board, or other governmental agency funds, property, or time, for any political activities."[92] Sub-section (c) then states:  "Any person who is in the employment of the State of Alabama, a county, a city, a local school board, the State Board of Education or any other governmental agency, shall be on approved leave to engage in political action or the person shall be on personal time before or after work and on holidays."  The remaining portion of sub-section (c) preceding the above-quoted final sentence contains further prohibitions on government workers coercing other employees or using a position as a superior to influence subordinate employees into contributing time or effort to a political campaign.[93]  Thus, in the existing version of the statute,

---

[91] *See supra* note 88.

[92] The text of sub-section (a) of Act No. 761 reads as follows:  "(a)  No person in the employment of the State of Alabama, a county, a city, a local school board, or any other governmental agency, whether classified or unclassified, shall use any state, county, city, local school board, or other governmental agency funds, property, or time, for any political activities."

[93] *See supra* note 88.

the text reads as a series of prohibitions followed by a penalty clause.[94]   Now prohibitory language is spread across three sections, with the penalty clause attached only to the last one.

To clarify how the provisions interact, and the applicability of the penalty clause to individual government officers who engage in the conduct purportedly proscribed in the first portion of sub-section (b), the undersigned stated to the representative of the Alabama Attorney General's Office, who served as attorney for some of the defendants at the hearing held on March 15, 2011:  "[A]s I read it, [the statute] provides, among other things, that *any person*, meaning *individuals*, *who arranges for* payment by salary deduction or otherwise for dues to a membership organization that engages in political activity *is guilty of the crime of trading in*

---

[94] The entire text of Alabama Code § 17-17-5 (1975) (2007 Replacement Vol.) as it presently exists reads as follows:

> No person in the employment of the State of Alabama, a county, or a city whether classified or unclassified, shall use any state, county, or city funds, property or time, for any political activities.  Any person who is in the employment of the State of Alabama, a county, or a city shall be on approved leave to engage in political action or the person shall be on personal time before or after work and on holidays. It shall be unlawful for any officer or employee to solicit any type of political campaign contributions from other employees who work for the officer or employee in a subordinate capacity.  It shall also be unlawful for any officer or employee to coerce or attempt to coerce any subordinate employee to work in any capacity in any political campaign or cause.  Any person who violates this section shall be guilty of the crime of trading in public office and upon conviction thereof, shall be fined or sentenced, or both, as provided by Section 13A-10-63.

*public office*, which is subject to fine or imprisonment or both."[95]  None of the team of defense attorneys present disagreed.  Thus, every indication provided to this court suggests that the criminal penalty would apply to individual public servants whose conduct comes within the prohibitions in sub-section (b).

Rather than mitigating the policy implications of any vagueness in sub-section (b), the indeterminacy of the potential sanctions for its violation by an individual makes the problems all the more acute.  As noted above, the threat of criminal penalties makes the constitutional issues with a law potentially affecting protected expressive activities all the more troublesome.  *E.g.*, *Reno v. American Civil Liberties Union*, 521 U.S. 844, 871-72 (1997) ("In addition to the opprobrium and stigma of a criminal conviction . . . . [a challenged law's criminal] sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images. . . .  As a practical matter, this increased deterrent effect, coupled with the risk of discriminatory enforcement of vague regulations, poses greater First Amendment concerns . . . .") (citations and quotation marks omitted).[96]  Individuals

---

[95] Doc. no. 34, at 110-111 (emphasis supplied).

[96] *See also National Endowment for the Arts v. Finley*, 524 U.S. 569, 588-89 (1998) (statutory language dictating that funding for arts projects would be distributed based upon "artistic excellence," taking into account "the diverse beliefs and values of the American public," and other such language were "undeniably opaque, and *if they appeared in a criminal statute or regulatory scheme, they could raise substantial vagueness concerns*," but were not in the context of art grant statute) (emphasis supplied).

may self-censor to avoid even conduct colorably covered by a criminal prohibition in order to avoid the ignominy and economic impact of criminal sanctions.  In this way, any chilling effect the law has on expressive (or associative) activity is greatly magnified.  If it is problematic when an individual cannot know whether the kind of conduct he engages in will subject him to criminal penalties, it is all the more problematic for an individual to be unable to tell whether criminal penalties are even in the picture.  That is precisely the problem with the present statute.  Not only would individual public employees of the State of Alabama or its political subdivisions be unsure whether their conduct met the vague and overbroad definition of proscribed conduct, or whether an entity to whom they decided to make a payment had engaged in one of the activities subsequently determined to have been "political activity" (as will be discussed more fully below), they would be unsure whether their conduct could subject them to criminal penalties at all.

> **b**.     **"or otherwise"**

Perhaps the most problematic portion of Act No. 761 is found in sub-section (b), which reads as follows:

> No *person* in the employment of the State of Alabama, a county, a city, a local school board, or any other governmental agency *may arrange* by salary deduction *or otherwise* for any payments to a political action committee or *arrange* by salary deduction *or otherwise* for any payments for the dues of any person so employed to a membership

organization which uses any portion of the dues for political activity.[97]

The problem, as plaintiffs point out, is that the phrase "or otherwise" does not lend itself to a narrow construction.[98]  Especially after the Supreme Court's decision in *Citizens United v. Federal Election Commission*, — U.S. —, 130 S. Ct. 876 (2010), it cannot be realistically argued that the payment of money to a political action committee, or the payment of membership dues to a union or other voluntary association that engages in political activity, is not "speech" (or, in the case of union membership, associational activity) subject to constitutional protection.  *See id.*, 130 S. Ct. at 905 ("All speakers, including individuals and the media, use money amassed from the economic marketplace to fund their speech."); *see also id.* at 898 ("As a 'restriction on the amount of money a person or group can spend on political communication . . . that statute 'necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached.'") (quoting *Buckley v. Valeo*, 424 U.S. 1, 19 (1976) (*per curiam*)); *see also Buckley*, 424 U.S. at 44-46 (reading the challenged provisions narrowly so as not to include more-protected "issue advocacy," but still finding them to be unconstitutional).  Moreover, payment of money to support an organization

---

[97] S.B. 2, 2010 Leg., 1st Sp. Session (Ala. 2010) (aka Act 2010-761). (emphasis supplied).

[98] Doc. no. 30, at 23-25.

engaged in political activity constitutes "[s]peech on public issues [which] occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder*, — U.S. —, 131 S.Ct. at 1215 (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)) (bracketed alterations supplied).

The most natural reading of sub-section (b) prevents payments by *all individual government employees* to any political action committee or any entity engaging in the ill-defined "political activity" *by any means*. The principal definition of the word "otherwise" is, simply, "different"; and the secondary definition is "under different circumstances." *Webster's Third New International Dictionary* 1598 (2002). The problem with this language may better be viewed through the lens of overbreadth. *See American Booksellers*, 919 F.2d at 1505 ("Overbroad legislation need not be vague, indeed it may be too clear; its constitutional infirmity is that it sweeps protected activity within its proscription.") (quoting *M.S. News Co. v. Casado*, 721 F.2d 1281, 1287 n.6 (10th Cir. 1983)); *see also Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972) ("A clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct."). By its plain terms, the statute appears to proscribe an enormous amount of protected speech by employees of the state.

However, even if the court accepts defendants' contention that the phrase "or

69

otherwise" *should not* be given its natural reading, this fails to save the provision. It is unclear how "or otherwise" could plausibly be read more narrowly to save the statute from  constitutional infirmity, and a federal court is not at liberty to rewrite a state statute not "readily susceptible" to a narrowing construction. *Virginia v. American Booksellers Association*, 484 U.S. 383, 397 (1988). Even if "or otherwise" could be read in some narrower fashion, that narrower reading necessarily would still be vague. Thus, however the problem with this language is characterized, the threat that conscientious, law-abiding public servants may "steer far wider of the unlawful zone" than the government constitutionally could command is significant. *Speiser v. Randall*, 357 U.S. 513, 526 (1958).

Even though the court recognizes the importance of querying hypothetical application of an allegedly overbroad statute to parties not before the court, the court finds it need not resort solely to such thought-experiments to find problematic applications of this statute. At the hearing this court conducted, plaintiffs introduced, without objection, a letter sent by Alabama's Comptroller White, a defendant in this action, to the Retirement Systems of Alabama.[99]  That letter informed its recipient, a Mr. Marc Reynolds, that "legal counsel interpretation" of Act No. 761 prohibited the "process[ing] of retiree payment registers that include deductions for payments that

---

[99] Plaintiffs' Exhibit 2, admitted at the Hearing held on March 15, 2011.

will be used for political activities.  This includes dues to any organization that contributes to political action committees or provides support for any political activities or contributions to political action committees."[100]   Based upon this directive, Mr. Reynolds sent a letter the Alabama Retired Teacher's Association,[101] which arranges for insurance coverage for thousands of retired educational personnel in the state.[102]   In that letter, Mr. Reynolds advised the Association that the Retirement System's "records indicate that the following entities [a group of insurance companies] are receiving *payroll deducted* payments from [the Retirement Systems of Alabama] through you."[103]   The letter further advised that, "[i]n order to ensure our compliance with § 17-17-5 and the directive of the Comptroller," the Retirement Systems of Alabama had to receive affidavits from each of the *insurance companies* proving that *those companies* engaged in no political activities; otherwise, the direct payments on behalf of retirees would be terminated (apparently without notice to the retirees themselves).[104]

---

[100] *Id.* at 7.

[101] *Id.* at 8-9. Though the court is unclear regarding the precise details, the affidavit to which these letters are attached, of Ms. Janice J. Charlesworth, Executive Secretary of the Alabama Education Retirees Association, makes plain that the Alabama Retired Teachers' Association is in fact a part of, or the same entity as, the Alabama Education Retirees Association.  *Id.* at 1-4.

[102] *See* doc. no. 34, at 23-32.

[103] Plaintiffs' Exhibit 2, admitted at the Hearing held on March 15, 2011, at 8.

[104] *Id.* at 8-9.

As counsel for some of the defendants helpfully noted, retirees are not "employees" and, therefore, payments deducted from their monthly retirement checks would *not* be "salary deductions" within any comfortable meaning of the phrase.[105] *Even so, defendant Comptroller White apparently concluded that retirees were within the ambit of the statute.* Defense counsel apparently were unaware that their client had interpreted the prohibition on "arrang[ing] by salary deduction *or otherwise* for any payment" in this extraordinarily broad fashion.[106] Certainly, if there is confusion between counsel and the governmental officials they represent (who will be charged with implementation of this statute) about the meaning of the language "salary deduction *or otherwise*," both the fair notice and enforcement guideline aspects of the vagueness doctrine are starkly implicated. Additionally, if remission of retirement funds through an intermediary to an independent insurance company that (consistent with its own constitutional rights) engages in political activity *is* within the ambit of the statute, as Comptroller White obviously believes, then the statute's definition of "arrange by salary deduction or otherwise" is *significantly* overbroad.

At the hearing held before this court, defendants made much of the fact that AEA has engaged in a campaign to secure consents from its members to pay dues by

---

[105] *See* doc. no. 34, at 55-56; *see also id.* at 61-62.

[106] *See* doc. no. 34, at 47.

bank draft.[107]   Counsel's implication appears to be that, because AEA has been so doing, and has been partially successful, public employees must obviously know that bank drafts do not fall into the category of activities proscribed by the "or otherwise" language.   Yet, as Dr. Hubbert testified, even though AEA was pushing ahead with its initiative to establish bank drafts as a necesssary survival tactic, he was unsure whether doing so was in compliance with the statute.[108]   Also relevant, especially at such an early stage of this action, two of the individual plaintiffs, Strickland and Slaughter, according to the complaint, have long paid their dues to AEA and made contributions to A-VOTE in cash.   Despite defendants' contentions to the contrary, based upon the plain language of this Act, the court has no reason to doubt they reasonably "fear" that their cash payments may fall within the "or otherwise" conduct the Act criminalizes.

Moreover, even had Dr. Hubbert agreed that bank drafts fell outside the ambit of the statute, that would do little to affect the court's overbreadth concerns.   In an overbreadth challenge, a court must "consider both the ambiguous and unambiguous scope of the provision," *Hoffman Estates*, 455 U.S. at 494 n.6, and inquire into whether the "provision might be unconstitutionally applied to third parties not before

---

[107] *See* doc. no. 34 at 57-58.

[108] *Id.*

the court." *Maverick Media Group, Inc. v. Hillsborough County, Florida*, 528 F.3d 817, 822 (11th Cir. 2008). It is not difficult to imagine a number of scenarios under which an employee's payment of funds to a political action committee or membership organization that engages in political activity would be by means "otherwise" than salary deduction. Indeed, as indicated above, at this early juncture, the court is persuaded that *all* other means readily fall within the meaning of that phrase.

Defendants marshal two arguments to counter plaintiffs' assertion that "or otherwise" must be read to mean just what it says. Their first argument focuses upon the word "arrange" that precedes the words "or otherwise." Defendants contend that "[i]t is clear that two persons are involved in the arranging – the person in the employment of the state who facilitates the payment (in the first clause of sub-section (b)), and the person in the employment of the state whose dues are being paid (the person "so employed" referred to at the end of the first sentence)." This court is far from convinced that such a reading is "clear" from the text.[109]

---

[109] Defendants' argument that two individuals are necessarily involved in "arranging" relies upon a faulty comprehension of that word's common meaning, at least in the usage the Act makes of it. While one version of the intransitive form of "arrange" used in the statute does involve two individuals ("to come to an agreement, understanding, or settlement"), that form does not track the definition defendants suggest to the court is clear from the use of that word. *Webster's Third New International Dictionary* 120 (2006). Rather, defendants seem to graft together that definition with another definition of "arrange" as a *transitive* verb (namely, "to effect usu. by consulting") in translating arrange to "facilitate[]." *Id.* The more natural reading of the intransitive form of the verb as used in the phrase is "to make preparations," the second definition, in which case the provision is best read to criminalize making preparations to pay by means of salary deduction or otherwise to a politically active organization. *Id.*

First, the "other person so employed" (who defendants suggest is a required part of the hypothetical triangular relationship they posit is described in sub-section (b)) appears for the first time only *after* the phrase "by salary deduction or otherwise" *is repeated a second time*. Defendants' clever elision therefore ignores a clause where the "other person" is nowhere to be found. Unless this court chooses to believe the Alabama legislature accidentally repeated itself (and, thus, construe the first "arrange by salary deduction or otherwise" as discardable surplussage), the court cannot accept defendants' two person construction of the word "arrange." Logic confirms this conclusion: certainly defendants would not contend that a public employee could avoid the proscription entirely by setting up a payroll deduction (or some "other" means of payment) on his own behalf. As defendants rightly note, the court must avoid such absurd results.

Finally, even if this court accepts that "arrange" necessarily implies two individuals, defendants' reading does nothing to obviate the overbreadth of the "or otherwise" language. As the Comptroller's letter discussed above indicates, even where two individuals *are* involved — in that example, the employee at the Retirement Systems of Alabama, *and*, the retiree on whose behalf the Alabama Retired Teacher's Association secures insurance — state officials *have already* read the statute such that it is not necessary for both persons involved in "arranging" to be

75

state employees. Thus, the "two person" reading of "arrange" leaves open to prosecution the public employee who sets up a bank draft with her banker. In short, defendants' contention misses the point altogether.[110]

Seemingly conceding that the plain text of the words "arrange by salary deduction *or otherwise*" cannot readily be construed sufficiently narrowly to avoid substantial overbreadth, defendants refer this court to a series of extra-textual sources: (1) the text of the present statute that now surrounds sub-section (b); (2) the title and subject of the Act; and (3) the interpretation expressed by the Alabama Attorney General in documentation submitted to the Department of Justice for preclearance of the statute pursuant to the State's obligations under section 5 of the Voting Rights Act of 1965. However, the text of the *present* statute can hardly be a fair device for construction of a *new enactment*.

The other two sources are similarly unhelpful in aiding the court to formulate a construction that would avoid constitutional overbreadth in the language. First,

---

[110] The court need only address in a footnote defendants' "*ejus-dem generis*" argument, itself contained solely in a foonote of the brief in opposition to the motion for preliminary injunction submitted by defendants Morton, Hill, and Trese. Doc. no. 29, at 9 n.6. As the definition defendants provide states, that canon "provides that general words, following the enumeration of particular classes of persons or things, are construed to apply only to persons or things of the same general nature or class as those specifically enumerated.'" *Id.* (quoting *Ex Parte Emerald Mountain Expressway Bridge, L.L.C.*, 856 So. 2d 834, 842 (Ala. 2003)). The court here does not confront a general word following a class of words, but, instead, a general word following a single word; that canon is inapplicable because the language defines no class at all that would impose limitations upon the word "otherwise."

both the Attorney General's preclearance interpretation and the title are, as defendants concede, simply persuasive authority as to the statute's meaning. *See Alabama-Tennessee Natural Gas Co. v. Southern Natural Gas Co.*, 694 So. 2d 1344, 1346 (Ala. 1997) ("[A]n opinion of the attorney general is not binding . . . ."). To be sure, this court is under a duty to "defer to a state *court's* authority to interpret its own law," *Stevens*, 130 S Ct. at 1588 (emphasis supplied), and, as defendants' point out, to interpret this statute as it believes the Alabama Supreme Court would interpret it.

Yet, this court may not rewrite a statute, even to save it from invalidation, and even at the insistence and assurances of a member of the executive branch. *Id.* at 1591-92. To do so would both intrude on the legislative domain and, in the case of a state statute, present profound federalism concerns. The Attorney General's preclearance documents and the title both graft onto "arrang[ing] by salary deduction or otherwise for payment" a further element of the criminal *actus reus*:  namely, use of state funds, time, or property.[111] The language "funds, property, or time" is a direct quote from the statute as it existed prior to the passage of sub-section (b) of Act No. 761 in language now contained in subpart (a). That fact cripples defendants' contention that the title and Attorney General's preclearance interpretation are correct. If the legislature intended "arrange by salary deduction or otherwise" to be

---

[111] Doc. no. 29, at 9-12.

limited to use of state funds, property, or time, they had the language readily at hand; indeed, it was in the title of the statute and in  its first sentence prior to the amendment presently at issue.  More saliently, "using any agency funds, property, or time" is a hefty phrase to shoehorn into subpart (b), both in import and length. Defendants have not even pointed to *how* this court might accomplish this feat without rewriting the text, save for just assuming it somehow lies implicitly beneath the text.  But the "key to application of th[e] principle [of avoiding unconstitutionality by reading a statute narrowly] is that the statute must be 'readily susceptible' to limitation." *American Booksellers Association*, 484 U.S. at 397.  This court has no power to "rewrite a state law to conform it to constitutional requirements."  *Id.*

Plaintiffs have adequately demonstrated a substantial likelihood that they will succeed in proving that the prohibition on individual governmental employees' "arrang[ing] by salary deduction or otherwise for payments" to political action commitees or membership organizations involved in political activities, under penalty of criminal sanctions, is substantially overbroad.  In the alternative, plaintiffs have shown a substantial likelihood that they will succeed in proving that the language is so vague that it fails to provide sufficient guidance to enforcement authorities or fair notice to the individual public employees subject to its terms.  Accordingly, plaintiffs' motion for a preliminary injunction is due to be granted.

### c.    The statute's definition of "political activity"

Relatedly, the above-quoted portion of the statute makes it unlawful to "arrange by salary deduction or otherwise for any payments for the dues of any person . . . to a membership organization which uses any portion of the dues for political activity." The term "political activity" is specially defined only for the purposes of sub-section (b) in subparts (b)(1) — (b)(7). Conduct that would constitute "political activity" by that definition includes "[e]ngaging in or paying for public opinion polling";[112] "[p]hone calling for any political purpose";[113] "contracting with any entity which engages in any form of political communication, including communications which mention the name of a political candidate";[114] "[d]istributing political literature of any type";[115] and "[e]ngaging in or paying for any form of political communication, including any communications which mention the name of a political candidate."[116] As mentioned above, this is a criminal statute.  Yet, it appears to have *no* mens rea *requirement*.  Thus, quite conceivably, a school janitor could pay dues ("by salary deduction or otherwise") to an organization without knowing that the organization, to borrow the example made by the documentation plaintiffs have submitted with

---

[112] S.B. 2, 2010 Leg., 1st Sp. Session (Ala. 2010) ("Act 2010-761"), at (b)(2).

[113] *Id.* at (b)(5).

[114] *Id.* at (b)(1).

[115] *Id.* at (b)(7).

[116] *Id.* at (b)(3).

respect to the Retirement Systems of Alabama, contracted with an insurance company that paid funds to a political action committee, or "provide[d] support for any political activities,"[117] and thereby be "guilty of the crime of trading in public office . . . ."[118] Thus, like the law struck down in *City of Chicago v. Morales*, 527 U.S. 41 (1999), this is a "criminal law that lacks a *mens rea* requirement," and, for many of the same reasons discussed above, "vagueness permeates the text" to a degree that both discriminatory enforcement and complete failure of notice to those subject to its terms appear likely. *See id.* at 55.

It is doubtful whether an organization itself could know beforehand whether it would engage in one of the enumerated "political activities" before it submitted the documentation the statute requires of organizations seeking to have dues paid "by payroll deduction or otherwise . . . ." Act No. 761, sub-section (b). Those documents require an organization to "certify to the appropriate governmental entity that none of the membership dues *will be used* for political activity." *Id.* (emphasis supplied). It could be extraordinarily difficult, for example, for AEA to know whether a pension plan with which it contracts on behalf of its members would, in the coming year, fund an issue ad that names a candidate. Knowledge of that fact at the relevant time

---

[117] Plaintiffs' Exhibit 2 at the Hearing Held March 15, 2011, at 8.

[118] S.B. 2, 2010 Leg., 1st Sp. Session (Ala. 2010) (aka Act 2010-761), at (c).

would, of course, be *impossible* for an individual government official who may "arrange by salary deduction or otherwise" for dues payments to the organization for a given period on his own behalf or on behalf of coworkers.

The threat posed by the vagueness of the definition of "political activity" is thrown into stark contrast by the following hypothetical example. In December of 2011, an Alabama police chief arranges for salary deductions to pay dues for herself and her officers to a national organization of mounted police officers. Ten officers in the department join, paying dues by salary deduction to a membership organization that they believe fosters their interest in, and helps educate the public regarding, the history and importance of the mounted police officer culture.[119] In July of 2012, the organization of mounted police officers conducts a poll of residents in Paducah, Kentucky, regarding their opinions on mounted officers: *e.g.*, Are the horses' hooves pounding on the pavement too loud? Are children frightened by the horses? Perhaps one question mentions the President, then a candidate for office, asking whether the respondents to the survey would like to see mounted officers more often in his entourage. Unbeknownst to the police chief and her ten officers, the mounted

---

[119] In other words, the court is describing an expressive association. *See* Ashutosh Bhagwat, *Associational Speech*, 120 Yale L.J. 978, 983-89 (2011) (discussing the Supreme Court's jurisprudence on the "freedom of expressive association" — that is, the organization's ability to "engage in . . . protected activities or to disseminate its preferred views") (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 627-29 (1984)).

officers' association has arguably engaged in two of the activities defined as "political" in sub-sections (b)(2) and (b)(3) of Act No. 761: specifically, public polling and "engaging in . . .[a] communication[] which mention[s] the name of a political candidate." Whether it had in fact done so, however, would not even be clear to the association itself, much less to the police chief and officers two states south with no knowledge that the poll had ever even occurred. However, the police chief and officers continue to pay and, in December 2012, the organization again certifies that it will not engage in political activities and the police chief once again sets up payroll deductions to it for herself and her officers. If the terms of the statute mean what they purport to mean, then the police chief and each of her officers has committed the crime of trading in public office.

Even ignoring the fact that the definition of "political activity" is inextricably linked to the "salary deduction or otherwise" language about which the court has already expressed its concerns, the court is satisfied that plaintiffs have adequately demonstrated that the political activity definition is substantially likely to lead to discriminatory and arbitrary enforcement, especially as there will be "scores — hundreds maybe . . . — of enforcers . . . ."[120] Coupled with the above-discussed concerns about what kinds of dues payment mechanisms are covered, the vagueness,

---

[120] Doc. no. 34, at 70-71.

subjectivity, and near limitless sweep of activities that could be determined, *ex post facto*, to have been one of the seven types of activity defined in subparts (b)(1)-(b)(7), simply aggravate the problems.  Together, the breadth of the "or otherwise" language and uncertain reach of the political activity definitions appear to  "delegate standardless discretionary power to local functionaries, resulting in virtually unreviewable prior restraints on First Amendment rights."  *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973).

Defendants urge this court to read the term "political activities," so as to avoid any vagueness or overbreadth.  They do this primarily upon two bases.  First, they assert that other cases have construed similar or identical language narrowly to avoid constitutional challenges.[121]   Second they argue that the Attorney General has interpreted "political activities" narrowly, thereby limiting the meaning of the language the legislature used to define that term.[122]   Doing so, defendants tell the court, will limit the scope of the activities outlined in sub-sections (b)(1)-(b)(7) to "electioneering activities,"[123] but not "merely issue advocacy or voter education" or other activity that is more tangentially political,[124] and will thus avoid any vagueness

---

[121] *See* doc. no. 29 ("Opposition to Motion for Preliminary Injunctive Relief by Defendants" Morton, Hill, and Treese), at 4.

[122] *Id.* at 4-5.

[123] *Id.* at 4.

[124] *Id.* at 5.

concerns.  More specifically, defendants provide a suggested restatement of each of the provisions found in sub-sections (b)(1) – (b)(7) of Act No. 761, into which they graft the phrase "in support of or against a particular candidate or particular political party."[125]

As stated above, this court is under a duty to construe "political activities" to avoid constitutional infirmities if doing so is possible.  *E.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. — , 129 S. Ct. 1800, 1811 (2009).  The court may only do so, however, if facially ambiguous text is "*readily susceptible* to such a construction." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 884 (1997).  A federal court is without power to "rewrite a state law to conform it to constitutional requirements." *American Booksellers Association, Inc.*, 484 U.S. at 397.  Doing so would raise both profound federalism and separation of powers concerns.  *E.g.*, *Stevens*, 130 S. Ct. at 1592 (rewriting duly-enacted legislation would "constitute a serious invasion of the legislative domain and sharply diminish [the legislature's] incentive to draft a narrowly tailored law in the first place") (citations and quotation marks omitted); *Hill v. City of Houston*, 789 F.2d 1103, 1112 (5th Cir. 1986) *aff'd*, 482 U.S. 451 (1987) ("The principles of federalism forbid a federal . . . court to arrogate the power to rewrite a municipal ordinance.").  This forbidden endeavor, rewriting the law of

---

[125] *Id*. at 5-6.

another sovereign, is precisely what defendants ask this court to do.

As noted above, opinions of the Alabama Attorney General are merely persuasive authority in the courts of Alabama and, accordingly, cannot overcome indications that are plain from the text. *E.g.*, *Alabama-Tennessee Natural Gas*, 694 So. 2d at 1364.  Compounding this problem, the most recent of the proffered opinions interpreting the phrase "political activity" that defendants would have this court rely upon was issued more than seven years *before* the challenged Act.[126]  This timing problem leaves this court in a quandary about how such opinions could be used to interpret the phrase as defined "for purposes of [newly-enacted] subsection (b) only . . . ." Act No. 761, sub-section (b).  Additionally, neither of the cases defendants cite, nor the Attorney General's interpretations, is particularly helpful for one simple reason:  this court cannot interpret "political activities" in a vacuum.  The Alabama legislature did not stop at those words, but instead set forth a series of seven activities, "all" of which are expressly captured within that general term.  *Id.*  Even if "political activities" alone would be sufficiently clear, the additional language in (b)(1)-(b)(7) expands the meaning of that phrase significantly.  *Cf. Stevens*, 130 S. Ct. at 1588 (recognizing that breadth of terms *defining* "animal cruelty" in statute

---

[126] *See* doc. no. 28 (Motion to Dismiss of Defendants Morton, Hill, and Treese), Ex. C (Attorney General's Opinion 99-77) & Ex. D (Attorney General's Opinion 2003-232).

rendered it unconstitutional, while "cruelty" alone would have passed constitutional muster). Finally, a court construing a legislative enactment must "'give effect to every word of a statute wherever possible.'" *Ransom v. FIA Card Services, N.A.*, 131 S. Ct. 716, 724 (2011) (quoting *Leocal v. Ashcroft*, 543 U.S. 1, 12 (2004)). Reading "political activity" in the challenged Act to reach only electioneering activities would not only require this court to functionally rewrite the section, but also would effectively render most of the subsequent definitional language surplusage.

As lucidly demonstrated by the exhibit described above, including a letter from defendant Comptroller White and communications about state employees' implementation of his directive, the individual public employees charged with administering this provision are granted an almost limitless degree of enforcement discretion by the subjective terminology of the "political activit[ies]" enumerated in this Act.[127] Not only have plaintiffs shown that this language "encourage[s] arbitrary and discriminatory enforcement," this court has before it a concrete example of such arbitrary enforcement. *Skilling*, 130 S. Ct. 2927 (citation and quotation marks omitted); *see also Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1030 (1991) (striking rule that was "so imprecise that discriminatory enforcement is a real possibility"). Thus, at least at this juncture, the court is persuaded that public

---

[127] *See* Plaintiffs' Exhibit 2, admitted at the Hearing held on March 15, 2011, *passim*.

86

employees in Alabama, both those who would enforce this Act and those who would be subject to its criminal penalties, would suffer from "the indeterminacy of what that fact [*i.e.*, whether a membership organization has engaged or will engage in 'political activity'] is." *Williams*, 553 U.S. at 306 (alterations supplied).  Accordingly, plaintiffs have shown a substantial likelihood that they will succeed in demonstrating this part of the statute is void for vagueness under the Fourteenth Amendment to the United States Constitution.  Further, because the unclear scope of that definition will necessarily exacerbate public employees' uncertainty regarding what payments "by salary deduction or otherwise"  would subject them to criminal penalties, the court finds plaintiffs have demonstrated a substantial likelihood they will succeed in showing that the sweep of that language contributes significantly to the substantial overbreadth found in the previous section.  Upon that basis, a preliminary injunction barring the Act's enforcement is due to issue.

An appropriate order and injunction consistent with this memorandum opinion will be entered contemporaneously herewith.

**DONE** this 18th day of March, 2011.

_____

United States District Judge

87