FILED
2013 Jan-03  AM 09:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **ALABAMA EDUCATION ASSOCIATION;** *et al.*, | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-11-S-761-NE** |
| | ) | |
| **ROBERT BENTLEY, in his official capacity as Governor of the State of Alabama and President of the State School Board;** *et al.*, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

This action is before the court on motions to quash subpoenas *duces tecum* issued by plaintiffs to four non-parties:  *i.e.*, Alabama Senate President *Pro Tempore* Del Marsh; Speaker of the Alabama House of Representatives Mike Hubbard; former Alabama Governor Robert R. ("Bob") Riley; and, current Alabama Governor Robert J. Bentley, who was a defendant until August 22, 2012, when all claims against him were dismissed.[1] Understanding how the documents sought by the contested subpoenas relate to claims asserted by plaintiffs requires a review of the case's procedural history.

---

[1] *See* doc. no. 126 (Memorandum Opinion and Order), at 82-84 and 100; *see also* note 13, *infra*, and the accompanying text.

# I. PROCEDURAL HISTORY

The Alabama Education Association ("AEA"), Alabama Voice of Teachers for Education ("A-VOTE"), and six individuals affiliated with those organizations commenced this action in February of 2011.[2]  They challenged the constitutionality

---

[2] AEA is an Alabama non-profit corporation.  Its membership consists of approximately 75,000 active and 30,000 retired public educators and education support personnel employed by the State of Alabama, or one of Alabama's four-year colleges and universities, or the State's Department of Postsecondary Education ("DPE"), or one of the State's postsecondary institutions (two-year colleges and trade and vocational training schools that function under the supervision of the DPE), or one of the State's local boards of education. *See* doc. no. 1 (Complaint) ¶¶ 5-7.  "AEA's mission is to promote educational excellence, advocate for its members, and lead in the advancement of equitable and quality public education for a diverse population." *Id.* ¶ 24.  To advance that mission, "AEA advocates on an array of issues that are of concern to its members, including questions relating to tax policy, pension and insurance issues, education funding, tenure protections for education employees, school curriculum, and charter schools." *Id.* ¶ 25.

"A-VOTE" is a political action committee sponsored by AEA that functions as "a vehicle for members who wish to support candidates whose positions are consistent with AEA's missions and goals." *Id.* ¶ 26.  AEA members who contribute to A-VOTE have the "opportunity to participate in the electoral process and to support and elect candidates of their choice." *Id.*  The "vast majority" of AEA members have, for decades, executed voluntary requests to have their AEA membership dues, as well as their voluntary contributions to A-VOTE, automatically deducted from their respective paychecks. *Id.* ¶ 7.

The six individual plaintiffs, all of whom are members of AEA, are:  Pam Hill, an education support professional who is employed by the Huntsville City Board of Education; Dr. Cathy McNeal, Ph.D., a professional educator who is employed by the same public school system; Chassity Smith, a professional educator who is employed by the City of Madison Board of Education; Jeff Breece, a professional educator who is employed by the Madison County Board of Education; Dorothy J. Strickland, a professional educator who is employed by the Lee County School District; and Ronald Slaughter, a professional educator who is employed by Alabama Agricultural & Mechanical University. *See* doc. no. 1 (Complaint) ¶¶ 8-13.

This court also allowed an intervention complaint to be filed by the Alabama State Employee Association ("ASEA"), the State Employee Association Political Action Committee ("SEA-PAC"), Randy Hebson (President of ASEA), Edwin J. McArthur (Executive Director of ASEA), and three State employees who are members of ASEA and contributors to SEA-PAC:  *i.e.*, Larry Sanders, JoAnne Brown, and John Allen.  *See* doc. no. 86 (Order entered May 30, 2012, allowing complaint in intervention to be filed), and doc. no. 87 (Complaint in Intervention).  The intervenor-plaintiffs assert essentially the same claims as the original plaintiffs.

of Alabama Act No. 2010-761 ("Act No. 761"), an amendment of preexisting law that was enacted by the Alabama Legislature on December 15, 2010, and signed into law by Governor Riley on December 20, 2010.[3]

## A.   Preexisting Alabama Law

Prior to the enactment of Act No. 761, Alabama Code § 16-22-6 directed city and county boards of education, as well as some post-secondary institutions, to adopt procedures to allow employees to deduct from their paychecks contributions for, among other things, "membership dues" and "voluntary contributions." The pertinent portion of the statute as it then existed provided that:

> Each local board of education and certain postsecondary institutions shall adopt policies or regulations which will provide for deductions from salaries of its employees or groups of employees whenever a request is presented to the board or postsecondary institution by the employees or groups.  The deductions shall be made from salaries earned in at least nine different pay periods and shall be remitted to the appropriate company, association, or organization as specified by the employees within 10 days following each deduction. *The deductions may be made for*, *but* [*are*] *not limited to*, savings plans, tax sheltered annuities, the Public Employees' Individual Retirement Account Fund, *membership dues*, *voluntary contributions*, and group insurance premiums. Deductions for membership dues and voluntary contributions shall be made based upon membership lists and forms provided by the employees' organization.  Such lists are to be corrected, updated, and returned to the employees' designated organization(s) not later than November 10 of each school year. . . .

Ala. Code § 16-22-6(a) (1975) (2001 Replacement Vol.) (emphasis and alteration

---

[3] *See* doc. no. 1 (Complaint) ¶¶ 1-2.

supplied).  Those statutory requirements had been a part of the *corpus* of Alabama law since at least 1973.  Relatedly, Alabama Code § 36-1-4.3 provided that:

>        (a)  The state Comptroller shall adopt statewide policies which provide for deductions from the salaries of state employees or groups of state employees whenever a request is presented to the state Comptroller by a group of participating state employees equal in number to at least 200 provided, however, that deductions being made as of April 23, 1985, shall continue to be made.  The deductions shall be made at least monthly and shall be remitted to the appropriate company, association, or organization as specified by the employees.  The deductions may be made for *membership dues*, and *voluntary contributions*, and insurance premiums.  Any deduction provided under the provisions of this section may be terminated upon two months' notice in writing by a state employee to the appropriate company, association, or organization and to the appropriate payroll clerk or other appropriate officials as specified by the state Comptroller.

>        (b)  The state Comptroller may, at his discretion, collect from the deductions withheld a cost of administration fee not to exceed one percent of the total deduction collected.

Ala. Code § 36-1-4.3 (1975) (2001 Replacement Vol.) (emphasis supplied).  Again, the basis for those statutory requirements had been a part of the *corpus* of Alabama law since at least 1985.

Both of the foregoing statutes were tempered by Alabama Code § 17-17-5, which is located in a chapter addressing "Election Offenses," and which read as follows prior to the enactment of Act. No. 761:

>        No person in the employment of the State of Alabama, a county, or a city whether classified or unclassified, shall use any state, county,

4

or city funds, property or time, for any political activities. Any person who is in the employment of the State of Alabama, a county, or a city shall be on approved leave to engage in political action or the person shall be on personal time before or after work and on holidays. It shall be unlawful for any officer or employee to solicit any type of political campaign contributions from other employees who work for the officer or employee in a subordinate capacity. It shall also be unlawful for any officer or employee to coerce or attempt to coerce any subordinate employee to work in any capacity in any political campaign or cause. Any person who violates this section shall be guilty of the crime of trading in public office and upon conviction thereof, shall be fined or sentenced, or both, as provided by Section 13A-10-63.

Ala. Code § 17-17-5 (1975) (2007 Replacement Vol.).[4]

---

[4] The statute referenced in the last line of the textual quotation (*i.e.*, "Section 13A-10-63") states the elements of the crime of "trading in public office" as follows:

(a)   A person is guilty of trading in public office if:

(1)   He offers, confers or agrees to confer any pecuniary benefit upon a public servant or party officer upon an agreement or understanding that he himself will or may be appointed to a public office or public employment or designated or nominated as a candidate for public office; or

(2)   While a public servant or party officer, he solicits, accepts or agrees to accept any pecuniary benefit from another upon an agreement or understanding that that person will or may be appointed to a public office or public employment or designated or nominated as a candidate for public office.

(b)   This section does not apply to contributions to political campaign funds or other political contributions.

(c)   Trading in public office is a Class A misdemeanor.

Ala. Code § 13A-10-63 (1975) (2005 Replacement Vol.). Class A misdemeanors are punishable by imprisonment in the county jail or by hard labor for the county for a term of not more than one year, or by a fine of not more than $2,000, or both. *See id*. §§ 13A-5-2(c), 13A-5-7(a)(1), and 13A-5-12(a)(1).

**B**.     **Alabama Act No. 761**

Act No. 761 specifically addressed Alabama Code § 17-17-5, and amended the

language of that provision in the following manner:

ENROLLED, **An Act**,

**To amend Section 17-17-5, Code of Alabama 1975, relating to prohibited political activities by state, county, and city employees; to further specifically prohibit employees of the state, a county, a city, a local school board, or other governmental agency from using any agency funds, property, or time arranging for payments by salary deduction, or otherwise, to a political action committee or dues for membership organizations that use funds for political activities**.

BE IT ENACTED BY THE LEGISLATURE OF ALABAMA:

Section 1.  Section 17-17-5, Code of Alabama 1975, is amended to read as follows:

"§17-17-5.

"(a)  No person in the employment of the State of Alabama, a county, a city, a local school board, or any other governmental agency, whether classified or unclassified, shall use any state, county, city, local school board, or other governmental agency funds, property, or time, for any political activities.

"(b)  No person in the employment of the State of Alabama, a county, a city, a local school board, or any other governmental agency may arrange by salary deduction or otherwise for any payments to a political action committee or arrange by salary deduction or otherwise for any payments for the dues of any person so employed to a membership organization which uses any portion of the dues for political activity.  For purposes of this subsection (b) only, political activity shall

6

be limited to all of the following:

"(1) Making contributions to or contracting with any entity which engages in any form of political communication, including communications which mention the name of a political candidate.

"(2) Engaging in or paying for public opinion polling.

"(3) Engaging in or paying for any form of political communication, including communications which mention the name of a political candidate.

"(4) Engaging in or paying for any type of political advertising in any medium.

"(5) Phone calling for any political purpose.

"(6) Distributing political literature of any type.

"(7) Providing any type of in-kind help or support to or for a political candidate.

"Any organization that requests the State of Alabama, a county, a city, a local school board, or any other governmental agency to arrange by salary deduction or otherwise for the collection of membership dues of persons employed by the State of Alabama, a county, a city, a local school board, or any other governmental agency shall certify to the appropriate governmental entity that none of the membership dues will be used for political activity. Thereafter, at the conclusion of each calendar year, each organization that has arranged for the collection of its membership dues of persons employed by the State of Alabama, a county, a city, a local school board, or any other governmental agency shall provide the appropriate governmental entity a detailed breakdown of the expenditure of the membership dues of persons employed by the State of Alabama, a county, a city, a local school board, or any other governmental agency collected by the governmental entity. Any organization that fails to provide the required certifications, that reports

7

<u>any expenditures for political activity or that files false information about political activity in any of its reports shall be permanently barred from arranging for the collection of its membership dues by any governmental entity</u>.   <u>The Examiners of Public Accounts shall annually review a sample of at least ten percent of the certifications filed with each governmental entity and report its findings to the appropriate governmental entity</u>.

"(c) Any person who is in the employment of the State of Alabama, a county, a city, <u>a local school board</u>, <u>the State Board of Education or any other governmental agency</u>, shall be on approved leave to engage in political action or the person shall be on personal time before or after work and on holidays.  <u>It shall be unlawful for any officer or employee to solicit any type of political campaign contributions from other employees who work for the officer or employee in a subordinate capacity</u>.  It shall also be unlawful for any officer or employee to coerce or attempt to coerce any subordinate employee to work in any capacity in any political campaign or cause.  Any person who violates this section shall be guilty of the crime of trading in public office and upon conviction thereof, shall be fined or sentenced, or both, as provided by Section 13A-10-63."

Section 2.  The provisions of this act are severable.  If any part of this action is declared invalid or unconstitutional, that declaration shall not affect the part which remains.

Section 3.  All law or parts of laws which conflict with this act are repealed.

Section 4.  This act shall become effective 90 days following its passage and approval by the Governor or its otherwise becoming law.

Act of Dec. 15, 2010, Ala. Act No. 2010-761 (boldface emphasis in original, underscoring applied to language added to preexisting law).

## C.   Codification of Alabama Act No. 761

8

The language of Act No. 761 as signed into law by Governor Riley was subsequently codified as follows:

 (a) No person in the employment of the State of Alabama, a county, a city, a local school board, or any other governmental agency, whether classified or unclassified, shall use any state, county, city, local school board, or other governmental agency funds, property, or time, for any *political activities*.

 (b)(1) No person in the employment of the State of Alabama, a county, a city, a local school board, or any other governmental agency may arrange by salary deduction *or otherwise* for any payments to a political action committee or arrange by salary deduction *or otherwise* for any payments for the dues of any person so employed to a membership organization which uses any portion of the dues for *political activity*. For purposes of this subsection only, *political activity* shall be limited to all of the following:

  a. Making contributions to or contracting with any entity which engages in any form of political communication, including communications which mention the name of a political candidate.

  b. Engaging in or paying for public opinion polling.

  c. Engaging in or paying for any form of political communication, including communications which mention the name of a political candidate.

  d. Engaging in or paying for any type of political advertising in any medium.

  e. Phone calling for any political purpose.

  f. Distributing political literature of any type.

  g. Providing any type of in-kind help or support to or for

a political candidate.

(2) Any organization that requests the State of Alabama, a county, a city, a local school board, or any other governmental agency to arrange by salary deduction *or otherwise* for the collection of membership dues from persons employed by the State of Alabama, a county, a city, a local school board, or any other governmental agency shall certify to the appropriate governmental entity that none of the membership dues will be used for *political activity*. Thereafter, at the conclusion of each calendar year, each organization that has arranged for the collection of its membership dues from persons employed by the State of Alabama, a county, a city, a local school board, or any other governmental agency shall provide the appropriate governmental entity a detailed breakdown of the expenditure of the membership dues of persons employed by the State of Alabama, a county, a city, a local school board, or any other governmental agency and collected by the governmental entity. Any organization that fails to provide the required certifications, that reports any expenditures for *political activity*, or that files false information about *political activity* in any of its reports shall be permanently barred from arranging for the collection of its membership dues by any governmental entity. The Examiners of Public Accounts shall annually review a sample of at least 10 percent of the certifications filed with each governmental entity and report its findings to the appropriate governmental entity.

(c) Any person who is in the employment of the State of Alabama, a county, a city, a local school board, the State Board of Education or any other governmental agency, shall be on approved leave to engage in political action or the person shall be on personal time before or after work and on holidays. It shall be unlawful for any officer or employee to solicit any type of political campaign contributions from other employees who work for the officer or employee in a subordinate capacity. It shall also be unlawful for any officer or employee to coerce or attempt to coerce any subordinate employee to work in any capacity in any political campaign or cause. Any person who violates this section shall be guilty of the crime of trading in public office and upon conviction thereof, shall be fined or sentenced, or both, as provided by

Section 13A-10-63.

Ala. Code § 17-17-5 (1975) (Supp. 2011) (boldface emphasis supplied).

## D.   **This Court's Preliminary Injunction**

Plaintiffs' complaint alleged, among other things, that the changes to preexisting Alabama law worked by Act No. 761 violated the Free Speech and Free Association Clauses of the First Amendment, as well as the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution.[5] Following a hearing, this court held that the Act infringed important First Amendment rights, and that plaintiffs had demonstrated a substantial likelihood of ultimately prevailing on the merits of their claims that the Act's restrictions were overly broad, and that the Act itself was unduly vague.[6]  Specifically, this court reasoned that the phrase "or otherwise" reached beyond payroll deductions, and attached the personal political contributions of government employees.[7]  This court also held that the term "political activity," found in both subsections of § 17-17-5(b), did not clearly define

---

[5] *See* doc. no. 1 (Complaint) at, *e.g.*, ¶¶ 1-2.

[6] To justify the entry of an order granting preliminary injunctive relief, plaintiffs generally must satisfy four prerequisites:  (1) demonstrate a substantial likelihood of ultimately prevailing on the merits; (2) show that plaintiffs will suffer irreparable harm if an injunction maintaining the *status quo pendente lite* does not issue; (3) prove that the threatened injury to plaintiffs outweighs whatever damage the proposed injunction may cause to the opposing parties; and (4) demonstrate that the injunction will not be adverse to the public interest.  *See Alabama Education Association v. State Superintendent of Education*, 788 F. Supp. 2d 1283, 1301-03 (N.D. Ala. 2011).

[7] *Id*. at 1319-24.

11

the nature of prohibited acts.[8]  For such reasons, this court preliminarily enjoined the

implementation and enforcement of Act. No. 761, and required defendants to honor

all employee requests for payroll deductions to AEA, and to remit those deductions

to AEA, including all amounts representing contributions to "A-VOTE,"[9] the political

action committee sponsored by AEA.[10]

E.      **Appeal of Order Granting Preliminary Injunctive Relief**

Most of the defendants appealed the order granting preliminary injunctive

relief.[11]  The Eleventh Circuit concluded that the constitutional issues raised by

plaintiffs turned upon questions of state law that had not been specifically addressed

by either the Alabama Supreme Court or the State's intermediate courts of appeal.

Consequently, rather than speculating as to the proper interpretation of a state statute,

the Circuit Court certified two questions:

> TO THE SUPREME COURT OF ALABAMA AND THE
> HONORABLE JUSTICES THEREOF:
>
> AEA contends that Alabama Act No. 2010-761 infringes a broader
> range of constitutionally protected activity than previously recognized
> as permissible under the First Amendment.  Specifically, AEA argues
> that the Act's "or otherwise" language would prevent government

---

[8] *Id*. at 1324-28.

[9] *See* doc. no. 37 (Preliminary Injunction).

[10] *See supra* note 2.

[11] *See* doc. no. 40 (Notice of Appeal by *AEA* Bice Defendants); doc. no. 41 (Amended Notice of Appeal by Bice Defendants); and doc. no. 45 (Notice of Appeal by *AEA* Governor Defendants).

employees from making contributions to an organization engaged in political activity through any means, including personal donations of their own money.  AEA also argues that the term "political activity" reaches a wide number of ill-defined activities, making it impossible for any organization to certify that it is in compliance with the Act.  The state counters that "or otherwise" simply prevents the use of state resources in any way — whether through salary deductions or some other state mechanism — from benefitting organizations involved in political activities.  The state argues that "political activity" means electioneering activities.

The interpretation of the Act is a question of state law that has not been specifically addressed by the Alabama Supreme Court or the intermediate state appellate courts.  Therefore, we certify the following questions to the Alabama Supreme Court:

> 1. Is the "or otherwise" language in the statute limited to the use of state mechanisms to support political organizations, or does it cover all contributions by state employees to political organizations, regardless of the source?

> 2. Does the term "political activity" refer only to electioneering activities?

The answers to these questions will permit this court to address AEA's concerns and determine whether the Act runs afoul of the First Amendment.  To facilitate the resolution of these questions, we direct the Clerk to transmit the entire record of this case, together with copies of the parties' briefs, to the Alabama Supreme Court.  Of course, the Alabama Supreme Court is in no way limited by our questions and may consider the case as it sees fit.

*Alabama Education Association v. State Superintendent of Education*, 665 F.3d 1234, 1238-39 (11th Cir. 2011) (Dubina, C.J.).[12]

---

[12] The other judges comprising the panel are Emmett Ripley Cox, Senior Circuit Judge, and

The Circuit opinion on interlocutory appeal also narrowed this court's injunction, and permitted the State to enforce Act No. 761, but only to the extent that it restricted payroll deductions for organizations engaged in "electioneering activities." *Id*. at 10-12.  That part of the Circuit opinion was based upon the Supreme Court's decision in *Ysursa v. Pocatello Education Association*, 555 U.S. 353 (2009), holding that a properly conceived ban on salary deductions to organizations engaged in electioneering activities would be constitutional.  The Eleventh Circuit opinion summarized the *Ysursa* holding as follows:

> In *Ysursa*, public employee unions challenged an Idaho state law ban on political payroll deductions as a violation of the First Amendment.  The Court began by reiterating that the First Amendment "protects the right to be free from government abridgment of speech.  While in some contexts the government must accommodate expression, it is not required to assist others in funding the expression of particular ideas, including political ones."  *Id*. at 358, 129 S. Ct. at 1098; *Regan v. Taxation with Representation of Wash*., 461 U.S. 540, 549, 103 S. Ct. 1997, 2003, 76 L. Ed. 2d 129 (1983) ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny.").  The Court accepted that the unions challenging Idaho's law faced substantial difficulties in collecting funds for their political speech without the assistance of the state through salary deductions.  However, this fact posed no difficulty for the Court, which concluded,
>
> > While publicly administered payroll deductions for political purposes can enhance the unions' exercise of First Amendment rights, Idaho is under no obligation to aid the

Willis B. Hunt Jr., United States District Judge for the Northern District of Georgia, sitting by designation.

> unions in their political activities.  And the State's decision
> not to do so is not an abridgment of the unions' speech;
> they are free to engage in such speech as they see fit.  They
> simply are barred from enlisting the State in support of that
> endeavor.

*Ysursa*, 555 U.S. at 359, 129 S. Ct. at 1098.  The Court then held,
"Idaho's decision to limit public employer payroll deductions as it has
is not subject to strict scrutiny under the First Amendment." *Id*. (internal
citations and quotation marks omitted).  Instead, "[g]iven that the State
has not infringed the unions' First Amendment rights, the State need
only demonstrate a rational basis to justify the ban on political payroll
deductions." *Id*.  The Supreme Court concluded that the payroll
deduction ban met the rational basis test.  It wrote,

> The concern that political payroll deductions might be seen
> as involving public employers in politics arises only
> because Idaho permits public employer payroll deductions
> in the first place . . . .  [T]he State's response to that
> problem is limited to its source — in this case, political
> payroll deductions.  The ban on such deductions plainly
> serves the State's interest in separating public employment
> from political activities.

*Id*. at 361, 129 S. Ct. at 1099.

Thus, the question before this court in the present case turns
entirely on how the Act is interpreted.  If it is meant only to reach payroll
deductions for organizations engaged in electioneering activities such as
those targeted by the Idaho statute at issue in *Ysursa*, then it presents no
constitutional problems.  A statute with a broader reach may implicate
First Amendment concerns not explored in *Ysursa*. . . .

*Alabama Education Association*, 665 F.3d at 1237-38 (alterations in original)

(footnote omitted).

**F**.    **Subsequent Disposition of Claims Not Addressed in the Prior Opinion**

This court recently narrowed the claims that were not addressed in the opinion granting preliminary injunctive relief.  All claims against the current Governor of Alabama, Dr. Robert J. Bentley, M.D., were dismissed without prejudice on August 22, 2012.[13]  The same opinion dismissed with prejudice all claims against any defendant that were based upon the Equal Protection Clause of the Fourteenth Amendment, as well as plaintiffs' claims for so-called "viewpoint discrimination" and "unconstitutional conditions."[14]

The ruling that led to the events forming the basis of the present motions to quash, however, was this court's determination that plaintiffs' First Amendment retaliation claim should not be dismissed.[15]

---

[13] *See* doc. no. 126 (Memorandum Opinion and Order), at 82-84 and 100 ("Pursuant to the consent of both the *AEA* and the *IAFF* plaintiffs, all claims asserted against Governor Robert Bentley are due to be, and hereby are, DISMISSED without prejudice.").  Dr. Bentley assumed the Governor's office on January 17, 2011, after the events leading to the enactment of Act No. 761. Governor Bentley argued that, because plaintiffs failed to identify any specific connection between him and enforcement of the Act, plaintiffs had in effect sued the State of Alabama, which is immune from the claims asserted in both actions.  Plaintiffs did not contest Governor Bentley's motion to dismiss.  *See* doc. no. 75 (AEA's Response to Governor Bentley's Motion to Dismiss), at 1 ("The plaintiffs have no objection to the granting of Governor Bentley's motion to dismiss."); and doc. no. 109 (ASEA's Response to Governor Bentley's Incorporation of the Motions to Dismiss Against the Plaintiff Intervenors), at 1-2 ("As with AEA and A-VOTE, ASEA has no objection to the granting of Governor Bentley's Motion to Dismiss.").

[14] *See* doc. no. 126 (Memorandum Opinion and Order), at 56-60 (discussion of "viewpoint discrimination" claims), 78-80 (discussion of "unconstitutional conditions" claims), and 100 (orders dismissing the foregoing claims with prejudice).

[15] *Id.* at 60-78 (discussion of the motions to dismiss the First Amendment retaliation claim), and 100-01 (overruling the motions to dismiss that claim).

1.    **First Amendment Retaliation Claim**

It is well established that governmental actions that do not violate the Constitution on their face may, nevertheless, become actionable constitutional "torts" *if* it is demonstrated that the contested acts were motivated in substantial part by a desire to punish an individual or group for the exercise of a constitutional right. *See*, *e.g.*, *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) ("[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.").[16]

Thus, a cause of action may arise from the curtailment or elimination of a governmental benefit in retaliation for a plaintiff's exercise of First Amendment rights.  *See*, *e.g.*, *Georgia Association of Educators v. Gwinnett County School District*, 856 F.2d 142, 144-45 (11th Cir. 1986) (recognizing a First Amendment retaliation claim based upon materially similar facts:  *i.e.*, the termination of a payroll deduction service for three teachers' associations based upon an alleged desire to destroy the local teachers' union in retaliation for the union's exercise of First Amendment rights) (citing *Perry*, 408 U.S. at 597).

---

[16] *See also*, *e.g.*, *Crawford-El v. Britton*, 523 U.S. 574 (1998) (holding that the act of intentionally depriving an inmate of his personal belongings may serve as the basis for a claim of retaliation for his exercise of First Amendment rights); *Board of County Commissioners, Wabaunsee County v. Umbehr*, 518 U.S. 668 (1996) (nonrenewal of plaintiff's government contract in retaliation for his exercise of free speech is actionable).

The policy rationale for the recognition of a cause of action for governmental acts motivated in substantial part by a desire to punish an individual or group for the exercise of First Amendment rights was succinctly stated by the Supreme Court in *Hartman v. Moore*, 547 U.S. 250 (2006), where the Court held: "Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'" *Id*. at 256 (quoting *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998)) (alteration in original).

### a.   *Prima facie* elements of a First Amendment retaliation claim

The Eleventh Circuit defined the elements of a *prima facie* First Amendment retaliation claim in *Castle v. Appalachian Technical College*, 631 F.3d 1194 (11th Cir. 2011), holding that a plaintiff must show that: "(1) her speech was constitutionally protected; (2) she suffered adverse conduct that would likely deter a person of ordinary firmness from engaging in such speech; and (3) there was a causal relationship between the adverse conduct and the protected speech." *Id*. at 1197 (citing *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005)). "In order to establish a causal connection, the plaintiff must show that the defendant was subjectively motivated to take the adverse action because of the protected speech." *Keeton v. Anderson-Wiley*, 664 F.3d 865, 878 (11th Cir. 2011) (quoting *Castle*, 631 F.3d at 1197).

18

### b.   The basis for plaintiffs' First Amendment retaliation claim

In substance, plaintiffs allege that AEA had a long history of expressing and advocating political viewpoints opposed by Alabama elected officials affiliated with the Republican Party.   That difference of opinion and policy continued into and intensified during the two terms of the Riley Administration,[17] as seen by, among other disputes, AEA's act of lobbying for a cloture vote on then-State Senator Bradley Byrne's filibuster of a teacher tenure bill, and AEA's opposition to Governor Riley's 2007 nomination of Byrne for Chancellor of the Alabama Department of Postsecondary Education.[18]   Further, and according to plaintiffs:

> In late 2009 and early 2010, Governor Riley criticized AEA for its opposition to legislation authorizing charter schools. And, in 2010, AEA and Riley clashed over a State Board of Education policy prohibiting two-year college system employees from serving in the state legislature. Riley (then serving as both Governor of Alabama and *ex officio* President of the State Board of Education) and Bradley Byrne (whom Riley had appointed to be Chancellor of DPE) both supported the policy. AEA vocally opposed that policy, and brought a lawsuit to invalidate it.[19]

The conflict between plaintiffs and Governor Riley came to a head during the 2010 election cycle, when AEA and A-VOTE spent a great deal of money in the Republican primary to thwart Bradley Byrne's attempt to become Riley's successor

---

[17] Robert R. "(Bob)" Riley served two consecutive, four-year terms as Governor of the State of Alabama, from Jan. 20, 2003 to Jan. 17, 2011.

[18] *See*, *e.g.*, doc. no. 1 (Complaint) ¶ 35.

[19] *Id.*

as Governor.  As a result, a dark-horse candidate, Dr. Robert J. Bentley, M.D., a retired dermatologist from Tuscaloosa who had served two terms in the Alabama House of Representatives (2002 to 2010), surprised political analysts by finishing second in the June 1, 2010 primary election, and forcing a run-off with Byrne.[20]  On June 26, 2010, during the run-up to the July 13th run-off election, Riley stated that "we do not support the AEA and we don't want 'em in our primary and we don't want anyone that wants 'em in our primary."[21]  Only two days later, his administration ended the decades-old policy of making payroll deductions for public employee contributions to political action committees:

> On June 28, 2010 — two days after Governor Riley stated his desire that AEA stay out of the Republican primary — Alabama Comptroller Thomas White announced to all state departments, agencies and personnel officers that "Payroll deductions for Political Action Committees (PACs) will no longer be withheld from employees' pay effective July 1, 2010."  Comptroller White subsequently amended the Fiscal Policy and Procedures Manual — which had expressly authorized payroll deductions for PAC contributions — to omit any mention of PACs as recipients of voluntary contributions.  The Comptroller purported to have come to the view that, even though such requests had been honored and effectuated for decades, longstanding statutory authority — in particular, the provision of Ala. Code § 17-17-5 prohibiting public employees from "us[ing] any state, county, or city funds, property, or time, for any political activities" — made it unlawful

---

[20] Out of a field of seven candidates, Byrne ran first with 137,349 votes (27.9% of all votes cast), followed by Bentley with 123,870 votes (25.2% of the total), and Tim James with 123,662 votes (25.1%).  *See* http://www.sos.state.al.us/elections/2010/electionInfo2010.aspx.

[21] Doc. no. 1 (Complaint) ¶ 39.  *See also*, *e.g.*, www.youtube.com/watch?v=LaXwNIp34qg (videotape recording of a portion of Governor Riley's remarks at the GOP Summer Dinner).

for the State to comply with such payroll deduction requests.[22]

Governor Riley issued a press release taking credit for the change:  *e.g.*, "the Riley Administration stopped payroll deductions . . . ."[23]

Despite Riley's public endorsement of Byrne prior to the primary run-off election,[24] Dr. Bentley handily defeated his opponent with 56% of the votes cast, and claimed the Republican nomination.  He went on to defeat the nominee of the Democratic Party in the November 2, 2010 general election by a margin of 230,000 votes:  just over 58% of the total number cast.

Of greater significance, however, is the fact that, during the 2010 general election, Republicans gained firm control of both chambers of the Alabama Legislature for the first time in 136 years.[25]  According to plaintiffs, the "new

---

[22] Doc. no. 1 (Complaint) ¶ 40 (alteration in original).

[23] *Id.* ¶ 41.

[24] *See*, *e.g.*, David Catanese, *Riley lines up behind Byrne*, Politico (July 9, 2010, 4:05 p.m. EST), http://dyn.politico.com/news/stories/0710/39543.html.

[25] Republican candidates won 21 of 35 seats in the Alabama Senate, and 63 of 105 seats in the Alabama House of Representatives during the November 2010 general election. *See*, *e.g.*, www. legislature.state.al.us.  Republicans previously controlled Alabama government only during a brief period following the Civil War and the end of "Presidential Reconstruction," and the general election of 1874, when candidates affiliated with the so-called "Conservative and Democratic Party" "redeemed" control of State government from the "Radical Republicans," a political coalition among Northern Carpetbaggers, Southern Scallywags, and a handful of recently-freed slaves.  The adjective "radical" was used to describe those white, Northern Republican officeholders who had most strongly opposed slavery prior to and during the Civil War; who distrusted former Confederate Army officers and those who had held political offices in the former Confederate States; who believed that harsh and punitive policies were required to punish those who had led the nation into civil war, and to "Reconstruct" the South; who demanded civil and political rights for the recently-freed slaves; and who understood that the moral redemption and future prosperity of the South were

Republican majority consist[ed] almost exclusively of legislators that AEA and A-VOTE failed to support or actively opposed during the 2010 election campaign."[26]

Further, even though Alabama legislators assume office the day after they are elected,[27] they normally do not convene in Montgomery until the first Tuesday in March of the following year.[28]  Thus, when Governor Riley "took the extraordinary step" on December 1, 2010 of issuing a "call" for a special session of the newly-elected legislature to convene on December 8th,[29] it gave him a "small window of opportunity"[30] to end his two terms in office with the enactment of "the most stringent ethics law in the country."[31]

Plaintiffs assert that Republican lawmakers involved in the enactment of Act No. 761 shared Governor Riley's animus against AEA:

---

dependent upon the education and elevation of the former slaves.

[26] Doc. no. 1 (Complaint) ¶ 43 (alteration supplied).

[27] *See* Ala. Const., art. IV, § 46(a), 2d sent. (1901) ("The terms of office of the senators and representatives shall commence on the day after the general election at which they are elected. . . .").

[28] *See* Ala. Code § 29-1-4 (1975) (2003 Replacement Vol.).  *See also* http://www.legislature. state.al.us/misc/visitorsguide/visitorsguide.html#anchor985286.

[29] Doc. no. 1 (Complaint) ¶ 45.

[30] Cameron McWhirter, "Alabama Seeks Ethics Overhaul," *The Wall Street Journal* (Nov. 15, 2010) ("Now, with winning legislators taking office immediately and his own party in charge, Gov. Riley says he's winding down his eight years in office by using a 'small window of opportunity' to take action before budget debates consume political discussion."), at http://online.wsj.com/article/SB10001424052748704865704575610730582946158.html.

[31] Kim Chandler, "Gov. Riley calls for special session on ethics reform for Alabama government," at http://blog.al.com/spotnews (posted Dec. 1, 2010).

47. On December 10, 2010, Senator Marsh [President *Pro Tempore* of the upper house] introduced in the Alabama Senate a bill to prohibit public employees from "arrang[ing]  by salary deduction or otherwise" for the payment of "dues for any membership organization which engages, directly or indirectly, in political activity" as well as to prohibit public employees from "arrang[ing] by salary deduction or otherwise" for the payment of PAC contributions.

48. On information and belief, defeated gubernatorial candidate Byrne participated in the drafting of the legislation and heavily lobbied Republican lawmakers to support it.  Indeed, Byrne lobbied legislators on the floor of the legislature while the legislation was being debated.

49. On information and belief, a majority of the members of the new legislature share then-Governor Riley's antipathy toward the political activities of AEA and A-VOTE, and/or were recruited by then-Governor Riley and/or his supporters to support the Riley Administration's campaign against those activities through legislation.[32]

Plaintiffs also contend that the Act will reduce AEA's membership and A-VOTE's funding, thereby diminishing their future ability to engage in protected speech.[33]

In summary, AEA and A-VOTE allege sufficient facts to show that they engaged in constitutionally protected speech during the 2010 Alabama Republican gubernatorial primary; that Governor Riley and members of his administration expressed animosity towards plaintiffs' political speech; and that those individuals played a critical role in the enactment of Act No. 761 shortly after plaintiffs utilized their protected speech to influence the selection of the Republican Party's nominee for

---

[32] Doc. no. 1 (Complaint) ¶¶ 48-49 (first alteration supplied, all other alterations in original).
[33] *Id.* ¶ 75.

the office of Governor.

Moreover, plaintiffs allege sufficient facts from which an inference can be drawn that a majority of the Republican members of the Alabama legislature who had been elected in the 2010 general election harbored an animus against AEA and A-VOTE due to their protected speech.

For all of those reasons, this court allowed plaintiffs' claim for First Amendment retaliation to survive defendants' motions to dismiss.[34]

## G.   The Contested Subpoenas

The need for the present opinion grew from plaintiffs' act of serving subpoenas *duces tecum* on Governor Bentley, former Governor Riley, Alabama Senate President *Pro Tempore* Del Marsh, and Speaker of the Alabama House of Representatives Mike Hubbard (collectively, "the Officials").  The subpoenas ask for the production of documents and communications that may show a causal relationship between plaintiffs' political speech during the 2010 Republican Party primary, and Act No. 761's termination of the payroll deduction service that had been a part of Alabama law since at least 1973.  Specifically, plaintiffs request production of six categories of documents:

> 1. Produce each document in your possession or control which explains the requirements of Alabama Act 2010-761, including any

---

[34] *See* doc. no. 126 (Memorandum Opinion and Order), at 60-78.

cover letter showing the person or agency sending you the document or to whom you sent the document.

2. Produce each document in your possession or control which is a draft of (or proposal for) any legislative bill, proposed rule, or proposed regulation to prohibit or restrict payroll deductions of dues or contributions to the Alabama Education Association, the Alabama State Employees Association, any other organization composed primarily of state or local government employees, or any political action committee associated with any of the foregoing; and any document showing the person or persons who drafted the bill or proposal.

3. Produce each communication (including emails) of which you were the sender or a recipient and which related to or concerned Senate Bill 2 in the 2010 Special Session of the Alabama Legislature.[35]

4. Produce each document or communication (including emails) in your possession or control with a known or apparent creation date in 2009 or 2010 and which related to or concerned Alabama Education Association, A-Vote, the Alabama State Employees Association, SEA-PAC, Dr. Paul Hubbert, Dr. Joe Reed, or Edwin "Mac" McArthur.

5. Produce each document or communication (including emails) received from the office of Gov. Bob Riley, the Comptroller, or the Finance Director and which related to or concerned any proposal to stop the collection of dues for membership organizations through payroll deduction.

6. Produce each document or communication (including emails) received from the office of Gov. Bob Riley, the Comptroller, or the Finance Director and which related to or concerned any proposal to stop the collection of contributions to political organizations through payroll deduction.[36]

---

[35] Senate Bill 2 became Act No. 761.   *See*, *e.g.*, http://lrs.state.al.us/publications/ 2010_special_summaries.html.

[36] Doc. no. 104-1 (Motion to Quash Subpoenas Directed to Speaker Hubbard, President *Pro Tempore* Marsh, and Former Governor Riley, and to Stay All Discovery Pending Resolution of the

**H.     The Motions to Quash and the Privileges Relied Upon**

Motions to quash plaintiffs' subpoenas were filed on behalf of the Officials.[37]

The motions contend that the subpoenas seek information protected from disclosure

by the privileges discussed in the following subsections.[38]

**1.     Executive privilege**

"Executive privilege"[39] refers to a doctrine under which "documents from a

former or an incumbent President [or, arguably, the chief executive of a state

government] are presumptively privileged." *United States v. Poindexter*, 727 F. Supp.

1501, 1505 (D. D.C. 1989) (citing *United States v. Nixon*, 418 U.S. 683, 708-13

(1974)) (alteration supplied).[40]   The privilege recognizes "the paramount necessity of

---

Defendants' Motions to Dismiss by Alabama House of Representatives Speaker Mike Hubbard, Alabama Senate President *Pro Tempore* Del Marsh, and the Bice Defendants), Exhibit "A," at 33 (Attachment F) (alteration supplied).

The phrasing of the request for documents in the possession of Governor Bentley is not identical to the language quoted in the text accompanying this footnote, but it is substantially the same. *Compare id. with* doc. no. 104-2, Exhibit "B," at 3-4.

[37] *See* doc. no. 104 (Motion to Quash Subpoenas Directed to Speaker Hubbard, President *Pro Tempore* Marsh, and Former Governor Riley, and to Stay All Discovery Pending Resolution of the Defendants' Motions to Dismiss by Alabama House of Representatives Speaker Mike Hubbard, Alabama Senate President *Pro Tempore* Del Marsh, and the Bice Defendants); doc. no. 106 (Motion to Quash Subpoena by Former Governor Riley); and doc. no. 127 (Motion to Quash Subpoena by Governor Bentley).

[38] In addition to the privileges discussed hereafter, Governor Bentley argued that the subpoenaed documents are protected by the "attorney-client" and "work-product" privileges. *See* doc. no. 127, at 2-3.

[39] *See* doc. no. 104, at 1-2; doc. no. 106, at 1 (incorporating by reference the arguments in doc. no. 104); and doc. no. 127, at 2-3 (same).

[40] Just as the President is the head of the executive branch of the United States government, so a Governor is the head of the executive branch of a state government.  Thus, extending the

26

protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties." *Cheney v. United States District Court for the District of Columbia*, 542 U.S. 367, 382 (2004) (citing *Nixon*, 418 U.S. at 715).

Any claim of executive privilege implicates three non-harmonious interests: (1) "the undeniable interest of the executive branch of government in maintaining confidentiality over certain types of information necessary for the performance of its constitutional duties"; (2) "the unquestionable interest of the litigant in seeking information for the just resolution of the legal dispute"; and (3) "the perplexing separation of powers question that is lurking in the background." *Assured Investors*

---

executive privilege to the current and former Governors of Alabama serves the interest of maintaining the separation of powers between the executive and judicial branches of government. *See Thomas v. Cate*, 715 F. Supp. 2d 1012 (E.D. Cal. 2010); *Wilson v. Brown*, 404 N.J. Super. 557, 563-64 (App. Div. 2009) (both applying the executive privilege to discovery sought from Governors).

It may also serve the purpose of insulating a state government from federal intervention. *See generally Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 102 (1984). In *Pennhurst*, the Supreme Court held that a suit against state officials may be functionally equivalent to a suit against the state served by those officials, "if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' or if the effect of the judgment would be 'to restrain the [Pennsylvania] Government from acting, or to compel it to act.'" *Id.* at 102 (citing *Dugan v. Rank*, 372 U.S. 609, 620 (1963)) (alteration supplied). Even though there are no claims pending against any of the four current and former Alabama officials upon whom plaintiffs have served the subject subpoenas, plaintiffs are seeking documentary evidence that may support their challenge to Act No. 761. Thus, there is at least a colorable argument that state sovereignty is "in play." *See* doc. no. 104 (Motion to Quash Subpoenas Directed to Speaker Hubbard, President *Pro Tempore* Marsh, and Former Governor Riley, and to Stay All Discovery Pending Resolution of the Defendants' Motions to Dismiss by Alabama House of Representatives Speaker Mike Hubbard, Alabama Senate President *Pro Tempore* Del Marsh, and the Bice Defendants), at 15.

*Life Insurance Co. v. National Union Associates, Inc.*, 362 So. 2d 228, 233 (Ala. 1978), *overruled on unrelated grounds by Ex parte Norfolk Southern Railroad Co.*, 897 So. 2d 290, 295 (Ala. 2004) (citing *United States ex rel. Jackson v. Petrilli*, 63 F.R.D. 152 (N.D. Ill.1974)).  Given that mix of conflicting interests,

> claims of executive privilege, like other evidentiary privileges, must be narrowly construed so as to permit the broadest possible discovery otherwise allowed under the Rules.  35 C.J.S. *Federal Civil Procedure* § 709.  The governmental interest in favor of maintaining confidentiality under the cloak of privilege must be tempered by the historical function of the courts to provide compulsory process for the production of material needed for a just determination of the legal dispute.

*Assured Investors*, 362 So. 2d at 233 (citing *Jabara v. Kelley*, 75 F.R.D. 475 (E.D. Mich. 1977); *Equal Employment Opportunity Commission v. Los Alamos Constructors, Inc.*, 382 F. Supp. 1373 (D. N.M.1974); *Wood v. Strickland*, 420 U.S. 308, 317 (1975); *Glick v. McKesson & Robbins, Inc.*, 10 F.R.D. 477 (W.D. Mo. 1950); 35A C.J.S. *Federal Civil Procedure* § 738).

## 2.   Legislative immunity and legislative privilege

The Officials also urge this court to quash the subpoenas based on the doctrine of "legislative *immunity*,"[41] which grants state legislators "common law immunity

---

[41] *See* doc. no. 104 (Motion to Quash Subpoenas Directed to Speaker Hubbard, President *Pro Tempore* Marsh, and Former Governor Riley, and to Stay All Discovery Pending Resolution of the Defendants' Motions to Dismiss by Alabama House of Representatives Speaker Mike Hubbard, Alabama Senate President *Pro Tempore* Del Marsh, and the Bice Defendants), at 1-2; doc. no. 106 (Motion to Quash Subpoena by Former Governor Riley), at 1 (incorporating by reference the arguments in doc. no. 104); and doc. no. 127 (Motion to Quash Subpoena by Governor Bentley), at 2-3 (same) (emphasis supplied).

*from liability* for their legislative acts." *Scott v. Taylor*, 405 F.3d 1251, 1254 (11th Cir. 2005) (emphasis supplied).[42]  In order to effectuate its purpose of freeing state legislators from the "worries and distractions" of a lawsuit, legislative immunity applies regardless of the legislators' subjective motivations, regardless of whether the legislators are sued in their individual or official capacities, and regardless of whether the plaintiffs seek a retroactive or prospective form of relief.  *Id.* at 1256-57.

Of course, the Officials on whose behalf motions to quash the subpoenas have been filed are not, in fact, being *sued*.  Even when the doctrine of legislative immunity applies, state legislators still may be "required to supply evidence in a federal civil case where, like the instant case, there is no threat of personal liability."  *Doe v. Nebraska*, 788 F. Supp. 2d 975, 984 n.2 (D. Neb. 2011) (interpreting *Tenney v. Brandhove*, 341 U.S. 367 (1951)).  Specifically, they "may be protected from testifying, but are not necessarily exempted from producing documents."  *Id.* at 984 (citing *Small v. Hunt*, 152 F.R.D. 509, 513 (E.D. N.C. 1994); *Marylanders for Fair Representation, Inc. v. Schaefer*, 144 F.R.D. 292, 302 n. 20 (D. Md. 1992)).

Accordingly, the Officials supplement their discussion of legislative *immunity*

---

[42] Despite the implication of its name, the doctrine of "legislative immunity" protects members of the executive branch as well as the legislative branch.  *See Women's Emergency Network v. Bush*, 323 F.3d 937, 950 (11th Cir. 2003) (applying legislative immunity to the Governor of Florida).

with a discussion of a related doctrine called "legislative *privilege*,"[43] which applies to protect legislators from the compulsory production of "evidence or testimony about all 'acts that occur in the regular course of the legislative process.'" *Corporacion Insular de Seguros v. Garcia*, 709 F. Supp. 288, 292 (D. P.R. 1989) (quoting *U.S. v. Brewster*, 408 U.S. 501, 525 (1972)). The doctrine of "legislative privilege" is an emanation of the Speech or Debate Clause of the United States Constitution and, as such, it "exists to safeguard . . . legislative immunity and to further encourage the republican values it promotes." *Equal Employment Opportunity Commission v. Washington Suburban Sanitary Commission*, 631 F.3d 174, 181 (4th Cir. 2011) (citing *Burtnick v. McLean*, 76 F.3d 611, 613 (4th Cir. 1996)).

In spite of the importance of those interests, the legislative privilege is not absolute, and "may be overridden in circumstances where 'reason and experience' suggest that the claim of privilege should not be honored." *Rodriguez v. Pataki*, 280 F. Supp. 2d 89, 99-100 (S.D. N.Y. 2003) (citing Fed. R. Evid. 501; *Manzi v. DiCarlo*, 982 F. Supp. 125, 131 (E.D. N.Y. 1997)). Thus, courts must "'balance the various competing interests' to determine whether to apply the . . . legislative privilege to

---

[43] *See* doc. no. 104  (Motion to Quash Subpoenas Directed to Speaker Hubbard, President *Pro Tempore* Marsh, and Former Governor Riley, and to Stay All Discovery Pending Resolution of the Defendants' Motions to Dismiss by Alabama House of Representatives Speaker Mike Hubbard, Alabama Senate President *Pro Tempore* Del Marsh, and the Bice Defendants), at, *e.g.*, 8, 12 (emphasis supplied).

shield the legislature's documents from discovery." *Rodriguez*, 280 F. Supp. 2d at

99-100 (quoting *Manzi*, 982 F. Supp. at 131).  When doing so, "any confidential

privilege for legislators must be 'narrowly tailored.'"  *Manzi*, 982 F. Supp. at 130

(quoting *In re Grand Jury*, 821 F.2d 946, 959 (3d Cir. 1987)).

### 3.    Deliberative process privileges

The motions to quash also assert the so-called "deliberative process privilege,"[44]

which actually constitutes two related privileges: *i.e.*, the "*executive* deliberative

process privilege," a subcategory of the executive privilege; and the "*legislative*

deliberative process privilege," a subcategory of the legislative privilege.

### a.    Executive deliberative process privilege

The *executive* deliberative process privilege "rests on the obvious realization

that officials will not communicate candidly among themselves if each remark is a

potential item of discovery and front page news."  *Department of Interior v. Klamath

Water Users Protective Association*, 532 U.S. 1, 8-9 (2001) (citing *Environmental

Protection Agency v. Mink*, 410 U.S. 73, 86-87 (1973); *United States v. Weber

Aircraft Corp.*, 465 U.S. 792, 802 (1984)).  Thus, the privilege serves the purpose of

enhancing the quality of decisions by "protecting open and frank discussion among

---

[44] *See id.* at 1-2; doc. no. 106 (Motion to Quash Subpoena by Former Governor Riley), at 1 (incorporating by reference the arguments in doc. no. 104); and doc. no. 127 (Motion to Quash Subpoena by Governor Bentley), at 2-3 (same).

those who make them within the Government." *Id.* (citing *National Labor Relations Board v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975)).

The executive deliberative process privilege "covers documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Alabama v. Abbott Laboratories, Inc.*, No. 08-3429, 2009 U.S. Dist. LEXIS 20379, *5 (M.D. Ala. Mar. 13, 2009) (quoting *Klamath Water Users*, 532 U.S. at 8).  As a result,

> [t]wo requirements must be met for the deliberative process privilege to apply. *First, the material must be pre-decisional*, *i.e.*, "prepared in order to assist an agency decision maker in arriving at his decision." *Renegotiation Bd. v. Grumman Aircraft Engineering Corp.*, 421 U.S. 168, 184, 95 S. Ct. 1491, 44 L. Ed. 2d 57 (1975); *Nadler v. U.S. Dep't of Justice*, 955 F.2d 1479, 1490-91 (11th Cir. 1992) *abrogated on unrelated grounds, U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 170, 113 S. Ct. 2014, 124 L. Ed. 2d 84, (1993).  *Second, it must be deliberative*, "a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." *Nadler*, 955 F.2d at 1490-91.  Even factual material contained in a "deliberative" document may be withheld pursuant to the privilege where disclosure of the factual material would reveal the deliberative process or where the factual material is so inextricably intertwined with the deliberative material that meaningful segregation is not possible. *Id.*, at 1490.

*Abbott Laboratories*, 2009 U.S. Dist. LEXIS 20379 at *6-7 (alteration and emphasis supplied).

Nevertheless, the executive deliberative process privilege "is a qualified

privilege which may be overcome upon a showing that the adverse party's need for

disclosure outweighs the interest in confidentiality." *Rodriguez v. Pataki*, 280 F.

Supp. 2d 89, 98 (S.D. N.Y. 2003).  When weighing the interests protected by the

privilege against the adverse party's need for disclosure, the leading considerations

include the following five factors:

> (i) the relevance of the evidence sought to be protected; (ii) the
> availability of other evidence, *see, e.g., Carl Zeiss Stiftung v. V. E. B.
> Carl Zeiss, Jena*, 40 F.R.D. 318, 331 (D. D.C. 1966), *aff'd. on opinion
> below*, 128 U.S. App. D.C. 10, 384 F.2d 979, *cert. denied*, 389 U.S. 952,
> 88 S. Ct. 334, 19 L. Ed. 2d 361 (1967); (iii) the "seriousness" of the
> litigation and the issues involved, *see, e.g., Freeman v. Seligson*, 132
> U.S. App. D.C. 56, 60, 405 F.2d 1326, 1340 (D.C. Cir. 1968); (iv) the
> role of the government in the litigation, *see, e.g., Carl Zeiss Stiftung*, 40
> F.R.D. at 329; *Bank of Dearborn v. Saxon*, 244 F. Supp. 394, 401-03
> (E.D. Mich.1965), *aff'd.*, 377 F.2d 496 (6th Cir. 1967); and (v) the
> possibility of future timidity by government employees who will be
> forced to recognize that their secrets are violable.

*In re Franklin National Bank Securities Litigation*, 478 F. Supp. 577, 583 (E.D. N.Y.

1979).

### b.   **Legislative deliberative process privilege**

The "deliberative process privilege . . . is more typically asserted in cases which

challenge the decisions of administrative agencies."  *Rodriguez v. Pataki*, 280 F.

Supp. 2d 89, 97-98 (S.D. N.Y. 2003).  Even so, some courts have also extended that

privilege to protect the deliberative processes of local legislators.  *See, e.g., North*

33

*Pacifica, L.L.C. v. City of Pacifica*, 274 F. Supp. 2d 1118, 1121 (N.D. Cal. 2003).

When doing so, those courts have reasoned that the deliberative process privilege for

executive officials "provides a useful analogy for a confidentiality-based privilege for

state legislators because executive agencies, like state legislators, engage in a wide

variety of activities, including factual investigations for quasi-legislative rulemaking."

*In re Grand Jury*, 821 F.2d 946, 958-59 (3d Cir. 1987).

Thus, "in terms of the alleged need for secrecy surrounding deliberations, there

is no principled distinction" between state legislators and executive officials. *United

States v. Irvin*, 127 F.R.D. 169, 172 (C.D. Cal. 1989).  Like the *executive* deliberative

process privilege, the *legislative* deliberative process privilege protects "only

documents which are pre-decisional, deliberative and reflect the subjective intent of

the legislators."  *See Doe v. Nebraska*, 788 F. Supp. 2d 975, 985 (D. Neb. 2011)

(citing *Qamhiyah v. Iowa State University*, 245 F.R.D. 393, 396 (S.D. Iowa 2007)).[45]

However, it does not protect "documents containing factually based information used

---

[45] Even though the *Abbott Labs* test for the *executive* deliberative process privilege discussed in the previous section lists only the first two prongs of the *Doe* test for the *legislative* deliberative process privilege (*i.e.*, that documents are protected only if they are both pre-decisional and deliberative), it appears that the definition of "deliberative" from *Abbott Labs* incorporates the third prong of *Doe* (*i.e.,* that protected documents must reflect the subjective intent of legislators)*. Compare Abbott Labs*, 2009 U.S. Dist. LEXIS 20379, at *5 (describing a deliberative document as one that is "a direct part of the deliberative process in that it makes *recommendations* or expresses *opinions* on legal or policy matters") (emphasis supplied) (quoting *Nadler*, 955 F.2d at 1490-91) *with Doe*, 788 F. Supp. 2d at 985 (requiring protected documents to "reflect the *subjective* intent of the legislators") (emphasis supplied).

34

in the decision-making process or disseminated to legislators or committees, such as committee reports and minutes of meetings." *Doe*, 788 F. Supp. 2d at 984-85. Likewise, it does not protect documents "shared with non-legislative members." *Id.* at 987.

Further, and even though the purposes and applications of the executive and legislative deliberative process privileges are similar, there may be valid policy reasons for construing the legislative deliberative process privilege more narrowly. *See Rodriguez*, 280 F. Supp. 2d at 98; *Manzi v. Dicarlo*, 982 F. Supp. 125, 130 (E.D. N.Y. 1997); *Corporacion Insular de Seguros v. Garcia*, 709 F. Supp. 288, 298 (D. P.R. 1989). In *Corporacion Insular*, for example, the court reasoned that legislators

> are part of the governmental branch that historically has been subjected to the greatest degree of public accountability. There are too many potentially detrimental ramifications to applying a confidentiality-based privilege to a governmental body that should continually remain open to the legitimate scrutiny of its constituents. Legislators should be protected from overreaching and intimidation by other branches of government and possibly from abusive or disruptive public intrusion but we refuse to swaddle them in a cocoon of secrecy for acts that go to the core of our democratic processes.

*Id.* at 298. Moreover,

> the cases discussing both the legislative and deliberate process privileges make clear that these protections are only "qualified." Accordingly, either privilege may be overridden in circumstances where "reason and experience" suggest that the claim of privilege should not be honored. *See* Fed. R. Evid. 501; *Manzi v. DiCarlo*, 982 F. Supp. 125, 131 (E.D.

> N.Y. 1997) (indicating that the court needs to "balance the various competing interests" to determine whether to apply the deliberative process or state legislative privilege to shield the legislature's documents from discovery).

*Rodriguez*, 280 F. Supp. 2d at 99-100.

Thus, even when a certain legislative record or document appears to fall under the privilege, "protection from production is not a given." *Doe*, 788 F. Supp. 2d at 985. Instead, courts should balance four considerations: "(1) the relevance of the evidence; (2) the availability of other evidence; (3) the government's role in the litigation; and (4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions." *Id.* (citing *Qamhiyah*, 245 F.R.D. at 396; *FTC v. Warner Communications, Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984); *Rodriguez*, 280 F. Supp. 2d at 101).[46]

> ### c. The applicability of the deliberative process privileges when the governmental decision-making process is "*the* issue" in the litigation

Neither the executive nor the legislative deliberative process privilege is available when the governmental decision-making process is, itself, the subject of the

---

[46] Unlike the five-factor *Franklin* test for the *executive* deliberative process privilege discussed at the end of the previous section, the *Doe* test for the *legislative* deliberative process privilege does not list the factor of "the 'seriousness' of the litigation and the issues involved." *See Franklin*, 478 F. Supp. at 583. However, both tests are worded in non-exclusive terms. *See id.* (listing "*some of the factors* that assume significance") (emphasis supplied); *Qamhiyah*, 245 F.R.D. at 396 (noting that, "[u]sually[,] four factors weigh in the balance") (alterations supplied).

litigation, or when the purpose of the disclosure is to expose governmental malfeasance.  *See, e.g., In re Subpoena Duces Tecum Served on the Office of the Comptroller of the Currency*, 145 F.3d 1422, 1424 (D.C. Cir. 1998); *Texaco P.R., Inc. v. Department of Consumer Affairs*, 60 F.3d 867, 885 (1st Cir. 1995); *Rodriguez v. Pataki*, 280 F. Supp. 2d 89, 99 (S.D. N.Y. 2003); *Corporacion Insular de Seguros v. Garcia*, 709 F. Supp. 288, 292 (D. P.R. 1989); *Burka v. New York City Transit Authority*, 110 F.R.D. 660, 667 (S.D. N.Y. 1986).

> A number of courts have held that the deliberative process privilege does not apply in actions where the government's decision making is central to the plaintiff's case.  *E.g. In re Subpoena Duces Tecum Served on the Office of the Comptroller of the Currency*, 145 F.3d 1422, 1424-25, 330 U.S. App. D.C. 352 (D.C. Cir. 1998); *United States v. Lake County Bd. of Comm'rs*, 233 F.R.D. 523, 526 (N.D. Ind. 2005) (collecting cases).  As the Court of Appeals for the District of Columbia explained in *In re Subpoena*:

>> The privilege was fashioned in cases where the governmental decisionmaking process is collateral to the plaintiff's suit. *See, e.g., In re Subpoena Served Upon the Comptroller of the Currency*, 296 U.S. App. D.C. 263, 967 F.2d 630 (D.C. Cir. 1992) (shareholders sought Comptroller's bank examination reports to prove fraud charges against corporation); *Singer Sewing Machine Co. v. NLRB*, 329 F.2d 200 (4th Cir. 1964) (petitioner wanted deliberative materials to establish a defense to an unfair labor practice charge).  If the plaintiff's cause of action is directed at the government's intent, however, it makes no sense to permit the government to use the privilege as a shield.  For instance, it seems rather obvious to us that the privilege has no place in a Title VII action or in a

> constitutional claim for discrimination. The Supreme Court
> struggled in *Crawford-El* and *Webster* with governmental
> claims that discovery in such a proceeding should be
> limited, but no one in any of these cases ever had the
> temerity to suggest that the privilege applied.   The
> argument is absent in these cases because if either the
> Constitution or a statute makes the nature of governmental
> officials' deliberations *the* issue, the privilege is a
> *nonsequitur*. The central purpose of the privilege is to
> foster government decisionmaking by protecting it from the
> chill of potential disclosure. *See NLRB v. Sears, Roebuck
> & Co.*, 421 U.S. 132, 150, 44 L. Ed. 2d 29, 95 S. Ct. 1504
> (1975).

*In re Subpoena*, 145 F.3d at 1424-25.

*Thomas v. Cate*, 715 F. Supp. 2d 1012, 1020-21 (E.D. Cal. 2010) (emphasis in

original); *see also Rodriguez*, 280 F. Supp. 2d at 99 (relying on *In re Subpoena*, 145

F.3d at 1424, to grant voters' motions to compel their legislators to produce requested

documents).

Because plaintiffs, in order to support their claim for First Amendment

retaliation, must be able to explore any evidence indicating that defendants, acting

through (among others) the Officials, intended to punish plaintiffs for their political

speech, the governmental decision-making process in the drafting and enactment of

Act No. 761 is "*the* issue" in this action.

## II. DISCUSSION

Historically, courts have been cautious about the creation or extension of

privileges because they do not aid in the ascertainment of truth.  Those privileges that have been recognized by federal and state courts generally have been justified on the basis of protecting "interests or relationships which, rightly or wrongly, are regarded as of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice."  *Ex parte Rudder*, 507 So. 2d 411, 414 (Ala. 1987) (Shores, J.) (citing *McCormick on Evidence* § 72, at 171 (1984)).

It must always be remembered, however, that, "[w]hatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth."  *United States v. Nixon*, 418 U.S. 683, 710 (1974) (alteration supplied) (footnote omitted).[47] Indeed, in the case just cited — overriding a sitting President's claims of executive privilege and compelling him to comply with a subpoena seeking recordings of his conversations with aides and advisers — the Supreme Court affirmed that the "need to develop all relevant facts in the adversary system is both fundamental and comprehensive. . . .  The very integrity of the judicial system and public confidence

---

[47] *See also, e.g.*, *Greenpeace v. National Marine Fisheries Service*, 198 F.R.D. 540, 543 (W.D. Wash. 2000) ("Like all evidentiary privileges that derogate a court's inherent power to compel the production of relevant evidence, the deliberative process privilege is narrowly construed."); *Kaufman v. City of New York*, No. 98-2648, 1999 U.S. Dist. LEXIS 5779, at *11 (S.D. N.Y. Apr. 22, 1999) ("The [deliberative process] privilege, as it is in derogation of the search for truth, is not to be expansively construed.") (alteration supplied); *Pacific Gas & Electric Co. v. United States*, 70 Fed. Cl. 128, 133 (2006) (quoting *Greenpeace*, 198 F.R.D. at 543, and *Kaufman*, 1999 U.S. Dist. LEXIS 5779, at *11, with approval).

in the system depend on full disclosure of all the facts, within the framework of the rules of evidence." *Id*. at 709.[48]

Moreover, as the discussion in Part I(H) of this opinion demonstrates, none of the privileges relied upon as the basis for the motions to quash are absolute. Instead, each is qualified, and subject to a balancing of interests.

A. **The Minimum Requirements for Invoking Governmental Privileges**

At least four requirements must be satisfied in order to support a claim of privilege based upon the doctrines discussed in Part I(H) of this opinion, *supra*.

> [1] The head of the agency claiming the privilege must personally review the material,[49]  [2] there must be "a specific designation and description of the documents claimed to be privileged," and [3] there must be "precise and certain reasons for preserving" the confidentiality of the

---

[48] Even though the Court's opinion in *Nixon* addressed subpoenas that had been issued in aid of a criminal investigation, courts have regularly applied both its holding and rationale to civil cases in which government officials asserted the deliberative process privilege. *See, e.g., Kelly v. San Jose*, 114 F.R.D. 653, 659 (N.D. Cal. 1987) (quoting *Nixon*, 418 U.S. at 710, for the proposition that, "[s]ince privileges derogate the search for the truth they are supposed to be narrowly construed") (alteration supplied); *Resolution Trust Corp. v. Diamond*, 773 F. Supp. 597, 604 (S.D. N.Y. 1991) (quoting *Nixon*, 418 U.S. at 706, for the proposition that a "broad, undifferentiated . . . generalized interest in confidentiality is insufficient to assert the deliberative-process privilege") (internal quotation marks and citations omitted); *Pacific Gas & Electric Co. v. United States*, 70 Fed. Cl. 128, 141 (2006) (quoting *Nixon*, 418 U.S. at 706, for the proposition that a "broad, undifferentiated claim of public interest in the confidentiality of . . . conversations" is not enough to support the deliberative process privilege) (internal quotation marks and citations omitted).

[49] Of course, none of the Officials are heads of "agencies" in the strict sense of that term. Nevertheless, Governor Bentley, former Governor Riley, Senate President *Pro Tempore* Marsh, and Speaker Hubbard are likewise subject to the requirement of personally reviewing the material requested by plaintiffs' subpoenas before a privilege may be validly invoked. *See, e.g., K.L. v. Edgar*, 964 F. Supp. 1206, 1209 (N.D. Ill. 1997) (holding in the context of a motion to compel discovery from a governor and a mental health department that "the department head with control over the matter must make a formal claim of privilege, after personal consideration of the problem").

communications.  [4] Usually such claims must be raised by affidavit.

*United States v. O'Neill*, 619 F.2d 222, 226 (3d Cir. 1980) (alterations supplied) (quoting *A. O. Smith v. Federal Trade Commission*, 403 F. Supp. 1000, 1016 (D. Del. 1975) (other citations omitted)).[50]  As will be seen, the motions before this court do not comply with any of those requirements.

### 1.    Personal consideration by the relevant official

The first requirement was best stated by the Supreme Court in *United States v. Reynolds*, 345 U.S. 1 (1953), holding that:  "There must be a formal claim of privilege, lodged by the head of the department which has control over the matter,

---

[50] A recent decision of the Northern District of California in the case of *In re: McKesson*, 264 F.R.D. 595 (N.D. Cal. 2009), parsed the requirements as follows:

> In order to invoke the privilege, there are several requirements, none of which is met here.  For example, CDHCS [*i.e.*, the state agency supervising and operating California's medicaid program] should have provided *a declaration from an agency head* that includes the following information with respect to each document for which the deliberative process privilege is asserted: 1) specific facts demonstrating why each document is "deliberative" and "predecisional"; 2) specific facts concerning: a) the degree and type of harm that would result from requiring production of each document; and b) what type of protective order would be necessary to reduce that harm or, alternatively, why a protective order would not reduce this harm; and 3) what portions of each document are deliberative and, if specific sections are purely factual, why those sections cannot be produced.  Without this information, the Court cannot determine whether the documents at issue are deliberative or predecisional.  Nor can the Court adequately assess the harm that would result if production is ordered.  *See e.g.*, *L.H. v. Schwarzenegger*, [No. 06-2042,] 2008 WL 2073958, *7 (E.D. Cal. May 14, 2008) (finding waiver of deliberative process privilege where no declarations supporting privilege were filed).

*McKesson*, 264 F.R.D. at 602 (alteration and emphasis supplied).  None of the requirements have been satisfied in this case.

after actual personal consideration by that officer." *Id.* at 7-8 (footnote omitted).[51]

*See also*, *e.g.*, *L.H. v. Schwarzenegger*, No. 06-2042, 2008 U.S. Dist. LEXIS 86829, at *25 (E.D. Cal. May 14, 2008) (holding that a public official "cannot invoke a privilege without personally considering the material for which the privilege is sought"); *In re Nelson*, 131 F.R.D. 161, 164 (D. Neb. 1989) (holding that a privilege "exists only when raised by a formal claim of privilege, *lodged by the head of the department which has control over the matter*, after actual personal consideration by that officer") (emphasis in original); *Resident Advisory Board v. Rizzo*, 97 F.R.D. 749, 752 (E.D. Pa. 1983) (quoting *Reynolds*, 345 U.S. at 7-8, *supra*); *Pierson v. United States*, 428 F. Supp. 384, 395 (D. Del. 1977) ("Requiring the agency head to review the documents sought and to claim the privilege where appropriate is the most effective method available to assure consistency and prudence [in the invocation of the privilege].") (alteration supplied).

---

[51] The omitted footnote emphasized the importance of this requirement:

> The essential matter is that the decision to object should be taken by the minister who is the political head of the department, and that he should have seen and considered the contents of the documents and himself have formed the view that on grounds of public interest they ought not to be produced.

*United States v. Reynolds*, 345 U.S. at 8 n.20 (citation and internal quotation marks omitted).  Even though *Reynolds* addressed a claim of privilege for state and military secrets, "its prerequisites for formal invocation of the privilege have been uniformly applied irrespective of the particular kind of executive claim advanced."  *Carter v. Carlson*, 56 F.R.D. 9, 10 (D. D.C. 1972).  *See also*, *e.g.*, *United States v. O'Neill*, 619 F.2d 222, 226 (3d Cir. 1980) (same).

The Supreme Court's reference to "a formal claim of privilege" in *Reynolds*, *supra*, is a remark that calls attention to a corollary of the first requirement: *that is*, the claim of privilege cannot be invoked merely by attorneys acting on behalf of the governmental official. "Usually such claims must be raised by affidavit [of the responsible governmental official]." *O'Neill*, 619 F.2d at 226 (alteration supplied).

> The requirement that the privilege be invoked only by the head of the department after actual personal consideration has been promulgated to insure that the privilege remains a narrow privilege which is not indiscriminately invoked. As stated in *Coastal Corp. v. Duncan*, 86 F.R.D. 514 (D. Del. 1980):
>
>> Requiring the agency head to claim the privilege assures the Court, which must make the ultimate decision, that executive privilege has not been lightly invoked by the agency, *United States v. Reynolds*, *supra*, and that in the considered judgment of the individual with an overall responsibility for the administration of the agency, the documents withheld are indeed thought to be privileged.
>
> *Id*. at 518. *Thus, the courts have not permitted staff attorneys, especially those who are participating in the pending litigation, to assert the privilege on behalf of the agency. Exxon Corp. [v. Department of Energy]*, 91 F.R.D. [26,] 43-44 [(N.D. Tex. 1981)]; *see also*, *Pierson v. United States*, 428 F. Supp. 384, 395 (D. Del. 1977).

*In re Nelson*, 131 F.R.D. 161, 164 (D. Neb. 1989) (emphasis and alterations supplied).

*See also*, *e.g.*, *O'Neill*, 619 F.2d at 225 (holding the invocation of a privilege by a municipality to be improper because, among other deficiencies, "it was not invoked by the department head, but by the attorney for the City"); *United States v. Burr*, 25

43

F. Cas. 187, 192 (C.C. Va. 1807) (Marshall, C.J., sitting on Circuit) ("The propriety of withholding [the allegedly privileged letter] must be decided by [the President] himself, not by another for him.") (alteration supplied).[52]

No case reviewed by this court has held that the assertion of a privilege by only an attorney for the governmental official was adequate.  *See*, *e.g.*, *In re Nelson*, 131 F.R.D. at 165 ("An assertion of the 'deliberative process privilege' by defense counsel is wholly inadequate for the proper invocation of that privilege."); *Rizzo*, 97 F.R.D. at 752 (observing that, "in no case has assertion [of a privilege] by the litigation attorney for the government been held adequate") (alteration supplied); *United States v. American Telephone & Telegraph*, 86 F.R.D. 603, 605 (D. D.C. 1979) ("All the cases sustaining government privilege appear to require an assertion of the claim by some responsible officer other than the Government's attorneys.").

The initial motion to quash plaintiffs' subpoenas was filed by the Alabama Attorney General on behalf of former Governor Riley, Senate President *Pro Tempore* Marsh, and Speaker Hubbard.[53]  Notably, however, the motion was not accompanied

---

[52] For a discussion of Aaron Burr's attempts to obtain a copy of a letter from General James Wilkinson (one of the principals who accused Burr of treason) to President Thomas Jefferson, see Paul A. Freund, *The Supreme Court, 1973 Term—Foreword:  On Presidential Privilege*, 88 HARV. L. REV. 13, 22-31 (1974), and *In re Sealed Case*, 116 F.3d 550, 559 (D.C. Cir. 1997).

[53] *See* doc. no. 104 (Motion to Quash Subpoenas Directed to Speaker Hubbard, President *Pro Tempore* Marsh, and Former Governor Riley, and to Stay All Discovery Pending Resolution of the Defendants' Motions to Dismiss by Alabama House of Representatives Speaker Mike Hubbard, Alabama Senate President *Pro Tempore* Del Marsh, and the Bice Defendants), signed by Assistant Attorney General Joshual K. Payne.

by affidavits executed by any of those officials, and indicating that any of them had personally "seen and considered the contents of the documents [sought by plaintiffs' subpoenas] and . . . formed the view that on grounds of public interest they ought not to be produced." *Reynolds*, 345 U.S. at 8 n.20 (alterations supplied).[54]

A separate motion to quash the subpoena issued to former Governor Riley was later filed by a member of the Birmingham law firm Bradley Arant Boult Cummings LLP.[55]   Again, however, the motion did not include an affidavit executed by Mr. Riley, indicating that he had personally seen and considered the contents of the documents sought by plaintiffs' subpoena, and personally concluded that, on grounds of public policy, they ought not to be produced.

---

Various Assistant Alabama Attorneys General previously had appeared on behalf of several of the named defendants. *See* doc. no. 22 (Notice of Appearance by Assistant Alabama Attorneys General James W. Davis, Margaret L. Fleming, and William G. Parker Jr. on behalf of defendants, Dr. Joseph B. Morton, State Superintendent of Education; Dr. Freida Hill, Chancellor of Postsecondary Education; and Robert T. Treese III, District Attorney of Lee County); doc. no. 83 (Notice of Appearance by Assistant Alabama Attorney General Joshua K. Payne as additional counsel for defendants Dr. Thomas R. Bice, State Superintendent of Education; Susan Price, Interim Chancellor of Postsecondary Education; and Robert T. Treese III, District Attorney of Lee County); doc. no. 101 (Notice of Appearance by Assistant Alabama Attorney General James W. Davis as counsel of record for non-parties Mike Hubbard, Speaker of the Alabama House of Representatives, and Del Marsh, President *Pro Tempore* of the Alabama Senate); doc. no. 102 (Notice of Appearance by Assistant Alabama Attorney General William G. Parker Jr. as additional counsel of record for non-parties Mike Hubbard, Speaker of the Alabama House of Representatives, and Del Marsh, President *Pro Tempore* of the Alabama Senate); and doc. no. 103 (Notice of Appearance by Assistant Alabama Attorney General Joshua K. Payne as additional counsel of record for non-parties Mike Hubbard, Speaker of the Alabama House of Representatives, and Del Marsh, President *Pro Tempore* of the Alabama Senate).

[54] *See supra* note 51 and accompanying text.

[55] *See* doc. no. 106 (Motion to Quash Subpoena by former Governor Riley).

45

A separate motion to quash the subpoena issued to Governor Bentley was also filed by attorneys affiliated with the Birmingham law firm Wallace Jordan Ratliff & Brandt LLC, and the Montgomery firm Ryals, Plummer, Donaldson, Agricola & Smith, P.C.[56]  Yet again, the motion was not accompanied by an affidavit executed by Governor Bentley, indicating that he had seen and considered the contents of the documents sought by plaintiffs' subpoenas, and concluded that, on grounds of public policy, they ought not to be produced.

All cases hold that such omissions render the attempted invocation of privileges wholly inadequate.  *See*, *e.g.*, *O'Neill*, 619 F.2d at 225 (holding "unsatisfactory" the omission of an affidavit indicating that "the privilege was being invoked by the responsible public official on the representation that he had personally examined the documents and determined nondisclosure was required"); *id*. at 226 (observing that "there was no indication here that the department heads made the type of personal careful examination which must precede invocation of the privilege"); *Rizzo*, 97 F.R.D. at 752 (holding an attempted invocation of privilege to be invalid because "there is no indication in the record that these officials personally reviewed the evidentiary material in question and made a determination that the public interest, as opposed to the government's interest in this litigation, would best be served by

---

[56] *See* doc. no. 127 (Motion to Quash Subpoena by Governor Bentley).

nondisclosure").

## 2.    A specific description of the documents claimed to be privileged

The second requirement for invoking any of the privileges at issue is "a specific designation and description of the documents claimed to be privileged, of sufficient detail to allow a reasoned determination as to the legitimacy of the claimed privilege." *In re Nelson*, 131 F.R.D. at 165 (citations omitted). *See also*, *e.g*, *O'Neill*, 619 F.2d at 225 (holding a municipality's invocation of a privilege to be improper because, among other deficiencies, "it was a broadside invocation of privilege which failed to designate with particularity the specific documents to which the claim of privilege applied"); *Rizzo*, 97 F.R.D. at 753 ("Specificity of description is necessary to enable the Court to comply with its duty of insuring that the privilege is invoked as narrowly as possible consistent with its objectives."); *Black v. Sheraton Corp. of America*, 371 F. Supp 97, 101 (D. D.C. 1974) (Ritchey, J.) ("A formal and proper claim of executive privilege requires a specific designation and description of the documents within its scope as well as precise and certain reasons for preserving their confidentiality.") (citing *United States v. Article of Drug*, 43 F.R.D. 181, 190 (D. Del. 1967); *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 327 (D. D.C. 1966)).

"The 'precise and certain reasons' requirement is well established in the case law." *Resolution Trust Corp. v. Diamond*, 773 F. Supp. 597, 604 (S.D. N.Y. 1991)

(citing *O'Neill*, 619 F.2d at 225-26; *Mary Imogene Bassett Hospital v. Sullivan*, 136

F.R.D. 42, 44 (N.D. N.Y. 1991); *Mobil Oil Corp. v. Department of Energy*, 102

F.R.D. 1, 5-6 (N.D. N.Y. 1983); *Rizzo*, 97 F.R.D. at 752; *Coastal Corp. v. Duncan*,

86 F.R.D. 514, 519, 522 (D. Del. 1980); *Black*, 371 F. Supp. at 101).[57]

This case-law requirement was incorporated into Federal Rule of Civil

Procedure 45, expressly commanding that privilege claims be stated with clarity and

specificity:

> A person withholding subpoenaed information under a claim that
> it is privileged or subject to protection as trial-preparation material *must*:
>
> (i)     expressly make the claim; and
>
> (ii)    describe the nature of the withheld documents, communi-
>         cations, or tangible things in a manner that, without
>         revealing information itself privileged or protected, will
>         enable the parties to assess the claim.

Fed. R. Civ. P. 45(d)(2) (emphasis supplied).[58] As emphasized by the italicized word

---

[57] Other decisions to the same effect as those cited in the text include *Mobil Oil Corp. v. Department of Energy*, 520 F. Supp. 414, 416 (N.D. N.Y. 1981), and *A. O. Smith v. Federal Trade Commission*, 403 F. Supp. 1000, 1016 (D. Del. 1975).

[58] *See also* Fed. R. Civ. P. 26(b)(5)(A), which addresses the proper method for failing to produce materials that would otherwise be discoverable under Rule 26, but which the withholding party contends are subject to a privilege.  Specifically:

> When a party withholds information otherwise discoverable by claiming that
> the information is privileged . . . material, the party must:
>
> (i)     expressly make the claim; and
>
> (ii)    describe the nature of the documents, communications, or tangible things not

"must," the requirements of that rule are mandatory, not precatory.[59]  The Advisory

Committee's Notes are consistent with the cases discussed above, and make clear that

"[t]he person claiming a privilege or protection cannot decide the limits of that party's

own entitlement."  Fed. R. Civ. P. 45 advisory committee's note (1991 amends.)

(alteration supplied).  Instead, the purpose of Rule 45(d)(2) "is to provide a party

whose discovery is constrained by a claim of privilege or work product protection

with information sufficient to evaluate such a claim and to resist if it seems

unjustified."  *Id.*

Thus, broad, undifferentiated claims of privilege, such as those lodged in the

motions before this court, provide sufficient reason to deny them.  *See*, *e.g.*, *O'Neill*,

619 F.2d at 227 ("The indiscriminate claim of privilege may in itself be sufficient

reason to deny it"); *Resolution Trust Corp. v. Diamond*, 773 F. Supp. 597, 603 (S.D.

N.Y. 1991) (holding that a "blanket" approach of "asserting the privilege for all

predecisional, deliberative documents, is unacceptably inflexible. . . . The deliberative

process privilege presupposes a review to determine, document by document, whether

---

produced or disclosed — and do so in a manner that, without revealing
information itself privileged or protected, will enable other parties to assess
the claim.

Fed. R. Civ. P. 26(b)(5)(A).

[59] *See*, *e.g.*, Bryan A. Garner, *Garner's Dictionary of Legal Usage* 953 (3d ed. 2011)
(defining "must" as meaning "is required to").

the assertion of the privilege is justified in each instance.") (citations omitted); *In re Nelson*, 131 F.R.D. at 165 (holding that parties asserting a privilege must provide "a specific designation and description of the documents claimed to be privileged") (citations omitted).

### 3.    Precise reasons for preserving confidentiality

The third requirement, closely related to the second, "is a demonstration, usually by affidavit of the responsible agency official, of precise and certain reasons for preserving the confidentiality of the governmental communication." *Rizzo*, 97 F.R.D. at 753.  *See also*, *e.g.*, *In re Sealed Case*, 856 F.2d 268, 271 (D.C. Cir. 1988) (holding that "the information for which the privilege is claimed must be specified, with an explanation of why it properly falls within the scope of the privilege"); *A. O. Smith*, 403 F. Supp. at 1016 (holding that the requirement for the agency head to state "precise and certain reasons for preserving" the confidentiality of the communications sought "is necessary in order [for] a court [to] be able to make a knowledgable decision as to whether any document or portion thereof actually contains advisory or deliberative materials.  Any attempts to invoke executive privilege in the absence of this specific factual showing are actually attempts to interfere with the proper functioning of the judicial branch of our government by appropriating the means of [making] this decision to the executive branch.") (alterations supplied); *In re Nelson*,

131 F.R.D. at 165 (holding that "there must be a specification of precise and certain reasons for the need to preserve the confidentiality of the documents at issue") (citing *Mobil Oil Corp.*, 102 F.R.D. at 6 (same)); *Coastal Corp.*, 86 F.R.D. at 517-19 (observing that the governmental entity "failed to proffer 'precise and certain' reasons for preserving the confidentiality of the requested documents"); *Exxon Corp. v. Department of Energy*, 91 F.R.D. 26, 44 (N.D. Tex. 1981) (holding that the agency must articulate "precise reasons why the public interest would be affected adversely by disclosure").

No such demonstration has been made in the present case.  Indeed, no justification for withholding the documents sought by plaintiffs' subpoenas has been advanced at all, other than the bare assertion that one or more of the privileges discussed in Part I(H) of this opinion, *supra*, applies.  Such broad, undifferentiated claims deprive this court of the ability to determine whether the plaintiffs' need for the documents and communications sought by the subject subpoenas "outweighs the harm that would result from their disclosure."  *McKesson*, 264 F.R.D. at 602.

**B**.   **Conclusions**

Numerous cases have held that improperly asserted claims of privilege are no claims of privilege at all.  *See, e.g.*, *Coastal Corp.*, 86 F.R.D. at 522-23; *A. O. Smith*, 403 F. Supp. at 1017; *Black*, 371 F. Supp. at 101.

In addition, when, as here, privileges are asserted in vague, nonspecific terms, untethered from the requirements discussed above, the privileges are deemed to have been waived. *See Nelson*, 131 F.R.D. at 165 (ordering a governmental agency to disclose requested documents because "conclusional assertions as to its right to protect the documents at issue on the basis of privilege are wholly inadequate not only to invoke the privilege but also to demonstrate that they are properly within its coverage"); *L.H.*, 2008 U.S. Dist. LEXIS 86829, at *27 (ordering the Governor of California and other state officials to disclose requested documents because "defendants have presented no declarations whatsoever to support their claim of deliberative process privilege or official information privilege"); *McKesson*, 264 F.R.D. at 602 (ordering the California agency responsible for overseeing and operating the state's medicaid program to disclose requested documents because it cited "no authority for the proposition that a state agency can avoid its initial burden to satisfy the requirements for invoking the deliberative process privilege simply by arguing financial burden").[60]

## III. ORDERS

---

[60] *See* doc. no. 105 (AEA Plaintiffs' Response to Motion to Quash Subpoenas to Hubbard, Marsh, and Riley etc.), at 7 (arguing that "the Court should deny the motion to quash because of the failure of the Officials to comply with Rule 45(d)(2), FRCivP"); and doc. no. 129 (AEA Plaintiffs' Response to Alabama Governor Robert Bentley's Motion to Quash Subpoena), at 8 (arguing that the motion to quash is due to be denied "*because of the waiver of the claimed privilege* by Governor Bentley's predecessor, Governor Riley," *and*, "*in the alternative* . . . because of Governor Bentley's failure to comply with Rule 45(d)(2), FRCivP") (emphasis supplied).

For all of the foregoing reasons, it is **ORDERED** that the motions to quash be, and the same hereby are, **DENIED**.  It is further **ORDERED** that Alabama Governor Robert J. Bentley, M.D., former Alabama Governor Robert R. ("Bob") Riley, Alabama Senate President *Pro Tempore* Del Marsh, and Speaker of the Alabama House of Representatives Mike Hubbard, separately and severally, provide full and complete responses to the subpoenas *duces tecum* served upon each of them on or before Friday, February 1, 2013.

**DONE** and **ORDERED** this 3rd day of January, 2013.

United States District Judge